UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE No. 00-6035-CIV-MOORE

KIMBERLY JONES HUBBARD, on behalf
of herself and all others
similarly situated,

     Plaintiff,

v.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

     Defendant.

_____

## MOTION TO DISMISS CLASS ALLEGATIONS
## OR FOR ENTRY OF SCHEDULING ORDER
## AND MEMORANDUM OF LAW

Defendant Government Employees Insurance Company ("GEICO") hereby

moves, through undersigned counsel, for an order dismissing Plaintiff's class allegations

in her First Amended Class Action Complaint or, in the alternative, entering a scheduling

order. As grounds for this motion, GEICO states as follows:

1.  This proposed class action lawsuit attacks the quality of thousands of different types
    of aftermarket car and truck parts.

2.  Plaintiff filed her original Class Action Complaint on or about November 24, 1999
    and her First Amended Class Action Complaint on or about March 15, 2000. Local
    Rule 23.1(3) requires that plaintiffs purporting to represent a class move for class
    determination within 90 days after filing the complaint, unless this time is extended
    upon motion for good cause. Plaintiff has failed to move for class determination for



over 15 months.  Accordingly, GEICO moves to dismiss the class allegations of the First Amended Class Action Complaint.

3. In the alternative, if the Court does not dismiss Plaintiff's class allegations, GEICO moves for entry of a scheduling order that would govern the discovery and briefing of the class certification issue and that would provide that trial be set after resolution of that issue.

WHEREFORE, GEICO requests the following relief:

1.    Entry of an Order dismissing the class allegations contained in the First Amended Class Action Complaint; or, in the alternative,

2.    Entry of an Order adopting the attached proposed schedule.

Respectfully submitted,

Frank A. Zacherl
Florida Bar No. 868094
**BURD LOZANO & ZACHERL, LLP**
601 Brickell Key Drive, Suite 500
P.O. Box 01-9110
Miami, Florida 33131
Telephone: (305) 374-3100
Fax: (305) 374-3161

David P. Gersch, *pro hac vice*
Anne M. Package, *pro hac vice*
Garrett M. Heenan
**ARNOLD & PORTER**
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5000

*Counsel for Defendants Government Employees Insurance Company, GEICO General Insurance Company and GEICO Indemnity Company*

Dated: March 12, 2001

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE No. 00-6035-CIV-MOORE

KIMBERLY JONES HUBBARD, on behalf
of herself and all others
similarly situated,

      Plaintiff,

v.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

      Defendant.

_____

### MEMORANDUM IN SUPPORT OF
### MOTION TO DISMISS CLASS ALLEGATIONS
### OR FOR ENTRY OF SCHEDULING ORDER

      This lawsuit attacks the quality of thousands of different types of "aftermarket"

car and truck parts. These parts are used by GEICO to estimate the cost of repairing their

insureds' vehicles. They are quality parts guaranteed by GEICO for as long as the

insured owns the car. The use of aftermarket parts is expressly permitted by the laws of

Florida, *see* Fla. Stat. § 501.31 (1997) (Aftermarket Crash Parts Act) and many other

states. And, their use is endorsed by well known consumer and safety groups such as

Public Citizen and the Center for Auto Safety. *See* "Consumer Groups Ask Illinois

Supreme Court to Expedite Automobile Crash Parts Case: Illinois Ruling Will Create

Monopoly, Lead to Higher Auto Insurance Rates, Groups Say," at

www.citizen.org/press/pr-crashparts1.htm (attached as Exhibit 1).

3

The Complaint was filed on November 24, 1999. This Court's rules *required* plaintiff Hubbard to move for certification within 90 days unless that time was extended by the Court. *See* S.D. Fla. Local Rule 23.1(3). Fifteen months after filing her initial Complaint, Hubbard still has filed no motion for class certification. Nor has the Court extended the time for filing such a motion.[1]

The case currently has an August 23, 2001 discovery cut-off and an October 22, 2001 trial date. *See* Order Setting Pretrial Conference and Trial Date (Aug. 1, 2000).

It would be fundamentally unfair for GEICO to have to take the burdensome and expensive discovery required to prepare for a nationwide class action trial simply because Hubbard has not timely moved for class certification as required by the rule. A class action would involve sweeping factual and legal issues. Resolution of Hubbard's individual case, however, would involve a far narrower scope.

To illustrate, plaintiff alleges that GEICO breached its policy with her by estimating the cost to repair her 1992 Honda Accord LX based on the cost of an aftermarket rear combination light and aftermarket rear bumper reinforcement bar. The Complaint alleges that all aftermarket parts are "inferior" to original equipment manufacturer ("OEM") parts – in this case parts made by Honda – and that as a result, GEICO did not pay her a sum sufficient to restore her car to its "pre-loss condition." *See* First Amended Class Action Complaint ("Am. Compl.") ¶ 8. Hubbard's individual case thus involves two parts for a single car and is governed by the laws of a single state – Florida.

---

[1]  Hubbard may take the position that the 90 days runs from the amended complaint filed on March 15, 2000; however, even then her motion is almost a year over due.

In contrast, were a class certified, the suit would challenge tens of thousands of different kinds of parts, made by different manufacturers, at different times, out of different materials, for different makes and models of vehicles. For example, a plastic rear combination lamp for a 1992 Honda Accord made in 1999 is very different from a sheet metal hood made in 1995 for a 1993 Ford Escort. A nationwide class action would involve assessing the "pre-loss condition" of at least hundreds of thousands of different cars and trucks. It would also implicate the laws of at least 48 states. The work necessary to prepare for such a case is manifestly of a different order of magnitude than what is necessary for Hubbard's individual case.

Because Hubbard has not moved within the 90-day period or obtained an extension, class certification should be denied. This is required in order that the Rule not be rendered devoid of meaning.

Plaintiff's reluctance to move for class certification may stem from the recent trend of decisions denying class certification in virtually identical cases. *See Thames v. United Servs. Auto Ass'n*, No. 98-01324 CA DIV. CV-B (Fla. Cir. Ct. June 9, 2000) (attached as Exhibit 2); *Rios v. Allstate Ins. Co.*, No. 94 CH 11396 (Ill. Cir. Ct. Jan. 27, 1998) (attached as Exhibit 3); *Schwendeman v. USAA Cas. Ins. Co.*, No. 99-2-06505-1SEA (Wash. Sup. Ct. Oct. 20, 2000) (attached as Exhibit 4); *Murray v. State Farm Mut. Auto. Ins. Co.*, No. 96-2585-M1/A (W.D. Tenn. Aug. 19, 1997) (attached as Exhibit 5). These courts have rejected class certification because, among other things, there are simply too many different cars and different parts involved for common issues to predominate or for a class trial to be manageable. *Id.* But the weakness of plaintiff's class claims cannot justify her failure timely to move. Continuing delay in resolving the

5

class issue would be unduly prejudicial to GEICO, which is entitled to know the type and scope of the case it is defending in order to prepare its defense and pursue discovery.

Accordingly, the Court should either (1) dismiss plaintiff's class action claims for failure timely to seek certification, or (2) in the alternative, set a schedule for the orderly resolution of class certification, including an opportunity for GEICO to have discovery of any expert or other testimony and exhibits that plaintiff would propose to offer in support of her motion for class certification.

## BACKGROUND

This lawsuit alleges that GEICO breached its policy with its insureds by estimating the cost of repairing their vehicles by using what are commonly referred to as "aftermarket" parts – parts not made by the OEMs such as General Motors, Daimler-Chrysler or Nissan. *See* Am. Compl. ¶ 8. According to the Complaint, it is a breach of the policy language to use such parts because allegedly every single one of tens of thousands of different types of parts – without exception – is not of "like kind and quality" to the corresponding OEM parts that were on the insureds vehicles before the loss. *See* Am. Compl. ¶ 12.

Hubbard is wrong. There are many high quality aftermarket crash parts. When an aftermarket part is put on a GEICO insured's car pursuant to a GEICO estimate, it is guaranteed by GEICO for as long as its insured owns the vehicle. As indicated, *supra,* use of such parts is approved by state laws and sanctioned by consumer and safety groups.

Moreover, in blind fit tests at collision repair industry meetings, aftermarket parts have been judged to fit comparably to OEM parts, and in some cases better. For

6

example, in recent fit tests conducted in Orlando, Florida on a Ford F150 Pickup, and in

Nashville, Tennessee on a Honda Civic, the aftermarket parts scored higher when

compared to both the original parts and the OEM service parts.[2]  *See CIC Parts*

*Demonstration: Orlando Meeting, at* http://www.ciclink.com (Dec. 2000) (attached as

Exhibit 6); *CIC Parts Demonstration: Nashville Meeting, at* http://www.ciclink.com

(Sept. 2000) (attached as Exhibit 7).  Likewise, in 1999, the aftermarket sheet metal parts

installed on a 1996 Ford Winstar Minivan were rated higher overall than OEM service

parts.  *See CIC Parts Demonstration: Palm Springs Meeting, at* http://www.ciclink.com

(Jan. 1999) (attached as Exhibit 8).

   The proposed class would cover tens of thousands of different parts.  According

to plaintiff's interrogatory answers, the class covers:

> Fenders, hoods, front covers, door shell, quarter panels,
> bumper covers, bumpers and components, grills,
> headlights, tail lights, turn lights, fog lights, doors, trunk
> lids, fascias, rear covers, head panel, wheel house, radiator
> support, tie bars, front air dam, valance, nose panel,
> deflector, tailgate, rebars, bumper reinforcements, lamps
> and assemblies, roofs, front section, and rear section.

Pl's Ans. to Def. Interrog. No. 1 (attached as Exhibit 9).  These types of parts vary

depending on:

- the make of the vehicle (for example, Fords are different than Hondas);

- the year of the vehicle (for example, the body parts on a 1992 Ford Escort are
  different than those on a 1999 Ford Escort);

- the type of part (for example, hoods are different from fenders);

---

[2] "Service parts" refers to OEM parts made to be sold as replacement parts, as opposed to
those that came on the car when new.

- the materials used for the part (there are different kinds of metals and different kinds of plastics); and

- the manufacturer of the part (for example, at least six different manufacturers make aftermarket replacement hoods for the 1997 Toyota Camry).

In short, the parts proposed to be part of the class have little in common.

In addition to the great factual diversity among the purported class members, there is the question of how a nationwide class involving the separate laws of over 48 states could be certified as a class action. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 609-10 (1997); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). Here, however, we are not even at that point, as plaintiff has failed even to request class certification.

Finally, GEICO is aware of the proposed settlement before this Court in the consolidated matter of *Ascar v. Colonial Penn Ins. Co.*, No. 99-7474-MOORE, *Aharonoff v. Colonial Penn Ins. Co.*, No. 99-7434-CIV-MOORE. Because it is a settlement, however, the class issue is no longer contested in the *Colonial Penn* cases. Indeed, now that they have settled their differences, it is in both sides' interest to have a class certified. That is not the case here and, as set forth below, this is not a proper case for certification of a class.

## ARGUMENT

## I.  HUBBARD'S CLASS ACTION ALLEGATIONS SHOULD BE DISMISSED

Local Rule 23.1(3) expressly requires that "[w]ithin 90 days after the filing of a complaint in a class action, unless this period is extended on motion for good cause appearing, the plaintiff *shall* move for a determination under subdivision (c)(1) of Rule

8

23, Fed.R.Civ.P., as to whether the case is to be maintained as a class action." S.D. Fla. Local Rule 23.1(3) (1996) (emphasis added).[3]

Fifteen months after filing the Complaint no such motion has been made and the Court has not extended plaintiff's time to file such a motion. Under the express terms of the Rule, class certification should be denied. *See Williams v. Southern Bell Tel. & Tel. Co.*, 464 F. Supp. 367, 368 (S.D. Fla. 1979) (striking class action allegations from the complaint for failure to timely move for class certification); *Walton v. Eaton Corp.*, 563 F.2d 66, 74-75 (3d Cir. 1977) (affirming denial of motion for class certification where plaintiff failed to comply with local rule requiring motion within 90 days).[4]

To be sure, in the Report of Scheduling Meeting filed with the Court on July 20, 2000, the parties proposed that plaintiff move for class certification by not later than November 30, 2000. However, the Court did not adopt this proposal. In any event, November 30, 2000 is long past.

---

[3] Local Rule 23.1(3) is intended to assist the Court in meeting its obligations under Federal Rule of Civil Procedure 23(c) which requires that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Fed. R. Civ. P. 23(c) (1998) (emphasis added).

[4] *See also Hall v. Burger King Corp.*, Civ. A. No. 89-0260-CIV, 1992 WL 372354 (S.D. Fla., Oct. 26, 1992) (denying plaintiff's motion for class certification as untimely and on other grounds) (attached as Exhibit 10); *Saunders v. BellSouth Advertising and Pub. Corp.*, No. 98-1885-CIV, 1998 WL 1051961, at *1 n.1, 12 Fla. L. Weekly Fed. D. 92 (S.D. Fla., Nov. 10, 1998) (granting defendant's motion to dismiss class action and rejecting plaintiff's argument that defense motion was procedurally improper, noting that plaintiffs failed to move for class certification or for an extension of time within 90 days) (attached as Exhibit 11); *Strozier v. Gen. Motors Corp.*, No. C75-49A, 1976 WL 13328 (N.D. Ga., Mar. 24, 1976) (granting motion to dismiss class action aspects of complaint for failure to timely move for class certification) (attached as Exhibit 12).

Hubbard's failure timely to move for class certification threatens to prejudice GEICO. Under the Court's Order of August 1, 2000, discovery is scheduled to conclude on August 22, 2001 and trial is scheduled for October 23, 2001. Under these time constraints, GEICO is forced to raise the issue because plaintiff has failed to act.

If GEICO were required to prepare for a class action trial of the scope proposed by plaintiffs, it would self evidently involve substantial expense and burden. To impose such an unfair burden on GEICO <u>absent</u> any class determination simply because someday a class might be certified would be extraordinarily prejudicial. As the *Manual for Complex Litigation* points out:

> Whether a class is certified and how its membership is defined can often have a decisive effect not only on the outcome of the litigation but also on its management. It determines the stakes, the structure of trial and methods of proof, the scope and timing of discovery and motion practice, and the length and cost of the litigation.

*Manual for Complex Litigation (Third)* § 30.1 Certification (1995).

The prejudice of requiring GEICO to prepare for such a trial is heightened because there is no proper basis for certifying a class in this case. Certification would be improper for a number of reasons and GEICO is *not* now briefing the merits of this issue because plaintiff Hubbard has failed to move at all.

That said, certain obstacles to class certification are facially apparent. ***First***, this case challenges the quality not of a single part or of even a discrete set of parts but rather of many thousands of disparate parts. The courts routinely reject certification in cases such as these involving multiple disparate parts or products because they fail to meet the commonality requirement of Rule 23(a) and/or the predominance and manageability

requirements of Rule 23(b). In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), the United States Supreme Court found predominance was lacking in a class exposed to asbestos because, *inter alia*, the class was "'exposed to different asbestos-containing products, in different ways . . . for different amounts of time.'" *Id.* at 624 (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996)).

The Eleventh Circuit reversed class certification where the contours of different "900-number programs implicated in [the suit] [could] not be lumped together and condemned or absolved en masse." *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1024 (11th Cir. 1996). Similarly, the Sixth Circuit reversed class certification on a writ of mandamus where the putative class alleged defects in approximately ten different models of a medical implant. *See In re American Med. Sys., Inc.*, 75 F.3d 1069 (6th Cir. 1996). Because the plaintiffs' claims would differ "depending upon the model and the year," the court held that common issues did not predominate. *Id.* at 1081.

The federal courts also have increasingly refused to certify classes alleging defects where different automobile models are at issue. In the leading case of *Walsh v. Ford Motor Co.*, 807 F.2d 1000 (D.C. Cir. 1986), *cert. denied*, 482 U.S. 915 (1987), co-authored by then Judge, now United States Supreme Court Justice, Ginsburg, the court vacated certification of a class claiming that 20 different Ford vehicles had defective transmissions that slipped from "park" to "reverse." *Id.* at 1002. Justice Ginsburg ruled that because the trial court failed to "estimate how varied...the transmission design proof would likely be," predominance was not satisfied." *Id.* at 1018.

Other recent cases follow suit. *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (E.D. Pa. 2000), refused to certify a class alleging Chrysler paint defects that

encompassed eight model years, different vehicle makes, manufacturing plants and paints supplied by two different companies. *See id.* at 450. Individual issues predominated because vehicle-by-vehicle examinations were necessary to determine whether each vehicle's paint was in fact defective and whether other factors, like the vehicle's age or maintenance, contributed to the defect. *See id.* at 451-52, 454. Another paint case, *In re Ford Motor Co. Vehicle Paint Litigation*, 182 F.R.D. 214 (E.D. La. 1998), held common issues did not predominate where the alleged paint defect "involved different models of vehicles, made of different materials, painted a variety of colors at different plants, using different paint formulae." *Id.* at 220.

      *In re Ford Motor Co. Ignition Switch Product Liability Litigation*, 174 F.R.D. 332 (D.N.J. 1997), similarly refused to certify a class alleging defective Ford ignition switches. The court explained that "[t]he general similarity between the switches does not necessarily mean, for example, that if the switch in the typical 1990 Ford Aerostar has an unacceptably high risk of being defective, then so has the switch in the typical 1987 Ford Tempo. Thus, the characteristics of the 158 model-years at issue would have to be determined." *Id.* at 344.

      Like the foregoing cases, there are too many different parts in question here. Unlike the foregoing precedents, however, this case involves not just tens of parts or variations, but tens of thousands.

      *Second*, evaluation of plaintiff's allegation that the non-OEM replacement parts are not of "like kind and quality" to the part being replaced <u>necessarily</u> requires an individualized examination of the part on each class member's car before the loss occurred. While the parts on some insureds' vehicles may have been in excellent

condition, others will have been rusting, dinged and scratched. One can see such cars in any parking lot. A recent Florida state court decision denying class certification in a virtually identical case explained that:

> Common sense dictates that in order to determine whether a replacement part is of "like kind and quality" to the part it replaces requires two separate inquiries: i) what was the condition of the vehicle before the accident (e.g. age, mileage, physical condition); and ii) what is the quality of the replacement part.

*Thames*, slip op. at 11 (emphasis added). Given these issues, the Court ruled, "the alleged claims of each of the purported class members are separate and distinct," each arising out of the particular circumstances of the individual class member's vehicle repair. *Id.*

**Third**, whether or not aftermarket parts may be used is a matter regulated in different ways by the various states. Florida expressly permits them and the Florida Insurance Commissioner has approved them. *See* Fla. Stat. § 501.31 (1997); *Frequently Asked Questions about Auto Ins.*, *at* http://www.doi.state.fl.us/index.htm, No. 21 (attached as Exhibit 13). States such as New York have advocated the use of aftermarket parts to the United States Supreme Court. *See* Brief of the State of New York as *Amicus Curiae* in Supp. of Pet. for Writ of Cert., *State Farm Mut. Auto. Ins. Co. v. Speroni* (No. 97-2063) (attached as Exhibit 14). By contrast, for example, Vermont has no statute regulating the issue.

A class may not be certified where there is no common question of law because the governing states' laws differ or where the differences in state law mean that no common issue of law "predominates," under Federal Rule of Civil Procedure 23. *See, e.g.*, *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 609-10, 624 (1997) (different state

laws governing asbestos claims compounded lack of predominance under Rule 23(b)(3));
*Castano v. American Tobacco Co.* 84 F.3d 734, 741-43 (5th Cir. 1996) (variations in
state law may "swamp any common question" under Rule 23).[5]

In short, no class could be certified here. The weakness of plaintiff's class claims
may explain her failure timely to move for certification, but does not excuse it. Because
Hubbard has failed to meet the 90-day deadline, GEICO requests that the class action
claim be dismissed.

## II.    IN THE ALTERNATIVE, THE COURT SHOULD SET A SCHEDULE FOR RESOLUTION OF THE CLASS ISSUE

If this Court declines to dismiss the class allegations, GEICO requests that the
Court enter a scheduling order providing for systematic resolution of class certification
and allowing GEICO discovery of any expert or other testimony and exhibits that
plaintiff would propose to offer in support of her motion for class certification.

A scheduling order is the common and preferred means for assisting the parties
and the Court in managing discovery in complex litigation. *See Manual for Complex
Litigation (Third)* § 21.212 (1995) ("Scheduling orders are a critical element of case
management. They help ensure that counsel will complete the work called for . . . and

---

[5] This precedent is not undermined by the recent Illinois decision in *Snider v. State Farm
Mut. Auto. Ins. Co.,* No. 97-L-114 (Ill. Cir. Ct. Oct. 4, 1999). *Snider* has been appealed
on multiple grounds. Moreover, as *Snider* expressly noted, the class was certified under
an Illinois standard lower than that of Federal Rule 23. *See* Order and Findings That
Action May Be Maintained as a Class Action, *Snider v. State Farm Mut. Auto. Ins. Co.,*
No. 97-L-114, at 12a (Ill. Cir. Ct. Dec. 5, 1997) (the "Illinois rule is more liberal than the
federal rule") (attached as Exhibit 15).

prevent the litigation from languishing on the court's docket."); *see also In re The Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996).

In the event that the Court chooses to enter such a scheduling order, a proposed order is attached. As an alternative, the Court may prefer that the parties resolve such a schedule with the Magistrate. In either case, GEICO requests adequate time to conduct class discovery before the class determination is made. In managing a putative class action, the court should permit GEICO discovery relevant to class issues before determining whether a class should be certified. *See Chateau de Ville Prods., Inc. v. Tams-Witmark Music Library, Inc.*, 586 F.2d 962, 965-67 (2d Cir. 1978) (class certification order reversed and remanded to allow defendant discovery prior to class determination); Ervin A. Gonzalez & Raymond W. Valori, *Considerations in Class Certification*, 72-MAR Fla. B.J. 78, n.3 ("[T]he court should reserve ruling on a motion to dismiss until the proponent of class certification has had a sufficient opportunity to take discovery to 'ascertain necessary information that must be pled.'") (quoting *Cordell v. World Ins. Co.*, 355 So.2d 479 (Fla. 1st DCA 1978)) (attached as Exhibit 16).

If a class is certified after class discovery and over GEICO's objection, GEICO requests adequate time thereafter for discovery into the merits of the class claims. Merits discovery should be permitted after a class is certified. *See Auto Cargo, Inc. v. Miami Dade County*, 237 F.3d 1289, 1291 (11th Cir. 2001) (affirming summary judgment granted after discovery taken following class certification); *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1570-71 (11th Cir. 1992) (bifurcation of discovery can "make early class determination practicable and . . . best serve the ends of fairness and efficiency . . . ."); *see also Prado-Steiman v. Bush*, 221 F.3d 1266, 1273

(11th Cir. 2000) ("Rule 23 contemplates that the class certification decision will be made prior to the close of discovery."); *Manual for Complex Litigation (Third)* § 21.213 (1995) ("The court should ascertain what discovery on class questions is needed before a ruling on certification . . . [o]ther discovery may be stayed if the court believes that resolution of the certification issue may obviate some or all further proceedings . . . .").

Here, it makes no sense for the parties to take discovery as to the merits of the class case given that this might prove unnecessary if – as should be true – no class is certified. Similarly, if a class were certified over GEICO's objection it is not yet apparent what the scope of that class would be. For example, plaintiff has still not answered GEICO's interrogatory no. 2(c) which asks plaintiff to specify the model years at issue, and the Complaint nowhere states the temporal scope of the class. *See* Pl's Ans. to Def. Interrog. No. 2(c) (attached as Exhibit 17). Accordingly, if a class were certified over GEICO's objection, GEICO would be prejudiced if required to proceed immediately to trial without additional opportunity to take merits discovery.

## CONCLUSION

For the foregoing reasons, GEICO respectfully requests an Order dismissing plaintiff Hubbard's class allegations or, in the alternative, entry of an order scheduling plaintiff's motion and providing adequate time for GEICO to take discovery of any testimony or evidence that plaintiffs may introduce in support of such a motion.

Respectfully submitted,

Frank A. Zacherl
Florida Bar No. 868094
**BURD LOZANO & ZACHERL, LLP**
601 Brickell Key Drive, Suite 500
P.O. Box 01-9110
Miami, Florida 33131
Telephone: (305) 374-3100
Fax: (305) 374-3161

David P. Gersch, *pro hac vice*
Anne M. Package, *pro hac vice*
Garrett M. Heenan
**ARNOLD & PORTER**
555 Twelfth Street, N.W.
Washington, D.C. 20004-1202
(202) 942-5000

*Counsel for Defendants Government Employees Insurance Company, GEICO General Insurance Company and GEICO Indemnity Company*

Dated: March 12, 2001

WE HEREBY CERTIFY that a true and correct copy of the foregoing Defendant's Motion to Dismiss the Class Allegations or For Entry of Scheduling Order and Memorandum in Support Thereof was hand-delivered this 12th day of March, 2001 to: **SCOTT D. SHEFTALL, ESQ.,** Co-Counsel for Plaintiff, Sheftall & Torres, P.A., 100 S.E. Second Street, Suite 4600, Miami, FL 33131; by overnight mail to: **SEAN C. DOMNICK, ESQ.,** Co-Counsel for Plaintiff, Searcy Denney Scarola Barnhart & Shipley, P.A., 2139 Palm Beach Lakes Blvd., P.O. Drawer 3626, West Palm Beach, FL 33402-3626; and by mail to: **JEFFREY ORSECK, ESQ.,** Co-Counsel for Plaintiff, Jeffrey Orseck, P.A., 1111 E. Broward Blvd., Orseck Plaza, Fort Lauderdale, FL 33301.

By: _____
Colleen Hoey

17

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

CASE No. 00-6035-CIV-MOORE

KIMBERLY JONES HUBBARD, on behalf
of herself and all others
similarly situated,

     Plaintiff,

v.

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

     Defendant.

_____

## ORDER

    The Court, having considered Defendant's Motion to Dismiss Class Allegations,

the Memorandum in Support thereof, and any Opposition thereto, this _____ day of

_____, 2001, hereby ORDERS that such Motion BE, and the same hereby IS,

**GRANTED**.  Accordingly, the class allegations contained in the First Amended

Complaint are **DISMISSED WITH PREJUDICE**.


_____
The Honorable
K. Michael Moore

## PROPOSED SCHEDULE
## IF THE COURT DOES NOT DISMISS
## THE CLASS ALLEGATIONS

THIS CAUSE came before this Court upon the Motion of Defendant and this

Court, having reviewed the same along with plaintiff's opposition and the oral arguments

of counsel, it is thereupon

ORDERED AND ADJUDGED as follows:

     a.    Plaintiff shall file her Motion for Class Certification and accompanying memorandum within 60 days after the entry of the scheduling order.

     b.    Plaintiff shall make available all affiants or live witnesses for deposition by defendant persons upon whose testimony plaintiff relies or intends to rely by not later than 15 days after filing her Motion for Class Certification.

     c.    Defendant shall file a memorandum in opposition to Plaintiff's Motion for Class Certification within 45 days after plaintiff files her Motion for Class Certification.

     d.    Defendant shall make available all persons upon whose testimony defendant relies or intends to rely by not later than 15 days after filing its memorandum in opposition to Plaintiff's Motion for Class Certification.

     e.    Plaintiff shall file any reply memorandum in support of her Motion for Class Certification within 30 days of defendant's opposition.

     f.    Should a class be certified, discovery will close 12 months from the date upon which the motion for class certification.

DONE AND ORDERED in Chambers at Miami, Florida this _____ day of

_____, 2001.

                                    _____

                                    The Honorable
                                    K. Michael Moore





ALL-STATE® LEGAL 800.222.0510   (D)   RECYCLED





*Feb. 9, 2000*

# Consumer Groups Ask Illinois Supreme Court to Expedite Automobile Crash Parts Case

## *Illinois Ruling Will Create Monopoly, Lead to Higher Auto Insurance Rates, Groups Say*

WASHINGTON, D.C. -- An Illinois state trial court ruling that threatens to create a monopoly in automobile crash parts -- and lead to dramatically higher part prices and auto insurance rates -- should be overturned, two Washington, D.C.-based consumer groups have told the Illinois Supreme Court.

Public Citizen and the Center for Auto Safety filed a "friend of the court" brief in the case on Tuesday, asking the Illinois Supreme Court to accept the case on an expedited basis because of the irreparable harm to consumers if it languishes in court during the appellate process. The groups want the Illinois Supreme Court to bypass the appellate court and handle the case immediately.

"This ruling, if not overturned, will severely harm automobile owners throughout the country," said Joan Claybrook, Public Citizen's president. "Repairing a car after a crash will become prohibitively expensive, and insurance rates will skyrocket. The Illinois Supreme Court should intervene and intervene now."

Crash parts, such as exterior sheet metal and plastic parts like fenders, hoods and grills, are used to repair autos damaged in crashes. State Farm and a number of other insurance companies use certified generic parts because they cost significantly less than auto company parts, called "original equipment manufacturer" (OEM) parts, and are equally reliable, the groups' brief states. The generic parts are certified by the Certified Automotive Parts Association (CAPA), which conducts a rigorous testing program and inspects manufacturing plants. Because these CAPA parts cost less, they help contain auto insurance rates. Further, their existence helps keep down the cost of auto company (OEM) parts; without such competition, those parts would cost much more, the filing says.

"The ruling gives the OEM part manufacturers something they have been trying to get for years from federal and state courts, and from federal and state legislatures, and that is a monopoly," said Eleanor J. Lewis, senior staff attorney for the Center for Auto Safety. "As a result, consumers will pay handsomely if this case is not reversed."

In October, an Illinois jury in a class action suit found that State Farm Insurance Co. had breached its contract with policyholders by using generic CAPA parts in damaged cars, rather than auto company (OEM) parts. The court ordered State Farm to pay $1.2 billion.

State Farm is appealing the judgment. Meanwhile, State Farm and other insurers have stopped using

generic CAPA parts, the filing says. If this situation continues, insurance rates will not only climb, but some generic parts manufacturers will be driven out of business, leaving manufacturers with a monopoly on crash parts, the brief says.

Further, the ruling effectively nullifies state laws, such as those in Hawaii and Massachusetts, which both have laws favoring the use of generic parts, the brief says.

### 

Return to Newsroom

Return to Public Citizen Home Page



Book 9651  Page 1988

IN THE CIRCUIT COURT FOR THE
FOURTH JUDICIAL CIRCUIT IN AND
FOR DUVAL COUNTY, FLORIDA

```
-----------------------------------------------------x
PATRICIA G. THAMES, on behalf of              :
herself and all others similarly              :        Case No. 98-01324 CA DIV. CV-B
situated,                                     :
                                              :
          Plaintiff,                          :
                                              :
                                              :        Class Action Complaint
v.                                            :
                                              :
UNITED SERVICES AUTOMOBILE                     :
ASSOCIATION                                   :
                                              :
          Defendant.                          :
-----------------------------------------------------x
```

### ORDER GRANTING DEFENDANT'S MOTION FOR
### SUMMARY JUDGMENT ON CLASS CLAIMS

This action was filed on March 9, 1998. On March 26, 1999, defendant United Services

Automobile Association ("USAA") filed a Motion for Summary Judgment. Plaintiff moved for

a stay of USAA's motion as to the class allegation. The Court granted that Motion to Stay and

the parties engaged in extensive discovery. On January 21, 2000, the Court entered a Scheduling

Order which provided that all discovery would be completed by March 31, 2000 and briefing on

USAA's motion would be completed on or before April 20, 2000. Oral argument was held on

May 24, 2000. Upon consideration of the record, including the pleadings, memoranda of law,

transcripts, the evidence timely submitted, and the argument of counsel, the Court holds that

USAA's Motion for Summary Judgment must be granted for the reasons set forth below.

Doc# 2000132330
Book: 9651
Pages: 1988 - 2002
Filed & Recorded
    06/13/00  11:35:49 AM
HENRY W COOK
CLERK CIRCUIT COURT
DUVAL COUNTY

Book 9651 Page 1989

## BACKGROUND

On November 27, 1996, Patricia G. Thames damaged her 1994 Ford Explorer in an automobile accident in Jacksonville, Florida. At that time, Mrs. Thames's vehicle was covered by a Wisconsin insurance policy (the "Policy") issued by USAA. The Policy had a "Limit of Liability" provision that limited USAA's liability for loss to "the lesser of the actual cash value of the property or part damaged or stolen, or the amount necessary to repair or replace the property or part." The Policy defined "Actual Cash Value" as "the amount which it would cost to replace the stolen or damaged property with new property of like kind and quality, less allowance for depreciation and physical deterioration."

The estimate provided by USAA for repairing Mrs. Thames's vehicle called for certain damaged parts to be replaced with non-original equipment ("non-OEM") parts and other parts to be replaced with original equipment manufactured parts ("OEM"). Non-OEM parts are parts made by a manufacturer other than the manufacturer of the vehicle or a manufacturer specifically authorized by the vehicle manufacturer.

Florida law expressly permits the use of non-OEM parts in the repair of vehicles provided that such parts "are at least equal in kind and quality to the original parts in terms of fit, quality and performance." Fla. Admin. Code § 624.308. Wisconsin law similarly permits the use of these parts with proper notice, however, the term "like kind and quality" is not defined. See Wisc. Statute Ann. § 632.38.

Mrs. Thames took her vehicle to King's Crown Ford, a Ford dealership in Jacksonville which was not affiliated in any way with USAA. It was established in discovery that the

2

Book 9651 Page 1990

dealership used OEM parts to repair Mrs. Thames's vehicle instead of some of the non-OEM parts called for in the USAA estimate without any additional cost to Mrs. Thames. All of the non-OEM parts which were used were warranted by USAA for a period of one year or the length of the OEM warranty, which ever was longer.

As a result of the November 1996 accident, USAA paid for $15,000 worth of medical bills, in addition to paying for the repairs to her vehicle and a rental car. Although the cost of the repairs and rental car were repaid by tortfeasor's insurance company, Mrs. Thames pursued the tortfeasor and recovered the $15,000 in medical bills which had already been paid by USAA. She signed a full and complete release of all claims against the tortfeasor, thus foreclosing USAA from seeking subrogation of all the amounts it had also paid Mrs. Thames. USAA's policy provides that its insureds hold in trust any amounts recovered from the tortfeasor, if those amounts had already been paid by USAA. Mrs. Thames never informed USAA about this recovery prior to her deposition in this case.

Mrs. Thames subsequently had a second accident in her Ford Explorer. As a result of the second accident, the non-OEM parts in question in the present action were destroyed and the vehicle was declared a total loss. Mrs. Thames's insurer for the second accident, State Farm, paid her full value for her vehicle, with no reduction for the use of non-OEM parts in her original accident.

In 1998, Mrs. Thames filed this action against USAA on her own behalf and on behalf of a purported class of Florida residents "who purchased or renewed previously purchased USAA Policies, and on behalf of a subclass of [Florida] residents . . . who purchased or renewed

3

Book 9651 Page 1991

previously purchased USAA Policies and had their insured automobiles repaired with non-OEM parts." First Amended Class Action Complaint at ¶ 7.

In her Complaint, Mrs. Thames alleged that non-OEM parts were per se not of "like kind and quality" to the parts they replaced and that they diminished the value of any vehicle on which they were installed. Furthermore, she asserted that USAA implemented its non-OEM parts Policy by requiring insureds to take their vehicles to repair shops which were affiliated with USAA. USAA counterclaimed to recover the amounts which it had paid Mrs. Thames and for which she received a double recovery from the tortfeasor.

## LEGAL ANALYSIS

### A.    Summary Judgment On The Class Allegations Is Appropriate In This Case

Although this case has been pending for over two years; the parties engaged in voluminous discovery; and plaintiff failed or refused to file a motion for class certification, plaintiff asserts that summary judgment is not the appropriate mechanism to resolve USAA's contention that Mrs. Thames cannot represent the purported class. This assertion, however, ignores several Florida decisions in which trial courts have been instructed to consider summary judgment motions that challenge a named plaintiff's ability to represent a class at the earliest time practicable in the litigation. See Taran v. Blue Cross Blue Shield, 685 So. 2d 1004 (Fla. 3rd DCA 1997) (before a court considers the certification of any class, it must determine as a threshold matter the named plaintiff's standing to represent class); Baptist Hosp. of Miami, Inc. v. DeMario, 683 So. 2d 641 (Fla. 3rd DCA 1996). Accordingly, summary disposition of class

4

Book 9651 Page 1992

allegations is not only permitted, but encouraged in order to prevent the unnecessary waste of judicial resources on claims that ultimately cannot be resolved on a class basis.

To maintain her purported class action, Plaintiff must prove each of the elements of Fla. R. Civ. P. 1.220:

(1)    the members of the class are so numerous that joining each member is impractical;

(2)    the claim involves questions of law or fact common to the individual class members;

(3)    the claim of the representative party is typical of those that would be asserted by individual class members; and

(4)    the representative party can fairly and adequately protect and represent the interest of each class member.

Because plaintiff contended that this action was appropriate for class treatment under subsection (b)(3) of Rule 1.220, in addition to the above listed elements, Plaintiff must also prove that the common questions of law or fact predominate over individual issues. Thus, applying the summary judgment standard to the class claims, if USAA can establish that Plaintiff will be unable to prove any one of these elements, USAA is entitled to judgment as a matter of law. Fla. R. Civ. P. 1.510(c).

USAA's Motion for Summary Judgment must be granted for several independent reasons. First, Mrs. Thames is not an adequate class representative and her claims are not typical of the claims of the class she purports to represent. Mrs. Thames had a Wisconsin Policy and was a resident of Wisconsin, but attempts to represent a class of Florida residents. Plaintiff cannot represent a class of which she is not a member. Further, USAA has asserted a

5

Book 9651 Page 1993

compulsory counterclaim against Mrs. Thames based upon subrogation rights set forth in her Policy. The existence of this compulsory counterclaim is another reason that Mrs. Thames's claims are not typical and summary judgment on her class claims must be granted.

Second, USAA has established that it would be impossible to determine whether USAA breached its contract with all class members merely by determining whether it had breached its contract with one member. The individual issues particular to each class member's claim make this action inappropriate and impossible for class treatment.

This ruling does not prejudice the claims of absent class members and, in fact, does not prejudice Plaintiff here. If members of the putative class claim that their vehicle was repaired with a part that is not of like kind and quality to the part it replaced, that person can pursue an individual appraisal claim against USAA. As USAA points out, it warrants all non-OEM parts that are used to repair the vehicles of its insureds. Furthermore, the plaintiff, Mrs. Thames, is not prejudiced by resolving these issues by summary judgment. To the contrary, because the burden on USAA under the summary judgment standard is greater than the burden on Plaintiff to prove that class certification is appropriate, even under this higher summary judgment standard, it is clear that these claims, by this Plaintiff, are inappropriate for class treatment.

**B.    Mrs. Thames Is Not An Adequate Class Representative And Her Claim Is Not Typical Of The Claims Of The Absent Class Members**

**1.    Mrs. Thames Had A Wisconsin Insurance Policy**

During the relevant time period, Mrs. Thames had a Wisconsin automobile insurance Policy, and not a Florida Policy, with USAA. This fact is undisputed. The Policy that Mrs. Thames entered into with USAA and the Declarations Page sent to Mrs. Thames just days before

Book 9651 Page 1994

the accident clearly stated that she had a Wisconsin Policy. Mrs. Thames represented to USAA that the vehicle in question would be principally garaged in Iron River, Wisconsin. Thus, Mrs. Thames's contract must be interpreted under Wisconsin law, not Florida law. Sturiano v. Brooks, 523 So. 2d 1126, 1130 (Fla. 1988) ("In the case of an insurance contract, the parties enter into that contract with the acknowledgement that the laws of that jurisdiction control their actions. In essence, that jurisdiction's laws are incorporated by implication into the agreement."); Allison v. Liberty Mut. Fire Ins. Co., 704 So. 2d 677, 678-79. (Fla. 1ᵗˢ DCA 1998) (Florida follows the doctrine of lex loci contractus in determining what states' law applies to contract claims). Mrs. Thames cannot act as a class representative for a class of Florida insureds whose contracts would be governed by Florida law. If she could, the class would have to be opened up to all persons who happened to be in Florida at the time of their accidents and the claims would be governed by contracts from all fifty states.

There are significant differences between Florida and Wisconsin statutory and common law. For example, Mrs. Thames's Policy had an appraisal clause requiring that in the event "we and you do not agree on the amount of loss, either may demand appraisal." Wisconsin and Florida differ on the basic issue of whether the appraisal clause in the Policy at issue would be enforceable. In Florida, it is well-established that such appraisal clauses are enforceable and are a condition precedent to any suit on the insurance contract. See Opar v. Allstate Ins. Co., No. 1D99-182, 2000 WL 228626 (Fla. 1ᵗˢ DCA Mar. 1, 2000) (citation omitted); State Farm Fire & Cas. Co. v. Licea, 685 So. 2d 1285 (Fla. 1996). On the other hand, in Wisconsin, the failure to invoke the appraisal clause prior to the filing of a suit may waive this clause as a condition

7

precedent to the suit. <u>Lynch v. American Family Mut. Ins. Co.</u>, 473 N.W.2d 515, 519 (Wisc. Ct. App. 1991). Similarly, under Wisconsin law (Wisc. Stat. § 632.32(4)(6)), an insurer can subrogate for medical payments but under Florida law it cannot. Fla. Stat. § 627.737.

Mrs. Thames, who had a Wisconsin Policy which will be interpreted pursuant to Wisconsin law, cannot represent a class of persons whose Florida policies must be interpreted under Florida law because she cannot act as a representative of a class of which she is not a member. <u>Brazilian Court Hotel Condo. Owners Ass'n. Inc. v. Walker</u>, 584 So. 2d 609, 612-13 (Fla. 4th DCA 1991). For this reason, this Court must grant summary judgment on Plaintiff's class claims because USAA has proven as a matter of law that Mrs. Thames cannot satisfy the typicality and adequacy prongs of Rule 1.220.

**2.    Mrs. Thames Was A Wisconsin Resident**

Mrs. Thames purports to represent a class of Florida residents "who purchased or renewed previously purchased USAA policies." First Amended Complaint at ¶ 7. Mrs. Thames, however, was a Wisconsin resident during the time period relevant to this action. USAA's records showed that Mrs. Thames represented to it in 1993 that she was a Wisconsin resident and that representation was repeated each year thereafter. Because Mrs. Thames represented to USAA that she was a Wisconsin resident, her insurance premiums were substantially less than her premiums would have been if she were a Florida resident.

Further, Mrs. Thames, specifically admitted in an interrogatory answer that she was a resident of Wisconsin from 1989 through early 1999. Plaintiff did not amend her answer to this interrogatory prior to the cutoff for summary judgment evidence. Therefore, this answer is an

8

Book 9651  Page 1996

admission which is binding on Plaintiff. See Smith v. State Farm Mut. Auto. Ins. Co., 691 So.

2d 1127, 1128 (3rd DCA 1997) (relying on party's admissions in her interrogatory responses to

affirm trial court's grant of summary judgment as to liability); Fla. R. Civ. P. 1.340 Author's

Comment (1967) ("[o]ne of the purposes of interrogatories is to obtain admissions and thus limit

subjects of controversy at trial and avoid unnecessary testimony and waste of time in

preparation"). In addition to this admission, there is overwhelming uncontroverted evidence that

Mrs. Thames was a Wisconsin resident.

Although Mrs. Thames submitted an affidavit with her summary judgment opposition

asserting that she was a Florida resident at the time of the accident, this belated assertion cannot

be used to defeat summary judgment. An affidavit submitted by a party to contradict other

statements of that party made during discovery is not competent summary judgment evidence.

Ellison v. Anderson, 74 So. 2d 680, 681 (Fla. 1954); Weisner v. United Sers. Auto. Ass'n, 771

So. 2d 1192, 1193 (Fla. 5th DCA 1998); McAllister v. Robbins, 542 So. 2d 470, 471 n. 1. (Fla. 1st

DCA 1989).

Because Mrs. Thames is not a Florida resident, this is one further reason that Mrs.

Thames, as a matter of law, cannot satisfy the typicality and adequacy prongs of Rule 1.220 and

thus, cannot properly represent the Florida insureds described in her Amended Complaint. Thus,

this is further grounds upon which this Court must grant USAA's motion for summary judgment.

### 3. The Compulsory Counterclaim Makes Mrs. Thames Claim Not Typical And Mrs. Thames An Inadequate Class Representative

USAA has filed a compulsory counterclaim against Mr. Thames based upon subrogation

and constructive trust rights set forth in Mrs. Thames's Policy. USAA brings its counterclaim

9

Book 9651 Page 1997

pursuant to the same Policy under which Mrs. Thames sues USAA. The existence of the allegations of release and subrogation makes many of Mrs. Thames's claims circular. If she were to prove that she is entitled to some additional money because of the use of non-OEM parts, USAA claims it is entitled to recover this amount from Mrs. Thames (plus the $15,000 in medical bills to which it is subrogated under Wisconsin law) because she released the tortfeasor and thereby extinguished USAA's contractual right to subrogate.

This Court has specifically held that USAA's claim is a compulsory counterclaim. Order (May 25, 2000). Even Plaintiff's counsel admits that if USAA's counterclaim is compulsory, this would be an "independent ground for denial of class certification." Plaintiff's Motion to Sever at 4 (citing Whigman v. Heilig Meyers Furniture, Inc., 682 So. 2d 643 (Fla. 1st DCA 1996)). The existence of this compulsory counterclaim conclusively demonstrates that Mrs. Thames's claims are not typical of the other purported class typical of the other purported class members. For these and other reasons set forth above, Mrs. Thames's claims are not typical of the claims of other purported class members. Therefore, summary judgment on Plaintiff's class claims must be granted on this basis.

C.  **The Issues Raised By Plaintiff's Complaint Are Not "Common" To All Class Members And Do Not Predominate Over The Individual Issues**

In Plaintiff's Opposition Brief, Mrs. Thames asserts that:

The issue of whether USAA's corporate policy of requiring the use of Non-Original Equipment Manufacturer ("Non-OEM") or aftermarket parts in the repair of USAA policyholders' vehicles -- known at USAA as the Quality Replacement Parts ("QRP") Program -- violates USAA's contractual obligation to provide repair parts of "like kind and quality" to Original Equipment Manufacturer ("OEM") parts, is common to every class member.

10

The evidence in this record, however, shows that plaintiff cannot possibly establish that each and every non-OEM part specified on an estimate by USAA is not of "like kind and quality" to each and every part replaced. Common sense dictates that in order to determine whether a replacement part is of "like kind and quality" to the part it replaces requires two separate inquiries: i) what was the condition of the vehicle before the accident (e.g., age, mileage, physical condition); and ii) what is the quality of the replacement part. Thus, each non-OEM replacement part must be examined individually to determine whether it complies with the terms of the insurance Policy and Florida law. Each class member was involved in separate accidents, used separate repair shops, and had their different makes and models of vehicles repaired with different parts. Therefore, by their very nature, the alleged claims of each of the purported class members are separate and distinct, each arising out of the quality of the specific non-OEM parts used to repair each individual class member's vehicle.

There is nothing in the Policy entered into by Mrs. Thames which prohibits the use of non-OEM parts. In fact, the Policy permits the use of any replacement part, including non-OEM parts, so long as the parts are "of like kind or quality, less allowance for depreciation and physical deterioration." Each of Plaintiff's "common questions," however, assume that the use of non-OEM parts per se does not satisfy this criteria. There is no basis for such a generalization.

The Florida Insurance Commissioner, who must approve all insurance policies issued to Florida residents, has promulgated regulations which do not prohibit the use of non-OEM parts, but rather specify the condition under which they can be used. These regulations allow the use

11

Book 9651   Page 1999

of replacement parts to repair an automobile if the parts "are at least equal in kind and quality to

the original parts in terms of fit, quality and performance." Fla. Admin. Code § 624.308. Thus,

it is only parts that fail to meet this criteria that could violate any Florida law.

Whether the particular parts used in any repair are of like kind and quality will be an

independent factual question for each class member and each repair. If Plaintiff's purported

class were to be certified, this Court would be required to examine each and every non-OEM part

used to repair a USAA insured's vehicle to determine whether each such part is "of like kind or

quality, less allowance for depreciation and physical deterioration" to the part it replaced. No

court could determine -- per se -- that all non-OEM parts do not satisfy this criteria.

Mrs. Thames's own claim demonstrates how individual each claim is:

- Mrs. Thames did not go to a repair shop affiliated with USAA yet she claims that
  USAA used affiliated repair shops to implement the policy of using non-OEM parts;

- It is impossible to compare the kind and quality of Mrs. Thames's non-OEM
  replacement parts to the parts they replaced because both the pre-accident parts have
  disappeared and the replacement parts were destroyed in a subsequent accident;

- Mrs. Thames claims that the use of non-OEM parts in repairs diminishes the resale
  value of the vehicle, yet she received full value for her vehicle when it was later
  declared a total loss with no deduction for the use of non-OEM parts; and

- Mrs. Thames received OEM parts instead of some of the non-OEM parts called for in
  the USAA estimate; thus demonstrating that each vehicle must be individually
  examined.

This Court agrees with those courts which have refused to adjudicate class action claims

involving non-OEM parts on a class basis because of the individual nature of such claims. The

Circuit Court of Cook County, Illinois, for example, refused to certify a class attacking Allstate's

non-OEM policy. See Rios v. Allstate Ins. Co., No. 94 CH 11396 (Cook Cty. Cir. Ct. Ill., Jan.

12

27, 1998). In Rios, as in this case, the plaintiffs framed the claims at issue as a simple breach of contract issue. The Court concluded, however, that "the contractual obligation of like, kind and quality is to bring the vehicle to its pre-accident condition, which of course is going to vary from vehicle to vehicle," and that "[c]ommon sense would dictate [] that one of the issues that would have to be considered is the nature of the person performing the repair because, in fact, the nature of the repair would have a great deal to do with the acceptability." The Court further noted that "there are, I believe . . . 30,000, but certainly many, many thousands of different parts, and it would be necessary to compare the parts on a part-by-part basis." The Court stated that "it would be illogical . . . to examine a mere handful of the . . . 30,000 non-OEM parts to make a comparison to OEM parts and somehow extrapolate from that that therefore the whole panoply of 30,000 parts are affected. That clearly would be inadequate and unacceptable . . . ."

Similarly, a federal court in Tennessee issued a well-reasoned Order Denying Plaintiff's Motion for Class Certification in Murray v. State Farm Mut. Auto. Ins. Co. The order in Murray states that:

> Although there may be questions of fact as to whether a particular non-OEM crash part is inferior to its OEM counterpart, those questions are certainly not common. In fact, as defendants explain, this determination, given the differences in vehicle makes and models and the fact that there are several manufacturers of non-OEM crash parts, would require the testing of thousands of individual crash parts. In addition, the defects, if any, would most likely have their own unique characteristics. Moreover, plaintiffs' common questions of law are dependent on a finding that [all] non-OEM crash parts are inferior to their OEM counterparts. As such, the Court finds that plaintiffs have not demonstrated that the proposed classes satisfy the commonality requirement of Rule 23(a)(2).

Murray v. State Farm Mut. Auto. Ins. Co., No. 96-2585-ml/A (W.D. Tenn. Aug. 19, 1997); see also Moorhead v. State Farm Mut. Auto Ins. Co., No. 95-AR-0688-S (N.D. Ala. Sept. 12, 1997)

Page 2001

Book 9651

(district court declined to certify class because class representatives were inadequate, and expressed doubts as to whether class claims related to State Farm's specification of non-OEM parts in estimates and repairs satisfied commonality requirement for class certification).

Plaintiff cites to the rulings of an Illinois trial court in Avery v. State Farm Mut. Auto. Ins. Co., Case No. 97-L-114 (Williamson County Cir. Ct. Ill. 1997) as persuasive authority for the proposition that these claims can be resolved on a class wide basis. That case dealt with a claim for breach of contract and a claim under the Illinois consumer protection statute against an Illinois corporation. Furthermore, although a class was certified and a jury verdict rendered, the court has yet to explain how the class members will be compensated, and the Avery case is presently upon appeal. I have reviewed these rulings and find them unpersuasive.

For these reasons, as a matter of law, there are no questions of law or fact common to this purported class. Thus, Mrs. Thames certainly cannot, as a matter of law, meet the higher requirement that these common questions predominate. Therefore, this is one further reason USAA's motion must be granted.

In view of the above, it is

**ORDERED AND ADJUDGED** that:

USAA has proven as a matter of law that Mrs. Thames cannot establish three of the four prongs of Rule 1.220 commonality, typicality, and adequacy, and further cannot satisfy the predominance requirement of that Rule. Based upon these four independent reasons, each of

14

Book 9651   Page 2002

which alone would require the granting of USAA's Motion, USAA's Motion for Summary

Judgment on Plaintiff's class claims is hereby **GRANTED**.

      **DONE AND ORDERED** in Chambers in Jacksonville, Duval County, Florida this 9t

day of _June_, 2000.

JUDGE PETER L. DEARING, Circuit Judge

cc:    Counsel of Record

15

STATE OF FLORIDA
DUVAL COUNTY
  I, UNDERSIGNED Clerk of the Circuit & County Courts, Duval
County, Florida, DO HEREBY CERTIFY the within and foregoing is
a true and correct copy of the original as it appears on record and
file in the office of the Clerk of Circuit & County Courts of Duval
County, Florida
  WITNESS my hand and seal of Clerk of Circuit & County Courts
at Jacksonville, Florida, this the 28 day of Dec. A.D. 20 00

HENRY W. COOK
Clerk, Circuit and County Courts
Duval County, Florida
By _____
Deputy Clerk



ORDER

CCG-N2

Sd 46T

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

RIOS, et al.

0000005.0600

v.

NO. 94 CH 9896

ALLSTATE INSURANCE CO.

ENTERED

JAN 27 1998

ORDER

This matter coming to be heard on plaintiffs' Motion for Class Certification, due notice being given, the parties being present and the Court being fully advised in the premises,

IT IS HEREBY ORDERED THAT:

1. Plaintiffs' Motion for Class Certification is denied for the reasons explained on the record in Court, and

2. A status conference shall be held in 28 days

Atty No. 31452
Name: PAINE, WEAVER & PRELL / J. Kokolis
Attorney for: Allstate
Address: 55 W. Monroe St., Suite 800
City: Chicago, IL 60603
Telephone: (312) 263-3600

1 27, 19 98

ENTER:

Judge          Judge's No.

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COURT FILE COPY

1    STATE OF ILLINOIS )

2               )   SS:

3    COUNTY OF C O O K )

4       IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

5         COUNTY DEPARTMENT — CHANCERY DIVISION

6

7    MANUEL RIOS; EMMA RETEGAN;     )

8    and MYRA TORRES, on behalf     )

9    of themselves and all others   )

10   similarly situated,          )

11          Plaintiffs,       )

12           vs.          ) No. 94 CH 11396

13   ALLSTATE INSURANCE COMPANY,    )

14         Defendant.       )

15

16       TRANSCRIPT OF PROCEEDINGS had in the

17  above-entitled cause on the 27th day of January,

18  A.D. 1998, at 1:30 p.m.

19

20   BEFORE:  HONORABLE THOMAS P. DURKIN.

21

22

23

24

```
1   APPEARANCES:

2       LAWRENCE WALNER & ASSOCIATES, LTD.,

3       (150 North Wacker Drive, Suite 2600,

4       Chicago, Illinois  60606), by:

5   MR. LAWRENCE WALNER and

6   MR. DAVID SULLIVAN,

7               -and-

8   GOLDBERG, WEISMAN & CAIRO, LTD.,

9       (One East Wacker Drive, 34th Floor,

10      Chicago, Illinois  60601-9654), by:

11  MR. LARRY E. WEISMAN,

12          appeared on behalf of the Plaintiffs;

13

14  BURKE, WEAVER & PRELL,

15      (55 East Monroe Street, Suite 800,

16      Chicago, Illinois  60603), by:

17  MR. EDWARD F. RYAN and

18  MR. JERRY KOKOLIS,

19          appeared on behalf of the Defendant.

20

21

22

23  REPORTED BY:  ELLEN DUSZA, CSR No. 84-3386.

24
```

ED



**(800) 708-8087**

1    There's no reputation of the affidavits saying

2    that they do not pay the repair shops for the

3    additional time.  And I think they

4    mischaracterized the recantations of Keystone in

5    the Ford case.  Keystone is a very vivid

6    demonstration of how you can cover a large

7    multitude of parts in the piece of litigation.

8    It's true that was limited to Ford, but by means

9    I've described I believe it can be extended to

10   parts generally in comparisons with the

11   manufacturers' specifications.

12           Thank you, Your Honor.

13      THE COURT:  The Court will take a five-minute

14   recess -- ten-minute recess.

15               (WHEREUPON, a recess was had.)

16      THE COURT:  Rios versus Allstate has been

17   called.  The Court has considered the arguments

18   and suggestions of counsel for both of the parties

19   and has considered the matters submitted in the

20   briefs and the evidentiary attachments.

21           The first thing I'm going to do is read

22   into the record 5/2-801 which is the linchpin of

23   the Code of Civil Procedure insofar as whether or

24   not class certification should be allowed in this

1   case.  And I quote, Prerequisite for the

2   maintenance after the class action.  An action may

3   be maintained as a class action in any court of

4   this state and a party may sue or be sued as a

5   representative party of the class only if the

6   Court finds:  One, the class is so numerous that

7   joinder of all members is impracticable; two,

8   there are questions of fact or law common to the

9   class which common questions predominate over any

10  questions affecting only individual members;

11  three, the representative parties will fairly and

12  adequately protect the interest of the class; and

13  four, the class action is an appropriate method

14  for the fair and efficient adjudication of the

15  controversy.

16       The matter before the Court concerns

17  the plaintiffs' allegation that Allstate furnishes

18  or requires inferior car parts referred to as

19  non-OEM parts in repairing its insureds'

20  vehicles.  The plaintiffs allege that this

21  practice constitutes a breach of contract and also

22  violates the Illinois Consumer Fraud Act because

23  Allstate's policy requires it to provide parts of,

24  quote, like, kind and quality, end quote.

BD

1        The plaintiffs allege that Allstate

2   only authorizes payments for inferior parts that

3   are not approved by the original manufacturer.

4   Since those parts are in their opinion

5   automatically inferior, they rust and corrode more

6   quickly than the rest of the car and are less safe

7   overall.

8        Now, the plaintiffs allege that each of

9   the three plaintiffs, the representative

10  plaintiffs, have been injured as a result of the

11  policy and practice of Allstate.  The first

12  subcategory of 801 is the only issue in which the

13  parties are not in disagreement, at least there's

14  been no response by the defendants concerning

15  numerosity, so the Court, of course, will concede

16  that.  It doesn't make any difference if they

17  conceded that it's clear, it's clear there are

18  numerous parties here so that a Level 1 of 801

19  is clearly adequately demonstrated by the

20  plaintiffs.

21       In so far as Level 2 which is the

22  commonality argument, that is really where the

23  bulk of the affidavits, the bulk of the

24  evidentiary submissions rests.  Level 3 which is

D

1   the adequacy of the representatives of the class

2   concerns both counsel and the punitive

3   plaintiffs.

4           Frankly, I suppose I would prefer that

5   counsel had done more by way of discovery.  I

6   certainly would prefer that the plaintiffs had

7   paid closer attention, the punitive plaintiffs had

8   paid closer attention to the case.  It's probably

9   easier to understand with the amount of motion

10  practice that has gone on in this case for the

11  last three-and-a-half years that, in fact, they

12  would have lost some interest in it.

13          There's also the question of the

14  salvaged parts versus the OEM parts, but I don't

15  think that that in and of itself is sufficient to

16  disqualify one of the punitive plaintiffs

17  particularly in light of the breach of contract

18  action pending.

19          I'm sympathetic with the plight of

20  Mr. Walner insofar as the Judge Curry matter.

21  Judge Curry was certainly a respected jurist, a

22  man who was known for his willingness to speak his

23  mind, and certainly knowledgeable and a highly

24  respected member of the bench as well as the

ED

*Wolfe, Rosenberg & Associates*
Chicago, IL (312) 782-8087  •  Wheaton, IL (630) 221-8087

ESQ.
(800) 708-8087

1 chancery division.

2       I'm reminded Mr. Walner is aware of the

3 case like an albatross probably as a result of the

4 efficiency of computers in our lives; secondly, I

5 don't blame the defendants for raising it, I

6 suppose their failure to raise it would perhaps be

7 an albatross in the event that it later became

8 public. But it is clear Mr. Walner by virtue of

9 his experience and his participation in other

10 class actions more than professionally qualified

11 to represent the class.

12       His explanation for failure to

13 undertake discovery is insufficient, to be

14 perfectly frank, but in light of his late entry

15 into the case after previous counsel withdrew, I

16 would not regard that as a fatal blow.

17       In the case of Carillo versus Jam

18 Productions which was finally disposed of before

19 this Court, I did consider the failure of the

20 punitive plaintiffs and the punitive -- and the

21 class counsel to undertake their discovery

22 obligations as being fatal to their ability to

23 proceed in the future, but that was a much more

24 aggravated situation than here. And I mention

ED

1    that only for the purpose of comparison so in the

2    future when the computer shows out a possible

3    chart difference between the way I handled the two

4    classes, that I will be able to explain then as I

5    am doing now the reason for the differences.

6              I am reminded of the fact 30 years ago

7    when I was in the state's attorney office, the

8    then state's attorney looked for a volunteer to be

9    held in contempt of court by a judge so he could

10   test the discovery rules.  Being a timid person by

11   nature, I refused to volunteer and one of my

12   cohorts did and was found in contempt of the

13   Court.  And much to the surprise of the elected

14   state's attorney, it was affirmed on appeal.  He

15   wore that himself -- he later became a judge and

16   he wore that as an albatross himself having to

17   explain that to every bar association before he

18   appeared.  So I'm sympathetic with the plight of

19   Mr. Walner having to face this issue every time he

20   represents a punitive class.  And, again, I find

21   that he is sufficiently articulate and

22   professional and in experience to represent the

23   class.

24             Really it comes down to the issue of



1    commonality which everyone knew it was going to

2    come down to, I suppose, in the first place.

3         The plaintiffs contend in a certainly

4    forthright if perhaps overly simple fashion that

5    the predominate issue in the case is whether the

6    OEM parts are of the same and like quality as the

7    non-OEM parts. Of course they do that based upon

8    the like, kind and quality contract provision in

9    the Allstate policy, which is obviously the basis

10   for the delineation of a class, ten-year period

11   from '94 to '84 on written contracts. And clearly

12   it is a linchpin of the breach of contract, so

13   that's an extremely significant part of the policy

14   which has to be taken into consideration.

15        According to them, the only issue

16   is whether the Allstate use of non-OEM parts

17   breaches its obligation to provide parts of like,

18   kind and quality as set forth in the contract of

19   insurance.

20        Since all of the insureds are

21   predicating their reported breach on the same

22   policy form or probably a similar policy form, I

23   suppose I have to accept the possibility of some

24   minor change throughout the period, but

D

1    essentially it's the same policy form.  It's the

2    position of the plaintiff that therefore the issue

3    is simple, clear and easy to move on with.

4            Not surprisingly, Allstate hotly

5    contests the plaintiff's simplification of the

6    issue.  They suggest that Allstate would have to

7    be tried as a simple breach of contract issue and

8    they assure the Court that it is not.  They point

9    out that ultimately the fact finder, the judge or

10   jury will have to make the determination as to

11   whether the use of non-OEM parts breaches the

12   contract requirements across the board in all

13   circumstances.  They therefore suggest it's not

14   nearly as simple as the plaintiffs would suggest.

15           Allstate claims that it is impossible

16   to make that determination on a class-wide basis.

17   They explain that there are many, many variables

18   which have to be taken into consideration and that

19   the questions are more individualized than

20   predominated by common questions that will cross

21   the class.

22           They have pointed out in their brief

23   some of the differences that they regard as

24   significant.  One being the -- their assertion

ED

1  that Allstate policyholders ultimately determine

2  whether or not the non-OEM parts will be used, and

3  in spite of the fact that Mr. Walner disagrees

4  with the method in which the disclosure takes

5  place and the sincerity as well as the depth to

6  which the Allstate adjusters go to orally explain

7  the Allstate policy to the insureds, it is in fact

8  undisputed that that is the case.

9         Allstate discloses both orally and in

10 writing the use of non-OEM parts and Allstate does

11 not require policyholders to accept the non-OEM

12 parts. Mr. Walner is certainly correct that the

13 affidavit points out that they apparently would

14 reason with, I believe -- rather than use my term,

15 I'll use theirs -- the adjuster will attempt to

16 explain to the claimant why the use of such parts

17 is beneficial, end quote. They don't in the

18 affidavit point out beneficial to whom, but I

19 think it's probably safe to assume that the

20 explanation would suggest to the insured that it

21 was beneficial to him rather than to Allstate.

22         The further allegation or further

23 representation that is part of the Allstate

24 position is that not all of the non-OEM parts are


(800) 708-8087

*Wolfe, Rosenberg & Associates*
Chicago, IL (312) 782-8087  •  Wheaton, IL (630) 221-8087

1    untested, and, in fact, they suggest that, in

2    fact, since I believe 1987 there is a CAPA

3    certification program, and they point out that by

4    way of comparison the State Farm class action

5    which is alluded to by both sides but most

6    specifically and more definitely by the plaintiffs

7    than by the defendants, not surprisingly, involved

8    predated testing by CAPA.

9            They also point out that the

10   contractual obligation of like, kind and quality

11   is to bring the vehicle to its pre-accident

12   condition, which of course is going to vary from

13   vehicle to vehicle.

14           They also point out, I think common

15   sense would dictate, that one of the issues that

16   would have to be considered is the nature of the

17   person performing the repair because, in fact, the

18   nature of the repair would have a great deal to do

19   with the acceptability.

20           They also point out that there are, I

21   believe, certainly the term used by counsel was

22   30,000, but certainly many, many thousands of

23   different parts, and it would be necessary to

24   compare the parts on a part-by-part basis.

1          They also assert that in fact some of

2     the parts are perhaps superior to OEM parts.

3     There's also included in the material a

4     description of the number of vehicles that are

5     involved and in going through that number of

6     vehicles, one is surprised, and in fact the number

7     of replacement parts would be only 30,000.

8     There's a mass majority of vehicles that I assume

9     that for most of the vehicles the parts are not

10    functional.  I suppose it's safe to assume that

11    certain of the parts are.

12          The fact is that OEM parts are

13    manufactured by different -- non-OEM parts are

14    manufactured by different non-OEM manufacturers,

15    and as I pointed out again without dispute there

16    are, in fact, some OEM parts and non-OEM parts

17    manufactured by the same facilities.

18          Allstate further argues that it will be

19    illogical for the Court to examine a near handful

20    of the -- some $30,000 non-OEM -- 30,000 non-OEM

21    parts to make a comparison to OEM parts and

22    somehow extrapolate from that that therefore the

23    whole panoply of 30,000 parts are affected.  That

24    clearly would be inadequate and unacceptable in

1    spite of the suggestion by Mr. Walner regarding

2    his experience with the use of mortgages.  Not all

3    of the same parts are at issue in the litigation

4    before the Court and as I mentioned with the large

5    number of vehicles involved in the time period

6    suggested by plaintiffs, not all of the parts go

7    on the same make and certainly not on the same

8    model of car.

9           Allstate has correctly asserted that

10   its obligation to repair the vehicle is to repair

11   the vehicle to its pre-collision condition and not

12   to the time the vehicle came off of the

13   manufacturing line.  Certainly, therefore, the

14   nature of the part required for a 1984 vehicle

15   might be different than the part for a 1987, 1990,

16   1993 and 1996.

17          Allstate further has submitted

18   documentation and affidavits refuting the

19   assertion by the plaintiffs that all of the

20   non-OEM parts are inherently inferior and most

21   specifically they have submitted documentation

22   concerning the nature of CAPA and including its

23   current, apparently, move to some type of

24   semi-official basis with the State of New York.

1    The plaintiffs have essentially reiterated their

2    position.

3             I have considered the case of Murray

4    versus State Farm Mutual Insurance Company which

5    is a western district of Tennessee case and

6    decided in August 19th of 1997.  It is a district

7    court case and of course doesn't have binding

8    effect upon the Court, but the language of the

9    judge certainly more lyrical and attractive than

10   the language being used by this Court, does in

11   fact demonstrate some of the difficulties with the

12   common issue.

13            The Court in that case found the same

14   difficulties that I'm having with the commonality

15   issue and that being that the use of the non-OEM

16   parts and the damages to insureds is, quote,

17   necessarily dependent on plaintiffs' allegations

18   that the non-OEM crash parts are inferior to OEM

19   crash parts, end quote.

20            The Court in that case concluded that

21   the question is not common because of the same

22   things I have cited, that is the numerosity of

23   parts and the numerosity of models and makes of

24   automobiles involved.  Also the fact that there

1    were more than one manufacturer. The court also

2    posited the premise that what defects, if any,

3    weren't necessarily common even to the individual

4    parts never mind across the range of different and

5    differing parts which would further complicate the

6    matter before the Court.

7              The Courts find that the plaintiffs

8    have failed to demonstrate on the commonality

9    issue. The motion for class certification is

10   heard and denied.

11             Do you want to take 28 days to consider

12   what your position will be?

13        MR. WALNER: Yes, your Honor.

14        THE COURT: Draft an order range of 28 days

15   status date with the plaintiffs. Thank you all.

16   Good afternoon.

17             (WHICH WERE ALL THE PROCEEDINGS HAD

18             IN THE ABOVE-ENTITLED CAUSE ON

19             THIS DATE.)

20

21

22

23

24





**ORIGINAL**

1

**CERTIFIED COPY**

THE HONORABLE J. KATHLEEN LEARNED

2

3

**FILED**

KING COUNTY, WASHINGTON

4

OCT 2 3 2000

5

SUPERIOR COURT CLERK
BY VICTOR A. BIG___A
DE___

6

7

8

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

9

GEORGE SCHWENDEMAN, on behalf of himself
and all others similarly situated,

No. 99-2-06505-1SEA

10

Plaintiff,

ORDER DENYING PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

11

v.

12

USAA CASUALTY INSURANCE COMPANY,

13

Defendant.

14

15

THIS MATTER is before the Court on Plaintiff's Motion for Class Certification.  Based upon

16

a review of the record, as well as the argument of counsel and the pleadings and memoranda

17

submitted in support of and in opposition to Plaintiff's Motion, Plaintiff's Motion for Class

18

Certification is hereby DENIED.

19

DATED _October 20_____, 2000.

20

21

22

THE HONORABLE J. KATHLEEN LEARNED
King County Superior Court Judge

23

ORDER DENYING MOTION FOR CLASS CERTIFICATION – Page 1

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1   Presented By:

2   CORR CRONIN LLP

3   _[signature]_

4   Kelly P. Corr, WSBA No. 555
    Michael A. Moore, WSBA No. 27047

5   Counsel for Defendant USAA Casualty Insurance Company

6   Of Counsel:

7   Dwight J. Davis

8   James W. Boswell
    Thomas F. Urban II

9   S. Stewart Haskins
    KING & SPALDING

10  191 Peachtree Street
    Atlanta, Georgia 30303-1763

11  (404) 572-4600

12

13

14

15

16

17

18

19  149 00001 af201604

20

21

22

23

ORDER DENYING MOTION FOR CLASS CERTIFICATION – Page 2

FILED

00 JUN 21 PH 5:22

KING COUNTY
SUPERIOR COURT CLERK
SEATTLE, WA.

THE HONORABLE J. KATHLEEN LEARNED

**CERTIFIED COPY**

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| GEORGE SCHWENDEMAN, on behalf of himself and all others similarly situated, | No. 99-2-06505-1SEA |
| Plaintiff, | DEFENDANT USAA CASUALTY INSURANCE COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION |
| v. | |
| USAA CASUALTY INSURANCE COMPANY, | |
| Defendant. | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SCHIFF LAW GROUP P.L.L.C.

2001 DEC 27 AM 11:49

RECEIVED

**ORIGINAL**

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

# TABLE OF CONTENTS

I.  INTRODUCTION AND RELIEF REQUESTED ...................................................................1

II. BACKGROUND .................................................................................................................2

    A.  THE UNUSUAL CIRCUMSTANCES SURROUNDING PLAINTIFF'S CLAIM ...............................................................................................................2

    B.  USAA CIC's EFFORTS TO CONTROL REPAIR COSTS ....................................5

    C.  QUALITY ASSURANCE IN THE REPAIR PROCESS .........................................7

III. ARGUMENT ......................................................................................................................8

    A.  PLAINTIFF HAS FAILED TO ESTABLISH THE ELEMENTS NECESSARY FOR CLASS CERTIFICATION UNDER CR 23 ..................................8

    B.  PLAINTIFF FAILS TO SATISFY ANY OF THE FOUR PRONGS OF CR 23(a) ..........................................................................................................10

        1.  Because It Is Impossible To Identify The Members Of The Class, Plaintiff Has Not Satisfied The Numerosity Requirement Of CR 23 ..............10

        2.  Plaintiff's Claim Fails To Raise Common Questions Of Law Or Fact .............12

            a.  The Facts Vary With Each Class Member's Vehicle ............................13

                (1)  Whether A Non-OEM Part Is Of "Like Kind and Quality" To The Part It Replaced Depends On a Host of Individualized Factors ................................................................13

                    (a)  Plaintiff Cannot Generalize That Each And Every Non-OEM Part Is Not Of "Like Kind And Quality" To The Part It Replaced ...................................13

                    (b)  The Idiosyncrasies Of Plaintiff's Individual Claim Cannot Be Used To Adjudicate The Unique Claims Of Every Other Class Members ...........14

                    (c)  Virtually All Courts Which Have Examined This Type of Claim Have Concluded Class Certification Is Not Appropriate ...................................16

                (2)  The Court Would Have to Conduct An Individualized Inquiry Into Each and Every Class Member's Damages ...........18

            b.  Plaintiff's Consumer Protection Act Claims Are Similarly Not Amenable To Class Treatment .......................................................................19

            c.  Plaintiff's Claim Of Good Faith And Fair Dealing Does Not Raise Common Issues .................................................................................21

        3.  The Claim Of The Representative Plaintiff Is Not Typical Of The Claim Of Each Member Of The Purported Class ........................................21

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - i

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

a.  Plaintiff's Claim Is Atypical Of Other Class Members' Claims Because Of The Circumstances Surrounding The Repair Of His Car...........................................................................................21

b.  Plaintiff's Claim Is Atypical Based On His Own Actions ...................23

4.  Plaintiff Cannot Fairly And Adequately Protect And Represent The Interests Of Each Class Member.........................................................23

a.  Because Of Intra-Class Conflicts Within This Case, Plaintiff Cannot Be An Adequate Class Representative......................................24

b.  Plaintiff Cannot Be An Adequate Class Representative Because He Has Abdicated Responsibility For Pursing This Action To His Attorney.........................................................................................24

c.  Plaintiff And His Counsel Cannot Adequately Represent This Purported Class Because Of Conduct By Counsel ...............................25

C.  PLAINTIFF CANNOT SATISFY ANY OF THE REQUIREMENTS OF CR 23(b)........................................................................................................29

1.  Class Certification of A Class Seeking Monetary Damages Is Not Appropriate Under CR 23(b)(2).....................................................................29

2.  Class Certification Is Not Appropriate Under CR 23(b)(3) Where Significant Individual Issues Predominate Over Class Issues .........................30

a.  Common Issues Do Not Predominate.................................................31

b.  Class Action Is Not A Superior Method Of Adjudication....................33

IV.  CONCLUSION.................................................................................................35

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - ii

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

# TABLE OF AUTHORITIES

**Cases**

*Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998)................................................30

*Anderson v. Moorer*, 372 F.2d 747 (5th Cir. 1967)..................................................................24

*Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014 (11th Cir. 1996) .......................................14

*Attorney Grievance Comm. of Md. v. Kandel*, 563 A.2d 387 (Md. 1989)...................................27

*Broussard v. Meineke Discount Muffler Shops*, 155 F.3d 331 (4th Cir. 1998) ...............18, 21, 34

*Capelouto v. Valley Forge Inc., Co.*, 990 P.2d 414 (Wa. App. 1999) ........................................20

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) ...............................................34

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998).............................................................33

*Costin v. Hargraves*, 283 So. 2d 375 (Fla. 1st DCA 1973)......................................................16

*Darling v. Champion Home Builders Co.*, 638 P.2d 1249 (Wa. 1982) .....................................9, 10

*DeFunis v. Odegaard*, 529 P.2d 438 (Wa. 1974) ..................................................................9, 24

*Eisen v. Carlisle & Jacqueline*, 417 U.S. 156 (1974) .................................................................9

*Eriks v. Denver*, 824 P.2d 1207 (Wa. 1992) ........................................................................29, 30

*Execu-tech Business Sys. Inc. v. Appleton Papers, Inc.*, 743 So. 2d 19 (Fla. 4th DCA 1999)........32

*Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) ..................................................22

*Gilpin v. American Federation of State County, and Municipal Employees, et al.*,
     875 F.2d 1310 (7th Cir. 1989) ......................................................................................24

*Gordon v. Ford Motor Co.*, 687 N.Y.S.2d 369 (N.Y. App. Div. 1st Dept. 1999).........................32

*Haley v. Medtronic*, 169 F.R.D. 643 (C.D. Cal. 1996) .............................................................31

*In re Agricultural Chem. Antitrust Litig.*,
     No. 94-402160-MMP, 1995 WL 787538 at *2 (N.D. Fla. Oct. 23, 1995) ...........................12

*In re American Med. Sys. Inc.*, 75 F.3d 1069 (6th Cir. 1996)....................................................33

*In re American Medical Sys. Inc.*, 75 F.3d 1069 (6th Cir. 1996)...........................................13, 22

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332 (D.N.J. 1997)..............15

*In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214 (E.D. La. 1998) ...........................31, 33

*In re Hotel Tel. Charges*, 500 F.2d 86 (9th Cir. 1974) .............................................................34

*In re Polypropylene Carpet Antitrust Litig.*, 178 F.R.D. 603 (N.D. Ga. 1997) ...........................10

*In re Stucco Litig.*, 175 F.R.D. 210 (E.D.N.C. 1997) ...............................................................18

*In the Matter of a Member of the State Bar of Arizona James W. Carroll*, 602 P.2d 461 (Ariz. 1979) 27

*In the Matter of H. V. Sandifer*, 198 S.E.2d 120 (S.C. 1973)....................................................27

*In the Matter of K.A.H.*, 967 P.2d 91 (Alaska 1998) ...............................................................27

*Insurance Co. of Pennsylvania v. Highlands Ins. Co.*, 801 P.2d 284 (Wa. App. 1990).............19, 20

*Johnson v. Moore*, 496 P.2d 334 (Wa. 1972) .....................................................................8, 9, 12, 29

*Kenger v. Government Employees Ins. Co.*,
     CV9901522 (Maricopa County (Az.) Sup. Ct. Minute Entry Feb. 8, 2000) .........................28

*Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir. 1987) ...........................................24

*Lacey Nursing Center, Inc. v. Washington*, 905 P.2d 338 (Wa. 1995).........................................9

*Lance v. Wade*, 457 So. 2d 1008 (Fla. 1984) ........................................................................13

*Louisiana State Bar Ass'n v. Edwins*, 329 So.2d 437 (La. 1976)...............................................26

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338 (7th Cir. 1997) ....................................................21

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - iii

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

*Marquardt v. Fein*, 612 P.2d 378 (Wa. App. 1980).................................................23, 24

*Martin et al. v. Dahlberg, Inc. et al.*, 156 F.R.D. 207 (N.D. Cal. 1994) .........................31

*Mattoon et al. v. City of Pittsfield et al.*, 128 F.R.D. 17 (D. Mass. 1989) ......................31

*Moorhead v. State Farm Mut. Ins. Co.*,
    No. 95-AR-0688-S, Order at 6 (N.D. Ala. Sept. 12, 1997) ......................................16

*Mound Hardware v. Spokane*, 1997 Wash. App. LEXIS 1940 (Wa. App. Nov. 25, 1997) .................31

*Murray v. State Farm Mut. Auto. Ins. Co.*,
    No. 96-2585-ml/A (U.S. Dist. Ct., W.D. Tenn. Aug 19, 1997)..............................16, 17

*Osborne v. Subaru of America*, 198 Cal. App. 3d 646 (Cal. 3d DCA 1988)..........................14

*Panorama Residential Protective Ass'n v. Panorama Corp.*, 627 P.2d 121 (Wa. App. 1981) .......12, 13

*Pottinger v. City of Miami*, 720 F. Supp. 955 (S.D. Fla. 1989) .................................24

*Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (E.D. Pa. 2000) ....................................11

*Shea v. Virginia State Bar Disciplinary Bd.*, 374 S.E.2d 63 (Va. 1988) .........................27

*Smith v. Brown & Williamson Tobacco Corp. et al.*, 174 F.R.D. 90 (W.D. Mo. 1997) ...............31

*Snider v. State Farm Mut. Auto. Ins. Co.*,
    No. 97-L-114 (Williamson Cty Cir. Ct. Ill. December 5, 1997)..................................18

*Southern Bell Telephone & Telegraph Co. v. Wilson*, 305 So. 2d 302 (Fla. 3d DCA 1974) ..........11

*Stavrides v. Mellon Nat'l Bank*, 60 F.R.D. 634, 1973 U.S. Dist. Lexis 11475 (W.D. Pa. 1973) ....25, 29

*Taub v. Glickman*, 1970 U.S. Dist. Lexis 93532 (S.D.N.Y. 1970).............................25, 29

*Thames v. United Services Auto. Ass'n*,
    Case No. 98-01324 CA Div. CV-B (Duval Co. Cir. Ct. Fl. June 9, 2000).................1, 12, 16, 18

*The Commonwealth of P.I. v. The M.V. Emily S.*, 158 F.R.D. 9 (D.P.R. 1994) .....................31

*Wagner v. Lehman Bros. Kuhn Loeb, Inc.*, 646 F. Supp. 643 (N.D. Ill. 1986) .....................25

*Washington Educ. Ass'n v. Shelton School Dist. No. 309*, 613 P.2d 769 (Wa. 1980) ...............9

**Regulations**
RCW 19.86.010 ..................................................................................19
Wash. Rev. Code § 46.71.025 ...................................................................20

**Statutes**
Haw. Rev. Stat. Ann. § 431:10C-313.6(a)........................................................6
Mass. Regs. Code tit. 211, § 133.04 (1999).....................................................6
RCW § 46.71.025 ...............................................................................6
Wash. Rev. Code ¶ 46.71.025 ...................................................................2

**Other Authorities**
7 C. Wright & A. Miller, Federal Practice and Procedure 638 (1972) .............................24
7A Wright, Miller & Kane, Federal Pract. & Proc: Civil 2d § 1775, at 462-63....................30

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

# I. INTRODUCTION AND RELIEF REQUESTED

Pursuant to this Court's revised Case Management Order of April 14, 2000, Defendant USAA Casualty Insurance Company ("USAA CIC") hereby files this memorandum in opposition to Plaintiff's Motion for Class Certification. Plaintiff seeks compensatory damages for USAA CIC's specification of non-original equipment manufacturer ("non-OEM") crash parts in its repair estimates on behalf of a class of USAA CIC policyholders in Washington for an undefined period of time. Plaintiff's motion for class certification is based on the inaccurate assumption that every non-OEM crash part specified by USAA CIC (out of at least 33,000 distinct non-OEM parts) for the repair of any purported class member's vehicle was not of "like kind and quality" to the part that it replaced.

Plaintiff's motion for class certification should not be granted because Plaintiff has failed to satisfy any of the requirements of CR 23. First, Plaintiff cannot establish numerosity because the members of the class Plaintiff purports to represent cannot be ascertained without inspecting each purported member's vehicle. Second, common issues of fact or law do not exist which are appropriate for class treatment, much less common issues that predominate over differences between the claims of the purported class members. Third, Plaintiff's claims are not typical of the claims of other purported class members because of the unique circumstances regarding Plaintiff's individual case. Fourth, the idiosyncrasies of Plaintiff's individual claim, his abdication of responsibilities, and the conduct of counsel, make Plaintiff an inadequate representative for this purported class.

Recently, a Florida court, considering nearly identical claims against USAA CIC's parent company dismissed all class claims in part based on these same arguments. <u>Thames v. United Services Auto. Ass'n</u>, Case No. 98-01324 CA Div. CV-B (Duval Co. Cir. Ct. Fl. June 9, 2000) (attached as Tab P). For these and the other reasons discussed in this brief, the Court should deny Plaintiff's motion for certification.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 1

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

## II. BACKGROUND

### A.   THE UNUSUAL CIRCUMSTANCES SURROUNDING PLAINTIFF'S CLAIM

Plaintiff George Schwendeman was involved in an automobile accident on March 25, 1998, while driving his 1993 Ford Bronco. Progressive Insurance Company insured the second driver involved in the accident, who admitted fault for the accident. USAA CIC insured Mr. Schwendeman's vehicle. At the time of the accident, Mr. Schwendeman's Ford Bronco was five years old and had approximately 115,900 miles worth of wear and tear on it. Deposition of George Schwendeman ("Schwendeman Dep.") (Vol. I) (Tab A) at 167, Exh. 16.

Plaintiff asked USAA CIC, rather than Progressive, to handle the claim. Id. at 67-68, 70-71, 73. In response to Plaintiff's request for a recommendation of a local body repair shop, USAA CIC recommended McCleod's Auto Body in Kirkland, a ten minute drive from Plaintiff's house. Id. at 70, Exh. 9.

Plaintiff's USAA CIC insurance policy, which conformed to the laws and regulations of Washington, included a "Limit of Liability" provision limiting USAA CIC's liability for loss to "the lesser of the actual cash value of the property or part damaged or stolen, or the amount necessary to repair or replace the property or part." Policy at USAA/SC8991 (Tab C). The Policy defined "Actual Cash Value" as "the amount which it would cost to replace the stolen or damaged property with new property of like kind and quality, less allowance for depreciation and physical deterioration." Id. Washington law permits the use of parts manufactured by a company other than the original equipment manufacturer ("OEM") in the repair of vehicles provided that such parts are disclosed in the estimate. Wash. Rev. Code ¶ 46.71.025.

McCleod's repaired most of the damaged parts on Mr. Schwendeman's vehicle with OEM parts made or authorized by Ford. McCleod's also installed a rear step bumper made by the Fey Manufacturing Company of Irwindale, California. Declaration of Declaration of Darin Montgomery ("Montgomery Decl.") (Tab D) at ¶ 4; Fey Materials (Tab E), at 1. Although Fey manufactures

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 2

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1   bumpers for several OEMs, the bumper used in Mr. Schwendeman's vehicle was not a Ford OEM

2   part.

3   Nonetheless, the Fey bumper has a towing capacity and a tongue weight capacity which are

4   greater than the capacities of the step bumper made by Ford for his vehicle. Id. at 1, 3. In all respects,

5   the Fey bumper met or exceeded the quality of a Ford bumper. Id.

6   Because Mr. Schwendeman's damaged bumper was discarded, there is no way to know what

7   type of bumper was on the Bronco or its condition prior to the accident. Mr. Schwendeman has

8   expressly indicated that he does not know what type of bumper was on the vehicle or who

9   manufactured the part. Schwendeman Dep. (Vol. I) at 35-36.

10  Pursuant to its subrogation rights, USAA CIC sought reimbursement from Progressive for the

11  repairs to Mr. Schwendeman's vehicle. USAA/SC008683 (Tab F). Accepting that its insured was at

12  fault for the accident, Progressive agreed to indemnify USAA CIC for 100% of the costs that USAA

13  CIC reasonably incurred in repairing Mr. Schwendeman's vehicle. USAA/SC008264 (Tab G).

14  When it came to reimbursement for the cost of the rear bumper, however, Progressive refused.

15  USAA/SC008205, USAA/SC008275 (Tab H). The Fey bumper installed on Mr. Schwendeman's

16  vehicle cost $ 300.28. Schwendeman Dep. (Vol. I) at Exh. 9. Progressive, however, found that a used

17  or "salvage" Ford Bronco bumper had been available for use in the repair. USAA/SC008205. This

18  salvage bumper, although made by Ford, was previously used on another vehicle, and now sat in a

19  local junkyard. The price of the salvage bumper was only $175.00. USAA/SC008207-211 (Tab I).

20  Because Progressive thought that USAA CIC should have used the less expensive salvage

21  bumper, it refused to reimburse USAA CIC any more than $175.00 for the replacement of Mr.

22  Schwendeman's rear bumper. USAA/SC008205. In fact, Progressive considered the Fey bumper

23  used on Mr. Schwendeman's Bronco to be "OEM." Id.; USAA/SC008275, USAA/SC8205.

24  Ironically, Mr. Schwendeman testified that he would have happily accepted a salvage bumper -- which

25

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 3

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

costs $125 <u>less</u> than the new bumper actually used -- to repair his Bronco.  Schwendeman Dep. (Vol. I) at 113-15, (Vol. II) (Tab B) at 57-61.

Sometime after the repair of Mr. Schwendeman's vehicle, he read an advertisement in the Seattle Times from the law firm of Hagens Berman that solicited plaintiffs for a lawsuit against insurance companies who used non-OEM parts in their repair estimates.  Schwendeman Dep. (Vol. I) at 12, 118-19.  Mr. Schwendeman did not know at that time whether any non-OEM parts had been used in the repair to his Bronco, <u>id.</u> at 119, 193, but he was dissatisfied with the work of the repair shop.  Mr. Schwendeman called Hagens Berman in response to the advertisement and spoke with a paralegal at the firm named Larry Kunzler.  <u>Id.</u> at 120.

Mr. Kunzler came to Mr. Schwendeman's house and inspected the Bronco.  <u>Id.</u> at 120, 122.  Mr. Kunzler informed Mr. Schwendeman that non-OEM parts were made of inferior metals and were not as safe as "certified manufactured parts."  Schwendeman Dep. (Vol. I) at 122.  Ignoring the fact that the Fey manufactured the bumper at issue within the United States, Mr. Kunzler called these parts "Taiwan Trash."  <u>Id.</u> at 135-36.  Other than his lawyers, no one ever told Mr. Schwendeman that there was any safety issue or any other problem associated with the use of non-OEM parts.  Schwendeman Dep. (Vol. I) at 192.

Similarly, prior to filing this lawsuit, Mr. Schwendeman never informed USAA CIC or McLeod's that he had any problem with the quality of the Fey rear bumper installed on his vehicle.  <u>Id.</u> at 97, 112.  Even after filing suit, Mr. Schwendeman never told any employee of either USAA CIC or McLeod's that he had any such problem with the quality of the bumper.  Schwendeman Dep. (Vol. II) at 13, 15, 20-21, 22.

On one occasion after filing this suit, Mr. Schwendeman did contact USAA CIC about other problems he had with his repair.  <u>Id.</u> at 9-12.  Mr. Schwendeman scheduled a meeting with the USAA CIC representative and prepared a list of his problems with the repair.  <u>Id.</u> at 22-23, Exh. 1.  Nowhere on the list did he even mention the quality of the rear bumper.  <u>Id.</u> at 23-26.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 4

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

When Mr. Schwendeman brought his vehicle into McLeod's to meet with the USAA CIC representative, he brought an employee of Hagens Berman, Mr. Kunzler.[1] Id. at 16. Mr. Schwendeman did not inform USAA CIC or McLeod's in advance that he was bringing Mr. Kunzler to this meeting. Id. at 15-16. When the USAA CIC representative left the meeting to seek advice on how to proceed given the presence of a legal representative, Mr. Schwendeman departed McLeod's, leaving behind the list. Id. at 23-26, 36.

Despite many requests from USAA CIC to discuss any concerns about the repairs, Mr. Schwendeman never again attempted to discuss any complaints about his repairs with USAA CIC. Id. 29-36, Exh. 2,3. Instead, Mr. Schwendeman's attorneys paid $6,140.50 for repairs to his Ford Bronco, including replacing the rear bumper with a brand new Ford bumper, which cost the repair shop $258.67. Schwendeman Dep. (Vol. II) at 71, Exhs. 7, 9; Stroud's Body Shop Documents STR 86, 93 (Tab J).

**B.    USAA CIC's EFFORTS TO CONTROL REPAIR COSTS**

In an effort to battle the monopolistic prices charged for OEM parts and to lower insurance premiums for its customers, USAA CIC (like many other insurers) implemented a Quality Replacement Parts ("QRP") program in 1989. (Declaration of Jay DeBoer ("DeBoer Decl.") (Tab K) ¶ 6). Under the QRP program, appraisers may specify certain non-OEM replacement parts when state laws permit, and when such parts are of "like kind and quality" to the parts they replace. (DeBoer Decl. ¶ 6.)

USAA CIC has seven regions in the United States and each Regional Director possesses considerable discretion as to how best to implement the QRP guidelines in keeping with USAA CIC's goal of member service and customer satisfaction. (DeBoer Decl. ¶ 9). Additionally, each local

---

[1] The contact between a representative of Hagens Berman and USAA CIC was a violation of RPC 4.2 regarding improper ex parte communication with a represented party. Wright v. Group Health Hosp., 691 P.2d 564 (Wa. 1984). The USAA representative was contacted by Mr. Schwendeman because the representative was an employee who could "bind" or "commit the corporation because of their authority," id. at 586, 70, -- he had the power to decide whether additional repairs were due to Mr. Schwendeman.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 5

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

physical damage manager, staff appraiser, and independent appraiser has individual discretion on whether and when to specify non-OEM parts in a repair. In general, should a like kind and quality non-OEM part not be readily available, USAA CIC will authorize the use of an OEM part. (DeBoer Decl. ¶ 8). It is therefore extremely difficult, if not impossible, to identify an absolute, across the board practice at USAA CIC regarding the specification of non-OEM parts. (DeBoer Decl. ¶ 9).

Many non-OEM parts have been recognized as equal in quality to their OEM counterparts. (Declaration of body shop manager Wendell Blakley ("Blakley Decl.") (Tab L) ¶ 5). In addition, non-OEM parts are, for the most part, significantly less expensive than their OEM equivalents, yet fully warranted by their manufacturer or distributor. (DeBoer Decl. ¶ 7; Blakley Decl. ¶ 5). USAA CIC backs up the manufacturer's warranty with its own warranty on the non-OEM parts it specifies on estimates. (DeBoer Decl. ¶ 7).

For years, car companies (which have a monopoly on OEM parts for their cars), and body shops (which make more money selling higher-priced OEM parts) have vigorously lobbied state legislatures to preclude insurance companies from specifying non-OEM parts. No state has done so. Many states have held hearings, conducted investigations, and determined, as a matter of public policy that the availability of non-OEM parts promotes the public welfare in their states by reducing repair costs and insurance premiums, without sacrificing the quality of the repair. Two states, Massachusetts and Hawaii, have actually made the decision to require the use of non-OEM parts in order to lower insurance premiums. Haw. Rev. Stat. Ann. § 431:10C-313.6(a); Mass. Regs. Code tit. 211, § 133.04 (1999).

Since 1993, all repair estimates in Washington have been required to contain a disclosure about the use of non-OEM parties in the repair. RCW § 46.71.025. In 1998, the car companies and body shops in Washington proposed legislation to ban the use of non-OEM parts. When that effort failed, automobile manufacturers pushed for a requirement that an insured affirmatively "consent" in writing to the use of non-OEM parts in a repair. This effort failed as well. Finally, the car companies

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 6

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1    sought a "disclosure" on insurance estimates that expressly indicated that non-OEM parts were

2    specified in the estimate. Legislative Materials (Tab M). The legislature uniformly rejected each of

3    these attempts to regulate the use of non-OEM parts in Washington. Plaintiff now seeks from this

4    Court what the legislature, after consideration and investigation, has refused to do -- ban the use of

5    non-OEM parts in Washington.

6        USAA CIC members have enjoyed the results of the QRP Program through lower premiums

7    and increased dividends. Even the Plaintiff in this case admitted that _after_ the subject accident and

8    repair he nonetheless renewed his insurance policy with USAA CIC because his premiums were

9    substantially lower than those offered by two other insurance companies he contacted. Schwendeman

10   Dep. (Vol. 1) at 50-52.

11   **C.    QUALITY ASSURANCE IN THE REPAIR PROCESS**

12       Although USAA CIC pays for the repair of damaged vehicles of its insureds pursuant to the

13   terms of their policies, it does not actually repair the damaged vehicles. Instead, parts are purchased

14   and repairs are made by local body shops selected by the policyholders. USAA CIC works with the

15   body shop, seeking to ensure that a quality repair is made at a reasonable price. Generally, the repair

16   process starts when USAA CIC inspects the damaged vehicle and writes an initial estimate for the

17   repair costs, specifying the parts that should be replaced and for which USAA CIC will pay.

18       USAA CIC works closely with body shops to prevent the installation of inferior non-OEM

19   parts on insured vehicles. USAA CIC routinely pays for an OEM part if a body shop cannot obtain a

20   like kind or quality non-OEM part or has had prior problems with a specific non-OEM part. (Blakley

21   Decl. ¶ 12-13; DeBoer Decl. ¶ 8.) Body shops also sometimes install OEM parts without passing on

22   the cost to either USAA CIC or the policyholder. (Blakley Decl. ¶ 12.)

23       In some cases, policyholders may decide they want OEM parts and pay the difference in cost

24   out of their own pockets. There are also situations where an insured wants more non-OEM parts used

25   in a repair -- as in the case where the cost of OEM parts is so exorbitant that the cost of repair exceeds

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 7

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

the limit for declaring the vehicle a total loss. This is particularly true when the insured owes more on the loan for the vehicle than would be paid for the total loss. Thus, the fact that a non-OEM part was specified in a USAA CIC repair estimate does not mean that it was actually installed on an insured's vehicle. Although USAA CIC's estimate may specify non-OEM parts, the estimate does not demonstrate whether those parts were actually installed by the body shop or, if not, who paid for the installation of an OEM part. (DeBoer Decl. ¶ 7.)

USAA CIC provides its policyholders with a written warranty, promising to repair or replace -- at no cost to the insured -- any USAA CIC specified non-OEM part that does not meet USAA CIC's standards. (DeBoer Decl. ¶ 7.) Currently, the warranty runs for three years or as long as the warranty on a comparable OEM part, whichever is greater. (Id.) In addition, many non-OEM manufacturers and distributors have their own warranties on their parts. (Id.)

### III. ARGUMENT

**A.    PLAINTIFF HAS FAILED TO ESTABLISH THE ELEMENTS NECESSARY FOR CLASS CERTIFICATION UNDER CR 23.**

The Court may not certify a class action unless it determines, after conducting a rigorous analysis, that the plaintiff has established the following:

1.   the class is so numerous that joinder of all members is impracticable (numerosity);

2.   there are questions of law or fact common to the class (commonality);

3.   the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality);

4.   the representative parties will fairly and adequately protect the interests of the class (adequacy).

CR 23(a) (class may be certified only if all four elements are satisfied); Johnson v. Moore, 496 P.2d 334, 335 (Wa. 1972) (class action, to be maintainable under CR 23(a), must first meet these four prerequisites).

In addition to the prerequisites of CR 23(a), the Court must find that one of the requirements of CR 23(b) exists. In the present case, the only such relevant requirement is whether "the questions

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 8

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1   of law or fact common to members of the class predominate over any questions affecting only

2   individual members." CR 23(b)(3) . Under Washington law, "[c]lass actions are specialized types of

3   suits, and as a general rule must be brought and maintained in strict conformity with the requirements

4   of CR 23." Lacey Nursing Center, Inc. v. Washington, 905 P.2d 338, 341 (Wa. 1995); DeFunis v.

5   Odegaard, 529 P.2d 438 (Wa. 1974).

6       Plaintiff asserts that "[s]ince a class certification is made at the pleadings stage of an action,

7   the factual allegations in the complaint are taken as true." Plaintiff's Motion for Class Certification

8   and Supporting Memorandum ("Pl's Mem.") at 4 (purporting to cite Eisen v. Carlisle & Jacqueline,

9   417 U.S. 156, 177 (1974) in support). This is a gross misstatement of both binding Washington law

10  and instructive federal class action law. Plaintiff engages in a bit of sleight of hand by correctly citing

11  to cases which hold that a determination of whether the plaintiff will ultimately prevail on the merits

12  of the lawsuit is not appropriate in a CR 23 analysis, but then arguing that the court cannot question

13  the evidence relating to the elements of CR 23. See Pl's Mem. at 4.

14      It is clear that evidence regarding each element of the CR 23 analysis must be considered by

15  the Court in making its determination whether certification of the class is appropriate. Eisen v.

16  Carlisle & Jacqueline, 417 U.S. 156, 177 (1974); 7A Wright & Miller, Federal Pract. & Proc., § 1759,

17  at 98-99 (2d ed. 1986).[2] Otherwise plaintiffs would be free to make any allegation they wanted and

18  thus flood the courts with frivolous class actions. See Darling v. Champion Home Builders Co., 638

19  P.2d 1249, 1252 (Wa. 1982).

20      The error of Plaintiff's assertion is best illustrated by the Washington Supreme Court's

21  decision in Washington Educ. Ass'n v. Shelton School Dist. No. 309, 613 P.2d 769 (Wa. 1980).

22  Plaintiff cites this case in support of his argument, quoting the Court's statement that "certification of

23  a class is to be undertaken with no consideration of the merits of plaintiff's claims." Pl's Mem. at 4

24  (quoting Washington Educ. Ass'n, 613 P.2d at 773). What Plaintiff fails to point out is that the

25  _____

    [2] CR 23 is the "exact counterpart" of Fed. R. Civ. P. 23. Johnson, 496 P.2d at 334. Therefore,
    Washington courts regularly rely on federal cases for guidance regarding CR 23. Id.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 9

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1    Supreme Court's decision in that case reversed a denial of class certification because the trial court

2    ignored the elements of CR 23 and just considered standing, venue, and the underlying substantive

3    merits of the plaintiffs' claims. Wash. Educ. Ass'n, 613 P.2d at 772-73. The Supreme Court defined

4    the issue on appeal as such: "[t]he case at this stage in the proceedings presents no substantive issues

5    as to the merits of plaintiffs' action," rather "[w]e must determine merely whether the court's

6    procedural rulings were premature." Id. at 772. Interestingly, the Supreme Court remanded the case

7    to the trial court "for a class certification decision pursuant to the criteria contained in CR 23 after

8    completion of plaintiff's requested discovery on this issue." Id. at 775 (emphasis added). If, as

9    Plaintiff contends, "the allegations in the complaint are accepted as true" when analyzing CR 23, then

10   this aspect of the Supreme Court's instructions would make no sense.

11   As the Washington Supreme Court noted,

12   [a]lthough class actions are advantageous and important in our system of
     justice, they present opportunities for abuse, both intentional and inadvertent, as
13   well as problems of management for the court and counsel. The potential
     abuses of the class action process include stirring up litigation, . . .[and], the
14   maintenance of an action by counsel. . . .

15   Darling, 638 P.2d at 1252.

16   **B.    PLAINTIFF FAILS TO SATISFY ANY OF THE FOUR PRONGS OF CR 23(a).**

17       **1.    Because It Is Impossible To Identify The Members Of The Class, Plaintiff Has
            Not Satisfied The Numerosity Requirement Of CR 23.**

18   Under Washington law, a plaintiff must establish that the members of the alleged class are "so

19   numerous that joinder of all members is impracticable." CR 23(a)(1). USAA CIC does not presently

20   dispute that there are numerous USAA CIC insureds living in Washington who had non-OEM parts

21   specified on their repair estimates and who may have had these parts installed on their vehicles.

22   Plaintiff fails, however, to show that the class is readily identifiable, a second "element" of

23   numerosity. This standard requires that Plaintiff identify a class that can be ascertained through

24   reasonable effort. See In re Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603 (N.D. Ga. 1997)

25   (the second element of numerosity requires a class that can be ascertained through reasonable effort);

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 10

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1    <u>Southern Bell Telephone & Telegraph Co. v. Wilson</u>, 305 So. 2d 302, 305 (Fla. 3d DCA 1974)

2    (reversing class certification where court could not determine the identity of class members of class or

3    even the size of the class without inquiring into the factual circumstance of each incident).

4         USAA CIC's estimates identify the policyholders who had non-OEM parts used in estimating

5    the cost of repairs, but those records do not show whether the non-OEM parts specified were actually

6    installed on the policyholders' vehicles. There are many reasons that the insured does not actually

7    receive a non-OEM part -- the part may not be available; the part may not fit; the insured may choose

8    not to have a non-OEM part used on his vehicle; the insured may choose not to repair the vehicle and

9    pocket the money; or the body shop may voluntarily install an OEM part at no charge.

10         By the very terms of USAA CIC's policies, there can be no breach of the policies if the non-

11    OEM part installed on an insured's vehicle was of "like kind and quality, less allowance for

12    depreciation and physical deterioration." Furthermore, under plaintiff's theory, the use of OEM or

13    salvage parts would satisfy the policy terms. Therefore, a class member who received an OEM or

14    salvage part at no additional cost cannot claim to have suffered any economic or other loss under

15    Plaintiff's theory. Yet the only way to determine which potential class members actually had non-

16    OEM parts installed on their vehicles is to examine the individual facts surrounding each repair and

17    each class member's vehicle. Because the class cannot be ascertained without an inspection of each

18    and every purported class member's vehicle, the class Plaintiff purports to represent simply cannot be

19    identified.

20         A Pennsylvania federal district court recently made this precise point in denying certification

21    of a class of purchasers of Chrysler vehicles with allegedly defective paint. <u>Sanneman v. Chrysler</u>

22    <u>Corp.</u>, 191 F.R.D. 441 (E.D. Pa. 2000). As the court noted, "the practical issue of actually identifying

23    class members" - proving whose vehicles had suffered or were suffering paint delamination -

24    "presents serious administrative burdens that are incongruous with the efficiencies expected in a class

25    action." <u>Id.</u> at *4. Because there was no way to determine, without looking at each individual

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 11

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

vehicle, whose vehicles were in fact delaminating or had delaminated - let alone why the delamination had occurred - the Sanneman court denied class certification. Id.

The same result should be reached here, where without looking at each individual vehicle and repair, it is impossible to determine which members of the purported class actually had non-OEM parts installed on their vehicle and thus have standing to seek damages as part of the purported class for any alleged breach of contract. Id.; see also In re Agricultural Chem. Antitrust Litig., No. 94-402160-MMP, 1995 WL 787538 at *2 (N.D. Fla. Oct. 23, 1995) (where even though customer lists existed, they did not enable a quick determination of which customers fell in the purported class, the court found that "it would take much sweat and calculation to determine who fits in this proposed 'class' of individuals").

2.    **Plaintiff's Claim Fails To Raise Common Questions Of Law Or Fact**

Commonality requires that "[t]he interests of the plaintiffs must be coextensive with the interests of the other members of the class with a common right of recovery based on the same essential facts." CR 23(a)(2); Panorama Residential Protective Ass'n v. Panorama Corp., 627 P.2d 121, 129 (Wa. App. 1981); Johnson, 496 P.2d at 336 (CR 23(a)(2) requires a finding that there are questions of law or fact common to the purported class). Plaintiff cannot carry his burden of demonstrating common issues of law or fact under CR 23(a)(2) because of the individual nature of the issues inherent in the proposed class.

Plaintiff cannot possibly establish that each and every non-OEM part used on an estimate by USAA CIC for one of its Washington insureds is not of "like kind and quality" to the part that it replaced. Common sense dictates that in order to determine whether a replacement part is of "like kind and quality" to the part it replaces requires two separate inquiries: i) what was the condition of the vehicle before the accident and the part being replaced (e.g. age, mileage, physical condition); and ii) what is the quality of the replacement part and repairs. Rios v. Allstate Ins. Co., No. 94CH 11396 (Cook Cty. Cir. Ct. Jan. 27, 1998); Thames v. United Services Auto. Ass'n, supra.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 12

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

Plaintiff asserts that the common question raised by the purported class is whether USAA CIC's "claims settlement practice and, in particular, its uniform specification of non-OEM crash parts, violates its contractual obligations, constitutes an unfair and deceptive practice, and violates the duty of good faith and fair dealing owed by USAA CIC to its insured." Pl's Mem. at 2. This misrepresents USAA CIC's policy, a policy that allows the specification of OEM, non-OEM, and salvage parts in its estimates so long as they are of like kind and quality to the part they replace, and the use of the parts complies with state law. (DeBoer Decl. ¶¶ 6, 8.) Even with Plaintiff's misstatement, the absence of "common" questions of law and fact in this case is apparent: the issue of whether a part is of "like kind and quality" to the part originally on a car necessarily requires an individualized assessment of each class member's claim. Indeed, it requires an individualized assessment of each class member's vehicle.

### a.     The Facts Vary With Each Class Member's Vehicle.

Substantially variable facts giving rise to different claims will defeat class certification. See, e.g., Panorama, 627 P.2d at 129 ("estoppel issues contained too many individual variables to be tried as a class action"); Lance v. Wade, 457 So. 2d 1008 (Fla. 1984) (fraud claims based on separate contracts are inherently diverse and not appropriate for class treatment); see also In re American Medical Sys. Inc., 75 F.3d 1069, 1081 (6th Cir. 1996) (no commonality where plaintiffs received different models of medical devices and had different complaints regarding each of those models). Here, the facts are not only substantially variable, but they vary with each and every would-be class member and each and every automobile at issue.

### (1)     Whether A Non-OEM Part Is Of "Like Kind and Quality" To The Part It Replaced Depends On a Host of Individualized Factors.

### (a)     Plaintiff Cannot Generalize That Each And Every Non-OEM Part Is Not Of "Like Kind And Quality" To The Part It Replaced.

The non-OEM parts challenged by the Plaintiff's purported class action may not be lumped together en masse, but rather must be assessed on an individualized basis. See Andrews v. American

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 13

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

Tel. & Tel. Co., 95 F.3d 1014, 1024 (11th Cir. 1996) (court noted that different types of 900-number programs required individual examination and could not be lumped together and "condemned or absolved en masse"). The quality of each non-OEM part varies by part and by manufacturer, and must be analyzed individually to determine whether it was of "like kind and quality" to the part originally on each class member's vehicle. (Blakley Decl. ¶¶ 5, 6, 7, 8, 9.)

In addition, whether a certain part is of "like kind and quality" to the part it replaces necessarily depends on the condition of the part originally on the vehicle. See id. at 6-7; Osborne v. Subaru of America, 198 Cal. App. 3d 646, 659 (Cal. 3d DCA 1988) (noting that whether cars are fit for their ordinary purpose will "necessarily vary from vehicle to vehicle . . . in determining whether Subaru lived up the implied warranty of that accountability would require proof of the history of each vehicle and its problems").

The determination of whether a particular non-OEM part is of like kind and quality to the part that it replaces requires extensive analysis of numerous factors peculiar to each class member, including the overall condition of his or her vehicle, its accident history, the manufacturer of the vehicle, the mileage, the age, and the type of damage sustained. (Blakley Decl. ¶¶ 6, 7.) For example, the accident history of each car must be examined because some class members may have already had non-OEM parts installed on their cars prior to the replacement of a part specified in a USAA CIC estimate, in which case, even under Plaintiff's theory, USAA CIC's specification of a particular non-OEM part for such class member's car would be permissible. In addition, whether the replacement part specified by USAA CIC was of "like kind and quality" depends to a large degree on the skill of the repair shop in installing each part. (Blakley Decl. ¶ 11.)

        **(b)**      **The Idiosyncrasies Of Plaintiff's Individual Claim Cannot Be Used To Adjudicate The Unique Claims Of Every Other Class Member.**

The absence of commonality becomes clear in this case when examining Plaintiff's claim. In this particular case, Plaintiff's car had approximately 116,000 miles on it at the time of the accident. Schwendeman Dep. (Vol. I) at 167, Exh. 16. Plaintiff bought his Ford Bronco used, and did not know

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 14

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

if his vehicle had previously been in an accident. Id. at 29-31, Exh. 1. Plaintiff could not, therefore, even testify that his vehicle's bumper was an OEM part prior to the subject accident. Id. at 34-35.

After Mr. Schwendeman filed this suit, USAA CIC inspected his vehicle and learned that it had been involved in an accident prior to the accident for which USAA CIC provided coverage. USAA CIC also determined that the front bumper of Plaintiff's vehicle had previously been replaced with a refurbished bumper. (Montgomery Decl. at ¶ 5). One is left to wonder how Plaintiff will prove that a non-OEM rear bumper is not of "like kind and quality" to the part it replaced when he is unable to testify that the replaced bumper was an OEM part. Whether the non-OEM rear bumper specified in USAA CIC's estimates for Plaintiff' car were of "like kind and quality" must, however, necessarily take these factors into account.

Moreover, a determination of liability in Plaintiff's case does not mean that another Plaintiff with a different vehicle has a valid cause of action. Even if the Court determined that the Fey non-OEM rear bumper specified by USAA CIC for Plaintiff's 1993 Ford Bronco -- which was made in California -- was of "like kind and quality" to the part that it replaced, such a finding would do little to establish that, for example, another non-OEM bumper -- manufactured in Taiwan for another class member's 1976 Pontiac Camaro or 1993 Ford Escort or 1995 Mazda 626 was of "like kind and quality" to the part originally on that member's car. See Rios v. Allstate Ins. Co., No. 94CH 11396 (Cook Cty. Cir. Ct. Jan. 27, 1998) at 13 ("Certainly, therefore, the nature of the part required for a 1984 vehicle might be different than the part for a 1987, 1990, 1993, and 1996 [vehicle]."); see also In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 334 (D.N.J. 1997) (general similarity between ignition switches at issue did not "necessarily mean, for example, that if the switch in the typical 1990 Ford Aerostar has an acceptably high risk of being defective, then so has the switch in the typical 1987 Ford Tempo"). Put simply, a determination regarding Plaintiff's rear bumper would provide no insight regarding the quality of a fender, quarter panel, hood, headlight, or any of the estimated other 33,000 non-OEM parts for the multitude of makes and models of vehicles

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 15

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

driven by USAA CIC's Washington policyholders. These individual questions defeat the very purpose of class certification. See Costin v. Hargraves, 283 So. 2d 375, 377 (Fla. 1st DCA 1973) (because "[t]he extent to which any plaintiff or any member of plaintiffs' 'class' may be entitled to the relief sought would be dependent upon different facts and circumstances for each plaintiff," class action cannot lie).

> **(c)    Virtually All Courts Which Have Examined This Type of Claim Have Concluded Class Certification Is Not Appropriate.**

Recognizing the presence of these individual issues, several other courts addressing the use of non-OEM parts in the context of lawsuits brought by insureds against their insurance companies have refused to adjudicate such a claim on a class basis. See Murray v. State Farm Mut. Auto. Ins. Co., No. 96-2585-m1/A (U.S. Dist. Ct., W.D. Tenn. Aug 19, 1997) (district court refused to certify a class of Tennessee State Farm insureds bringing claims based on State Farm's non-OEM crash parts policy) (attached at Tab N); Rios v. Allstate Ins. Co., No. 94CH 11396 (Cook Cty. Cir. Ct. Jan. 27, 1998) (court refused certification of a class in a case brought by insureds against Allstate where the plaintiffs challenged Allstate's use of non-OEM parts in its estimates and repairs) (attached at Tab O); see also Moorhead v. State Farm Mut. Auto. Ins. Co., No. 95-AR-0688-S, Order at 6 (N.D. Ala. Sept. 12, 1997) (district court declined to certify class because class representatives were inadequate, and expressed doubts as to whether class claims related to State Farm's use of non-OEM parts in estimates and repairs satisfied commonality requirement for class certification) (attached as Tab U); Thames v. United Services Auto. Ass'n, Case No. 98-01324 CA Div. CV-B (Duval Co. Cir. Ct. Fl. June 9, 2000) (summary judgment granted on class claims in part because class issues not common) (attached at Tab P).

The Circuit Court of Cook County, Illinois explicitly recognized the burden the individualized inquiries cited above place upon a court, and refused to certify a class attacking Allstate's non-OEM policy. See Rios, No. 94 CH 11396. In Rios, as in this case, the plaintiffs framed the claims at issue as a "simple breach of contract issue." The Court, however, noted that " the contractual obligation of

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 16

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1   like kind and quality is to bring the vehicle to its pre-accident condition, which of course is going to

2   vary from vehicle to vehicle," and that "[c]ommon sense would dictate . . . that one of the issues that

3   would have to be considered is the nature of the person performing the repair because, in fact, the

4   nature of the repair would have a great deal to do with the acceptability." The Court further noted that

5   " [t]here are, I believe . . . 30,000, but certainly many, many thousands of different parts, and it would

6   be necessary to compare the parts on a part-by-part basis." Id. "It would be illogical for the Court to

7   examine a near handful of the . . . 30,000 non-OEM parts to make a comparison to OEM parts and

8   somehow extrapolate from that that therefore the whole panoply of 30,000 parts are affected. That

9   clearly would be inadequate and unacceptable." Id. at 11-14 (emphasis added).

10   Similarly, a federal court in Tennessee, in an Order Denying Plaintiff's Motion for Class

11   Certification in Murray v. State Farm Mut. Auto. Inc. Co., held that the complex and numerous factual

12   issues that are raised by the use of non-OEM parts defeat commonality, and denied certification of a

13   single state class. The Order states that:

14   > Although there may be questions of fact as to whether a particular non-OEM
   > crash part is inferior to its OEM counterpart, those questions are certainly not
15   > common. In fact, as defendants explain, this determination, given the
   > differences in vehicle makes and models and the fact that there are several
16   > manufacturers of non-OEM crash parts, would require the testing of thousands
   > of individual crash parts. In addition, the defects, if any, would most likely
17   > have their own unique characteristics. Moreover, plaintiffs' common questions
   > of law are dependent on a finding that [all] non-OEM crash parts are inferior to
18   > their OEM counterparts. As such, the Court finds that plaintiffs have not
   > demonstrated that the proposed classes satisfy the commonality requirement of
19   > Rule 23(a)(2).

20   Murray v. State Farm Mut. Auto. Ins. Co., No. 96-2585-ml/A (U.S. Dist. Ct., W.D. Tenn. August 19,

21   1997) (emphasis added).

22   Most recently, a state trial court in Florida, considering issues identical to those presented by

23   Plaintiff here, concluded that the plaintiff in that case "cannot possibly establish that each and every

24   non-OEM part specified in an estimate by USAA CIC is not of 'like kind and quality' to each and

25

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 17

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

every part replaced." Thames v. United Services Auto. Ass'n, Case No. 98-01324 CA Div. CV-B at 11 (Duval Co. Cir. Ct. Fl., June 9, 2000) (emphasis in original). In Thames, the court held that

> [e]ach class member was involved in separate accidents, used separate repair shops, and had their different makes and models of vehicles repaired with different parts. Therefore, by their very nature, the alleged claims of each of the purported class members are separate and distinct, each arising out of the quality of the specific non-OEM parts used to repair each individual class member's vehicle.

Id. The Court concluded that "as a matter of law, there are no questions of law or fact common to this purported class." Id. at 14.

Notwithstanding the above cases, Plaintiff argues that this Court should grant class certification because of a single state court decision from Illinois, a decision that is currently on appeal. See Snider v. State Farm Mut. Auto. Ins. Co., No. 97-L-114 (Williamson Cty Cir. Ct. Ill. December 5, 1997). Plaintiff's attempts to rely on the Snider order as persuasive authority is misleading because, in fact, the court's decision goes against the weight of authority noted above.

### (2)    The Court Would Have to Conduct An Individualized Inquiry Into Each and Every Class Member's Damages.

The calculation of damages also depends on specific facts and circumstances attendant to each class member's claim. Again, such a factually complex inquiry cannot support class certification. See In re Stucco Litig., 175 F.R.D. 210 (E.D.N.C. 1997) (finding class certification inappropriate where the question of compensation for physical damage to homes would implicate myriad "house-specific" issues and similarly, an analysis in diminution in value of the homes would require individualized inquiries into items such as market value of the affected homes and of comparable homes in the area); Broussard v. Meineke Discount Muffler Shops, 155 F.3d 331 (4th Cir. 1998) (need for individual proof of damages bars class certification).

In this case, the damages allegedly covered by USAA CIC's specification of non-OEM parts depend on a variety of factors that differ with each class member. First, the extent and nature of damages will depend on whether the class member actually had non-OEM parts installed in their car or only received monetary compensation determined in relation to the cost of non-OEM parts.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION - 18

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1    Although non-OEM parts may have been specified in USAA CIC's estimates, owners may have had

2    new or used OEM parts installed in their vehicles at no additional cost for a variety of reasons. (See

3    Blakley Decl. ¶¶ 12, 16). For those class members with non-OEM parts installed on their cars, the

4    calculation of damages must consider, among other things, the original value of their car, the value of

5    the non-OEM parts installed, and how each non-OEM part affected the value of each individual car.

6    For example, in some cases, purported class members may have sold their cars at fair market value

7    with the non-OEM part specified by USAA CIC installed in the cars, thereby suffering no damages

8    from USAA CIC's specification of non-OEM parts for their vehicles' repairs. Because of these

9    differences in damages, Plaintiff's purported class is not appropriate for certification. Id.

10    Related to the damages issues is USAA CIC's contractual right to an allowance for the

11    depreciation and condition of the subject vehicle. As Plaintiff's claim makes clear, the pre-accident

12    condition of each plaintiff's vehicle will vary and, accordingly, the allowance to which USAA CIC is

13    entitled under the Policy would also vary, injecting even more individual issues into this case.

   b.    **Plaintiff's Consumer Protection Act Claims Are Similarly Not Amenable To Class Treatment.**

14

15    In his Complaint, Plaintiff asserts that USAA CIC violated the Washington Consumer

16    Protection, RCW 19.86.010 et seq., by engaging in "deceptive practices" related to its specification of

17    non-OEM parts in its estimates. Complaint at ¶ 67. In order to establish a violation of the Consumer

18    Protection Act, Plaintiff must establish that: (1) USAA CIC's actions were unfair or deceptive; (2) the

19    actions occurred in the conduct of any trade or commerce; (3) the actions affected the public interest;

20    (4) an injury was sustained by each member of the purported class; and (5) the unfair or deceptive

21    actions were causally linked to the injury. See Insurance Co. of Pennsylvania v. Highlands Ins. Co.,

22    801 P.2d 284, 286 (Wa. App. 1990).

23    In the present action, Plaintiff cannot establish four of the five elements of such a claim on a

24    class basis. First, the question whether USAA CIC acted in an unfair or deceptive manner toward

25    each purported class member is an individualized inquiry. It is undisputed that USAA CIC provided

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 19

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

information about its non-OEM parts policy to class members, even if Mr. Schwendeman does not recall reviewing it. Schwendeman Decl. (Vol. I) at 116-17, Exh. 12, 13. Whether a purported class member was "deceived" requires an examination of each class member to determine what information each member received from USAA CIC and what knowledge the purported class member had from any other source, including press reports about recent non-OEM litigation. Even Mr. Schwendeman admits that USAA CIC did not deceive him. Schwendeman Dep. (Vol. I) at 189.

Second, Plaintiff fails to allege, much less explain, how USAA CIC's actions affected the public interest. See Highlands, 801 P.2d at 286. This action involves an alleged dispute regarding private contractual rights between USAA CIC and its Washington members. An insurer's interactions with its insureds do not constitute a violation of the Act unless the insurer acts in bad faith, i.e. only if its actions were both frivolous and unfounded. See id. As explained previously, whether USAA CIC's use of non-OEM parts was a breach of contract, much less "frivolous and unfounded," requires an individual inquiry into the specifics of the member's vehicle, repair and the part used in the repair. Additionally, and perhaps most importantly, to the extent the public's interest is affected by the use of non-OEM parts, the Washington legislature has expressly addressed this very issue by permitting the use of these parts provided that adequate disclosure is made. Wash. Rev. Code § 46.71.025.

Third, Plaintiff cannot establish whether each purported class member was injured in his business or property on a class basis. For all of the reasons that Plaintiff cannot identify the members of his purported class, he also cannot determine who sustained the requisite necessary injury. If Plaintiff cannot establish injury for each purported class member, the Consumer Protection Act claim must fail. See Capelouto v. Valley Forge Inc., Co., 990 P.2d 414 (Wa. App. 1999). Last, Plaintiff cannot establish causation if he cannot establish injury.

For all of these reasons, Plaintiff cannot establish that common questions of fact or law exist for the Consumer Protection Act claim.

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

### c. Plaintiff's Claim Of Good Faith And Fair Dealing Does Not Raise Common Issues.

Plaintiff also tries to assert a claim on behalf of the class for breach of the duty of good faith and fair dealing. Complaint at ¶ 73 et seq. Plaintiff's contentions are based upon conclusory allegations with no explanation as to how USAA CIC breached this duty. Furthermore, Plaintiff does not explain anywhere in his Motion for Class Certification why a class should be certified on this claim. For the same reasons that Plaintiff cannot establish injury for each of the purported class members, this claim cannot be certified for class treatment.

### 3. The Claim Of The Representative Plaintiff Is Not Typical Of The Claim Of Each Member Of The Purported Class.

The typicality requirement mandates that "the claims . . . of the representative parties are typical of the claims . . . of the class." CR 23(a)(3); Broussard, 155 F.3d at 331, 340. The typicality requirement limits the class claims to those encompassed by the named plaintiff's claims. The underlying rationale is that, by pursuing his own claims, the named plaintiff will advance the claims of the class so that an adjudication of the defendant's alleged wrongdoing as to the named plaintiff will necessarily decide the common question of the defendant's wrongdoing as to the class generally. 1 Newberg & Conte, Newberg on Class Actions, 3.13 at 3-75 (3d ed. 1992) (citations omitted); see also Mace v. Van Ru Credit Corp., 109 F.3d 338, 341 (7th Cir. 1997) (typicality requirement of Fed. R. Civ. P. 23, like the commonality requirement, ensures that only those plaintiffs . . . who can advance the same factual and legal arguments may be grouped together as a class).

### a. Plaintiff's Claim Is Atypical Of Other Class Members' Claims Because Of The Circumstances Surrounding The Repair Of His Car.

As demonstrated above, the claims of each purported class member differ with each and every non-OEM part specified and with each and every class member's vehicle. Such diversity in facts and law prevents Plaintiff from asserting that his claim is typical of any other class member. Indeed, every class member's claim is unique, individualized, and "atypical." As the Third Circuit has held, in a case encompassing a "hodgepodge of factually as well as legally different plaintiffs . . . no set of

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 21

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

representatives can be 'typical' of this class." Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996), aff'd sub nom. Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

In Plaintiff's case, the only non-OEM part specified in his estimate was the Fey non-OEM rear bumper used to replace the damaged rear bumper on his 1993 Ford Bronco. A salvage OEM bumper, which cost substantially less than USAA CIC paid for the Fey bumper, was available for this repair. Plaintiff has admitted that this bumper would have satisfied USAA CIC's obligation under the Policy. Because USAA CIC's obligation is solely to pay for the cost of the repair, it has already exceeded its obligation under the Policy by paying for the more expensive Fey bumper.

The unusual circumstances surrounding Plaintiff's repair are clearly relevant to any calculation of damages as well as breach of contract, but they are not typical of class members. To the contrary, these facts are atypical and absent class members would be prejudiced by having their claims adjudicated with Plaintiff as their representative. Most purported class members certainly had non-OEM parts other than a rear bumper specified in the USAA CIC estimates for their vehicles. Other class members had OEM parts actually installed in their cars. And with certainty, the majority of purported class members did not own a 1993 Ford Bronco in the same condition as Mr. Schwendeman's vehicle for purposes of determining questions of "like kind and quality." Simply put, because the individualized circumstances vary for each of the class members, no typical class member exists. See also In re American Medical Sys. Inc., 75 F.3d 1069, 1082 (6th Cir. 1996) ("[W]e know from the amended complaint that each plaintiff used a different model [of medical device], and each experienced a distinct difficulty . . . These allegations fail to establish a claim typical to each other, let alone a class").

Plaintiff's Complaint is replete with references belittling an independent certifying body, Certified Automotive Parts Association ("CAPA") and its role in the use of non-OEM parts by USAA CIC. See Complaint at ¶¶ 19, 37. Mr. Schwendeman's Fey bumper, however, is not a part which had

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 22

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

been certified by CAPA because CAPA does not certify bumpers. Nonetheless, Mr. Schwendeman purports to represent a class of persons whose vehicles were repaired with parts certified by CAPA.

**b.    Plaintiff's Claim Is Atypical Based On His Own Actions.**

Mr. Schwendeman asserts a claim under the Washington Consumer Protection Act, claiming, among other things, that USAA CIC failed to disclose and knowingly conceals the "fact" that "it will use imitation auto parts in the repair of insureds vehicles, or will settle claims based upon the cost of suing such imitation parts." Complaint ¶ 67(a)(9).[3]

During his deposition, Mr. Schwendeman was presented with two examples of brochures or mailings sent to USAA CIC insureds which described USAA CIC's use of non-OEM parts in estimates in great detail. Schwendeman Dep. (Vol. I) at 116-17, Exhs. 12, 13. Mr. Schwendeman claimed that he had not seen either of these documents prior to the deposition. Id. at 116-17. After reading these documents, Mr. Schwendeman admitted that he understood why USAA CIC would use non-OEM parts. Id. at 118. Even he admitted that it was not USAA CIC's fault that he had not seen these documents. Id. at 188. Furthermore, Mr. Schwendeman admitted that USAA CIC had not deceived him about its policy. Id. at 189.

**4.    Plaintiff Cannot Fairly And Adequately Protect And Represent The Interests Of Each Class Member.**

Certification of a class action requires that the plaintiff establish that he can "fairly and adequately protect and represent the interests of each member of the class." CR 23(a)(4) . A trial court should decline to certify a class if the representative plaintiff would not fairly and adequately protect and represent the interests of each member of the class. Marquardt v. Fein, 612 P.2d 378, 381 (Wa. App. 1980). "'[T]he adequacy of representation' requirement is met if the named representatives have interests in common with the proposed class members and the representatives and their qualified attorneys will properly prosecute the class." Pottinger v. City of Miami, 720 F.

---

[3]    Plaintiff alleges other purported violations of the CPA, each of which fail on the same basis as the breach of contract claim -- each assume that non-OEM parts are per se not of "like kind and quality" to the part it replaces.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 23

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

Supp. 955, 959 (S.D. Fla. 1989); see also Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 726 (11th Cir. 1987).

### a.    Because Of Intra-Class Conflicts Within This Case, Plaintiff Cannot Be An Adequate Class Representative.

Intra-class conflicts preclude adequacy of representation in this case. Plaintiff's proposed class encompasses USAA CIC insureds, as well as former USAA CIC insureds. This presents very real conflicts of interest in the class because USAA CIC insureds have no interest in paying for the specification of only OEM parts on the cars of claimants. Equally important, former USAA CIC insureds have no interest other than maximizing recovery. Any recovery in this case will come out of the pockets of the USAA CIC insureds in the form of increased premiums and lower dividends. It is simply not possible for one plaintiff and one group of lawyers to represent these two groups. See, e.g., DeFunis, 529 P.2d at 441; Gilpin v. American Federation of State County, and Municipal Employees, et al., 875 F.2d 1310, 1313 (7th Cir. 1989) (class action not certifiable where members of class had "potentially divergent aims"). In DeFunis, the Washington Supreme Court stated that:

> In evaluating the applicability of CR 23(a) (4), the prerequisite that the interests of a purported class be fairly and adequately represented, one of the essential factors to be considered is the presence of absence of adversity within the asserted class. Conflicting or antagonistic interests among members of the alleged class in the subject matter of the litigation, necessitating a determination of priorities between class members, may render a class action an improper vehicle for seeking vindication of a given right.

Id. (citing Anderson v. Moorer, 372 F.2d 747 (5th Cir. 1967); 7 C. Wright & A. Miller, Federal Practice and Procedure 638 (1972)); see also, Marquardt, 612 P.2d at 381.

### b.    Plaintiff Cannot Be An Adequate Class Representative Because He Has Abdicated Responsibility For Pursing This Action To His Attorney.

Plaintiff is also an inadequate class representative because Plaintiff has completely abdicated all responsibility in the case to his attorneys. If the named plaintiff's "participation is so minimal that they virtually have abdicated to their attorneys the conduct of the case," then the class must not be certified. Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 728 (11th Cir. 1987). Plaintiff admitted that he has basically turned this case over to his lawyers. Schwendeman Dep. (Vol. I) at 186, 191-92;

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 24

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1   Schwendeman Dep. (Vol. II) at 90-9. Plaintiff had never personally met any of the attorneys prior to

2   filing the lawsuit. Schwendeman Dep. (Vol. I) at 182. In fact, he never met any of his attorneys face

3   to face prior to the day before his deposition. Id. Prior to preparing for his deposition, he had not

4   reviewed any documents in the case other than the original Complaint, which he "scanned" with a

5   paralegal. Id. at 181, 185. Nor did he review the First Amended Complaint before it was filed.

6   Schwendeman Dep. (Vol. II) at 88. In fact, the first time he saw the First Amended Complaint was

7   the week before his second deposition. Id. at 92. Mr. Schwendeman was not even aware that certain

8   allegations in the First Amended Complaint had been struck. Id. at 100. He has no first-hand

9   knowledge about the quality of non-OEM parts. Id. at 203-204. Nor did he even understand who was

10   a member of his purported class during his deposition. Id. at 190. Mr. Schwendeman has admitted

11   that he is a busy man with severe time constraints. Id. at 101-102.

12       In short, Plaintiff has virtually no knowledge regarding his role as a class representative or the

13   scope of the class the subject matter of the lawsuit. Schwendeman Dep. (Vol. I) at 184-187, 189-192

14   (believing that the class could include State Farm and Progressive insureds). As a result, Mr.

15   Schwendeman is not an appropriate class representative.

16       **c.**    **Plaintiff And His Counsel Cannot Adequately Represent This Purported Class Because Of Conduct By Counsel.**

17       The representative prong contained within CR 23(b)(4) tests both plaintiff's and proposed

18   counsel's ability to adequately represent a class. Questionable conduct by proposed class counsel is

19   therefore relevant at the certification stage to counsel's ability to adequately represent the class as

20   counsel. Wagner v. Lehman Bros. Kuhn Loeb, Inc., 646 F. Supp. 643 (N.D. Ill. 1986); Stavrides v.

21   Mellon Nat'l Bank, 60 F.R.D. 634, 1973 U.S. Dist. Lexis 11475 (W.D. Pa. 1973) (unethical conduct

22   by plaintiff's counsel may result in denial of class action); Taub v. Glickman, 1970 U.S. Dist. Lexis

23   93532 (S.D.N.Y. 1970) (class certification denied because of attorney's improper conduct even

24   through no finding of actual ethical rule violation). Where proposed class counsel has engaged in

25

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 25

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

questionable conduct, thereby impairing his or her ability to represent the class, denial of certification is proper. Stavrides, 1973 U.S. Dist. Lexis 11475 at *5-8; Taub, 1970 U.S. Dist. Lexis 93532, at *5-7.

All attorneys practicing law within Washington are subject to the Washington Rules of Professional Conduct (RPC). RPC 1.8 provides:

> A lawyer who is representing a client in a matter:
>
> * * *
>
> (e) Shall not, while representing a client in connection with contemplated or pending litigation, advance or guarantee financial assistance to his or her client, except that:
>
>> (1) A lawyer may advance or guarantee the expenses of litigation, including court costs, expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence, provided the client remains ultimately liable for such expenses; and
>>
>> (2) In matters maintained as class actions only, repayment of expenses of litigation may be contingent on the outcome of the matter.

Under RPC 1.8(e), a lawyer may advance funds to a client only if the funds are used to cover expenses of litigation. The rule itself defines various types of acceptable litigation expenses, including "expenses of investigation, expenses of medical examination, and costs of obtaining and presenting evidence." Id. Although courts interpreting such language do not view it as an exclusive list of permissible litigation expenses, the list illustrates various types of appropriate costs. See Louisiana State Bar Ass'n v. Edwins, 329 So.2d 437, 446 (La. 1976) (noting the rule "permitting the advance of 'expenses of litigation' includes certain instances as illustrative, but that it does not clearly exclude other expenses similarly necessary to permit the client his day in court.").

The ABA has explained that litigation expenses include "court costs, witness fees and expenses resulting from the conduct of litigation itself, and not expenses unconnected with the litigation, although resulting from the accident." ABA Formal Opinion 288 (1954) (emphasis added). "Monetary advances for automobile maintenance or repairs [are] not [, however,] authorized by the Code," as they are "not necessary expenses of litigation." Attorney Grievance Comm. of Md. v.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 26

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

Kandel, 563 A.2d 387, 389 (Md. 1989) (examining the Maryland Code of Professional Responsibility, which, in all material aspects, is identical to RPC 1.8(e)).

The overwhelming majority of courts faced with attorneys who advance nonlitigation costs have found a violation of rules similar to RPC 1.8(e). See, e.g., In the Matter of K.A.H., 967 P.2d 91 (Alaska 1998) (holding that a lawyer is forbidden by the Rules of Professional Conduct from advancing living expenses to clients); Shea v. Virginia State Bar Disciplinary Bd., 374 S.E.2d 63 (Va. 1988); In the Matter of a Member of the State Bar of Arizona James W. Carroll, 602 P.2d 461 (Ariz. 1979); In the Matter of H. V. Sandifer, 198 S.E.2d 120 (S.C. 1973); Attorney Grievance Comm. of Md. v. Kandel, 563 A.2d 387 (Md. 1989). Courts have explained the rationale behind this rule in various ways. One court analyzed the inherent conflict that results from such a "loan":

> The question that lurks below the surface ... is this:  Why can't a lawyer help a client who needs financial help so long as the client pays the money back from the proceeds of the litigation?  The short answer to that question is the disciplinary rule says that such conduct is improper . . . The broader answer is that the rule in question is intended and designed to maintain the independent judgment of counsel in the representation of clients.  If a client owes his attorney money, the attorney may have his own pocketbook in mind as he handles the litigation.  That attorney might settle for an amount sufficient to cover the loan to his client, while foregoing the risk of a trial where his client could recover a larger amount or lose everything.  The policy embodied in DR 5-103(B) is that a lawyer simply should not face this risk to independent judgment.

Shea, 374 S.E.2d at 64-65 (emphasis in original).  Another court analyzed the concern inherent in RPC 1.8(e) as an attempt to prevent a "bidding war" for clients:

> We are compelled to point out that the practice of making advances to clients, if publicized, would constitute an improper inducement for clients to employ an attorney. ...  It is obvious that as between a lawyer who offers such an agreement and a lawyer who does not, the client will choose the lawyer who offers the lesser financial obligation, regardless of the skill of the lawyers involved, and regardless of the other factors to be considered in the employment of legal counsel.

Carroll, 602 P.2d at 467.

Discovery to date has established that this is a lawyer initiated and lawyer driven suit.  Hagens Berman located its named plaintiff for this lawsuit through the use of a newspaper ad.  Schwendeman

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 27

Dep. (Vol. I) at 12; Advertisement (Tab Q). The named plaintiff, apparently unschooled in the recent wave of lawyer initiated class actions, even went so far as to admit that he had no complaint about the quality of his replacement bumper until he was interviewed by a "paralegal" from the Berman firm. Schwendeman Dep. (Vol. I) at 118-20, 193.

After securing Mr. Schwendeman as a client, Hagens Berman has gone to extraordinary lengths to keep him as the named plaintiff in this litigation. Hagens Berman advanced $6,140.50 worth of "costs" so that Plaintiff could repair his Ford Bronco, over $5,700 worth of which are not in any way related to this action. Stroud Documents STR 86-90, 93. Nor did the money Hagens Berman advanced Mr. Schwendeman go to cover expenses of litigation, as the cost associated with the repair of the Bronco did not result "from the conduct of the litigation itself," but rather "from the accident" giving rise to the suit. As a result, under RPC 1.8(e), Hagens Berman could not pay for the repair of Mr. Schwendeman's truck under any circumstances, regardless of whether Mr. Schwendeman remained ultimately liable for the repairs.

As the Superior Court of Arizona recently determined, Hagens Berman's questionable practices are not apparently limited to Washington. See Kenger v. Government Employees Ins. Co., CV9901522 (Maricopa County (Az.) Sup. Ct. Minute Entry Feb. 8, 2000) at 2 (Tab R). In Kenger, the Court concluded that Hagens Berman's practice of making the reimbursement of costs to non-indigent clients contingent upon a successful outcome violated Arizona's Ethics Rule 1.8(e). Id.

When considering the motivation underlying Hagens Berman's decision to dispense these funds to Plaintiff, the Court should bear in mind that Mr. Schwendeman was not even at fault in the accident underlying this litigation. As a result, Mr. Schwendeman could have pursued the tortfeasor, as well as his insurance company, for any alleged remaining damage to his vehicle. Instead, despite the fact that it has not asserted a claim against the tortfeasor in this litigation, Hagens Berman simply took it upon itself to compensate Mr. Schwendeman.

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 28

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1    In short, it appears that Hagens Berman made a conscious choice to pay approximately six

2    thousand dollars on behalf of Plaintiff with the knowledge that this expense was not a litigation

3    "cost," and that the amount of this "loan" exceeded any reasonable recovery in the underlying

4    litigation by an order of magnitude. Schwendeman Dep. (Vol. II) at 66-69. By doing so, Hagens

5    Berman has irreparably undermined its ability to represent the proposed class, and the Court should

6    deny certification on this ground. Stavrides, 1973 U.S. Dist. Lexis 11475 at *5-8; Taub, 1970 U.S.

7    Dist. Lexis 93532, at *5-7.

8    **C.    PLAINTIFF CANNOT SATISFY ANY OF THE REQUIREMENTS OF CR 23(b).**

9    In order to obtain the certification of a class, Plaintiff must demonstrate that one of the

10   requirements of CR 23(b) has been satisfied. Johnson, 446 P.2d at 335 (CR (b) sets out "three

11   preconditions for the maintenance of a class action, at least one of which must be met"). In the

12   present case, Plaintiff seeks certification pursuant to both CR 23(b)(2) and CR 23(b)(3).

13   **1.    Class Certification of A Class Seeking Monetary Damages Is Not
         Appropriate Under CR 23(b)(2).**

14   A class can be certified under CR 23(b)(2) only if " the party opposing the class has acted or

15   refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive

16   relief with respect to the class as a whole." CR 23(b)(2) "is limited to injunctive or declaratory

17   relief." Eriks v. Denver, 824 P.2d 1207, 1215 (Wa. 1992) (citing 3A L. Orland, Wash. Prac., Rules

18   Practice § 5263, at 427 (3d ed. 1980)).

19   Plaintiff asserts that this purported class should be certified pursuant to CR 23(b)(2) because

20   "USAA CIC has a uniform Policy of specifying non-OEM crash parts in the repair of insured's

21   vehicles," Pl's Mem. at 17, and because "Mr. Schwendeman's claim for money damages flows from

22   the declaratory and injunctive relief he seeks." Id. at 18. Both statements are patently false.

23   First, USAA CIC has repeatedly demonstrated throughout discovery that it handles each claim

24   on a case by case basis and often uses OEM or salvage parts in the repairs of its members' vehicles.

25   USAA/SC008344, USAA/SC008354 (Tab S); DeBoer Decl. ¶¶ 5, 8. Specifically, every level of

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 29

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

repair process -- the appraiser, the repair shop, supervisors and management – possesses the discretion to determine what type of part is used during a repair.

Second, Plaintiff's damages have nothing to do with the declaratory and injunctive relief he purports to seek. Plaintiff has asked for the following prospective declaratory and injunctive relief:

> 1) To enjoin USAA CIC from using non-OEM crash parts and to require USAA CIC to pay for OEM crash parts; and

> 2) To require USAA CIC to "meaningfully and effectively" disclose its past policy and practice of using non-OEM crash parts and cease making "false, deceptive or misleading" statements about the use of non-OEM crash parts.

Plaintiff's damages do not "flow" from either of these prospective reliefs. Rather, the damages that he seeks are in the nature of reimbursement or disgorgement, neither of which is an appropriate basis for a CR 23(b)(2) class. See Eriks, 824 P.2d at 1215. As the Washington Supreme Court held in Eriks, even "[w]here the declaration merely forms the basis for monetary relief, a CR 23(b)(2) action is not appropriate." Id. at 1215. Clearly, the crux of the relief that Plaintiff seeks here is monetary relief. See Schwendeman Dep. (Vol. II) at 68-69.

CR 23(b)(2), like its federal counterpart, Fed. R. Civ. P. 23(b)(2), applies exclusively to cases seeking injunctive or declaratory relief. Federal cases are uniform in their determination that class treatment under (b)(2) is not appropriate where money damages, rather than being incidental, constitute the predominant form of relief requested. See Allison v. Citgo Petroleum Corp., 151 F.3d 402, 414 (5th Cir. 1998); 7A Wright, Miller & Kane, Federal Pract. & Proc: Civil 2d § 1775, at 462-63 ("an action seeking that certain conduct constitutes a breach of conduct would not qualify under Rule 23(b)(2) because the effect is simply to lay the basis for a damage award rather than injunctive relief"). Therefore, certification under CR 23(b)(2) is inappropriate.

### 2. Class Certification Is Not Appropriate Under CR 23(b)(3) Where Significant Individual Issues Predominate Over Class Issues.

A court may only certify a class under CR 23(b)(3) if it finds that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 30

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." CR 23(b)(3); Mound Hardware v. Spokane, 1997 Wash. App. LEXIS 1940 (Wa. App. Nov. 25, 1997) (Attached at Tab T).

       a.    **Common Issues Do Not Predominate.**

Even if one or two common issues of law or fact did exist, Plaintiff cannot meet the requirements of predominance and superiority outlined in CR 23(b)(3) . For the same reasons that defeat Plaintiff's attempt to establish sufficient commonality under CR 23(a), Plaintiff cannot establish that common questions of law or fact predominate over the host of individual issues associated with each proposed class member's claim.

The predominance inquiry is "far more demanding" than the commonality requirement and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997); In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214, 219 (E.D. La. 1998). To carry the burden imposed by Rule 23(b)(3), plaintiffs must demonstrate that the common issue of fact or law is of "sufficient importance to the case that the Court is convinced that the most efficient method of determining the rights of the parties is through a class action." Haley v. Medtronic, 169 F.R.D. 643, 648 (C.D. Cal. 1996). Common class issues predominate only if trial of the common issues will actually advance the resolution of the claims at issue. Smith v. Brown & Williamson Tobacco Corp. et al., 174 F.R.D. 90, 94 (W.D. Mo. 1997); Martin et al. v. Dahlberg, Inc. et al., 156 F.R.D. 207, 214 (N.D. Cal. 1994); The Commonwealth of P.I. v. The M.V. Emily S., 158 F.R.D. 9, 15 (D.P.R. 1994); Mattoon et al. v. City of Pittsfield et al., 128 F.R.D. 17, 20-21 (D. Mass. 1989) (while trial of common issues need not dispose of claims, it must signal that the end is near). As such, where trial of the common issues will accomplish nothing more than answering a fraction of the issues presented in any given claim, common issues are not predominant. Smith, 174 F.R.D. at 94; Martin, 156 F.R.D. 207, 214 (N.D. Cal. 1994); The M.V. Emily S., 158 F.R.D. at 15 ("[c]ommon issues are predominant only if their resolution would provide

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 31

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1  a definite signal of the beginning of the end"). Given the multiple factual issues presented by the class

2  claims, and the fact that class treatment will not dispose of the overwhelming number of individual

3  issues associated with these claims, Plaintiff's proposed class resoundingly fails the test of

4  predominance.

5      As detailed above, under Plaintiff's proposed class action, the Court would have to make

6  individualized inquiries into the circumstances of each class member's repair to determine whether the

7  particular non-OEM part specified in the USAA CIC estimate was of "like kind and quality" to the

8  part it replaced and what damages, if any, alleged class members suffered. Such fact-specific

9  inquiries defeat predominance. See Execu-tech Business Sys. Inc. v. Appleton Papers, Inc., 743 So.

10  2d 19 (Fla. 4th DCA 1999) (upholding denial of class certification based on lack of predominance

11  where alleged impact of price-fixing conspiracy on each individual consumer did not lend itself to a

12  mechanical calculation, but required separate mini-trials of an overwhelmingly large number of

13  individual claims on a transaction by transaction basis, and thus the staggering logistical problems

14  made individual rather than common issues predominate); see also Amchem Prods., Inc. v. Windsor,

15  521 U.S. 591 (1997) (predominance requirement is not met where there exists a greater number of

16  questions peculiar to the several categories of class members and to individuals within each category,

17  where such uncommon questions are significant).

18      With respect to automobiles in particular, state and federal courts regularly deny class

19  certification because of plaintiffs' failure to meet the predominance standard, recognizing the

20  individual inquiries that would have to be made for each class member's vehicle. For example, in

21  Gordon v. Ford Motor Co., 687 N.Y.S.2d 369 (N.Y. App. Div. 1st Dept. 1999), a New York state

22  court refused to certify a nationwide class in an action for breach of warranty encompassing all

23  owners of 1988 and 1989 Lincoln Continentals. The court found that the matter of proving that the

24  class members' vehicles were not fit for ordinary purpose was indeterminable except by inquiries

25  directed to each member of the class: "Given the enormity of the potential class, possibly numbering

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 32

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1   as many as 60,000 persons, the necessity of conducting such individual inquiries would become the

2   predominant focus of the litigation, rendering the litigation extremely difficult, if not impossible to

3   manage, and an inefficacious means of adjudicating any underlying common issue respecting

4   defective design." Id. at 370; see also  Chin v. Chrysler Corp., 182 F.R.D. 448 (D.N.J. 1998)

5   (common factual issues did not predominate where the question of whether a defect existed in a

6   particular car and the cause of the defect would have to be determined individually on a car-by-car

7   basis); In re Ford Motor Co. Vehicle Paint Litig., 182 F.R.D. 214 (E.D. La. 1998) (court found that

8   plaintiffs' vehicles were not similarly situated on defect issues where challenged course of conduct

9   spanned years and involved different models, materials, colors and formulae).  Many of these cases

10   deny certification when only a single part on only one or two models of vehicles by one company are

11   at issue.

12       In this case, Plaintiff's claim would involve virtually every make and model of vehicle on the

13   road today.  Further, Plaintiff's claims in this case require a comparison of the quality (fit, finish,

14   performance, etc.) of literally thousands of parts on these vehicles.  In short, given the innumerable

15   permutations and variations implicated by the proposed class, common issues do not predominate.

16       **b.**    **Class Action Is Not A Superior Method Of Adjudication.**

17       In order to certify a class action under CR 23(b)(3), the court must determine that "a class

18   action is superior to other available methods for the fair and efficient adjudication of the controversy."

19   CR 23(b)(3).  Plaintiff's proposed class simply is not the superior method of resolving these claims.  If

20   this class action were to go forward, the Court would have to conduct separate trials for each

21   individual class member on the many individualized issues outlined above.  This would clog up the

22   Court for years, and conducting the necessary individualized trials would defeat any economies that

23   could result from aggregating claims into a class in the first place.  For these reasons, the purported

24   class action in this case is not a superior method of adjudication.  See In re American Med. Sys. Inc.,

25   75 F.3d 1069 (6th Cir. 1996) (a single litigation addressing every complication in every model of

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 33

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

1  medical device as well as unique problems of each plaintiff would present a nearly insurmountable

2  burden on the district court).

3      Moreover, this is not a case where creative use of the class action is necessary to solve a

4  litigation crisis. Most consumers are satisfied with non-OEM parts and the resulting lower premiums.

5  The courts have not been flooded with individual suits and USAA CIC has not been flooded with

6  complaints. To certify this class action would create, not solve, a litigation crisis. See In re Hotel Tel.

7  Charges, 500 F.2d 86, 91 (9th Cir. 1974) (courts should interpret Rule 23 to avoid creating lawsuits

8  where none previously existed); see also Castano v. American Tobacco Co.. 84 F.3d 734, 747-50 (5th

9  Cir. 1996).

10      Furthermore, most of the insurance policies at issue in the purported class contain an appraisal

11  clause which states that:

12      If we and you do not agree on the amount of loss, either may demand an
        appraisal. In this event, each party will select a competent appraiser. The two
13      appraisers will select an umpire. The appraisers will state separately the actual
        cash value and the amount of loss. If they fail to agree, they will submit their
14      differences to the umpire. A decision agreed to by any two will be binding.
        Each party will pay its chosen appraiser and share the expenses of the umpire
15      equally. Neither we nor you waive any of our rights under this policy by
        agreeing to an appraisal.
16

17  Exhibit No. 1 to Declaration of Steve W. Berman in Support of Plaintiff's Motion for Class

18  Certification, pg 17. Under Washington law, such appraisal/arbitration clauses are a condition

19  precedent to suit. Wash. Rev. Code § 7.04.010. Therefore, before each member of the purported class

20  joins, he must give USAA CIC an opportunity to invoke this provision. This would be a much

21  simpler and less expensive method of resolving the claim of an insured who actually had a specific

22  complaint about a specific part.

23      In this case, individual arbitrations are plainly the superior way to resolve these individual

24  claims. In such a procedure, the plaintiff can show how an actual part is somehow of inferior quality

25  to another part and USAA CIC can defend its decision to specify that part. That is USAA CIC's due

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 34

CORR CRONIN LLP
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900

process right. See Broussard, 155 F.3d at 345-46. Moreover, devices to narrow the dispute for trial, such as appraisal provisions, work much more efficiently in individual litigation. Thus, it cannot be maintained that these cases constitute "negative value" suits which would not be prosecuted on an individual basis.

Therefore, this case is not appropriate for certification under CR 23(b)(3).

## IV. CONCLUSION

For all of the foregoing reasons, USAA CIC respectfully requests that this Court deny Plaintiff's Motion for Class Certification with prejudice.

RESPECTFULLY SUBMITTED this _21st_ day of June, 2000.

CORR CRONIN LLP

Kelly P. Carr, WSBA No. 555
Michael A. Moore, WSBA 27047
Counsel for Defendant USAA Casualty Insurance
Company

Of Counsel:

Dwight J. Davis
Thomas F. Urban II
S. Stewart Haskins
KING & SPALDING
191 Peachtree Street
Atlanta, Georgia 30303-1763
(404) 572-4600

DEFENDANT USAA CASUALTY INSURANCE COMPANY'S
MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION - 35

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3700
Seattle, Washington 98154-1135
Tel (206) 625-8600
Fax (206) 625-0900



8-19-97

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ , D.C.
97 AUG 19 PM 2: 48
ROBERT R. DI TROLIO
CLERK U.S. DIST. CT.
W.D. TENN., MEMPHIS

ROSS MURRAY, and GENE PARKER,      )
On Behalf of Themselves and        )
All Others Similarly Situated,     )
                                   )
        Plaintiffs,                )
                                   )
v.                                 )        No.  96-2585 Ml/A
                                   )
STATE FARM MUTUAL AUTOMOBILE       )        CERTIFIED TRUE COPY
INSURANCE COMPANY, and STATE       )        ROBERT R. DITROLIO, CLERK
FARM FIRE AND CASUALTY COMPANY,    )        BY: _____
                                   )            DEPUTY CLERK
        Defendants.                )
                                   )

---

ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

---

    This matter is before the Court on plaintiffs' Motion for
Class Certification, filed December 30, 1996.  For the reasons
set forth below, plaintiffs' motion is DENIED.

                    PROCEDURAL HISTORY

    On April 22, 1996, plaintiffs filed a class action complaint
against defendants in Shelby County Circuit Court.  On June 5,
1996, defendants filed a notice of removal to this Court.
Plaintiffs' motion to remand was subsequently denied.  On
September 6, 1996, plaintiffs filed a first amended complaint.
Defendants filed an answer on September 23, 1996.

This document entered on docket sheet in compliance with Rule 58 and / or
79 (a) FRCP on 8/20/97          .



A status conference was held on October 24, 1996, at which the Court set a December 16, 1996 deadline for the filing of plaintiffs' motion for class certification and set a hearing on that motion for January 31, 1997. On October 31, 1996, the Court, upon plaintiffs' motion, entered an order dismissing plaintiffs Dean and Mathis with prejudice. Plaintiffs subsequently filed a motion to amend their complaint.[1]

On December 4, 1996, plaintiffs filed a motion to extend time to file their motion for class certification and for a continuance of the class certification hearing. The Court granted plaintiffs' motion and set a December 30, 1996 filing deadline for plaintiff's motion for class certification. The Court subsequently set the class certification hearing for February 28, 1997.

On December 12, 1996, the Court granted plaintiffs' motion to amend, and plaintiffs filed their second amended complaint on that same day.[2]

---

[1]   On November 18, 1996, defendants filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56 as to plaintiff Gene Parker. That motion was subsequently denied.

[2]   Defendants filed their answer to plaintiffs' second amended complaint on January 10, 1997.

- 2 -

On December 30, 1996, plaintiffs filed their motion for class certification. Defendants filed a response in opposition on January 31, 1997.[1]

On February 12, 1997, less than three weeks prior to the class certification hearing and after the parties had voluminously briefed the issue of class certification, plaintiffs filed a motion to amend their complaint, seeking leave to file a third amended complaint. That motion was subsequently denied. On February 28, 1997, the Court held a hearing on plaintiffs' motion for class certification.

## DISCUSSION

Plaintiff Murray has had vehicle casualty insurance coverage with State Farm Mutual Automobile Insurance Company ("State Farm"), including coverage for property damage, since 1984. In May 1996, Murray's daughter was involved in an automobile accident while driving Murray's 1995 Ford pick-up truck. As a result of that accident, Murray's truck suffered property damage. Murray subsequently took his truck to a Ford dealership in Knoxville, Tennessee, for repairs. The initial estimate prepared by one of State Farm's employees specified the use of several

---

[1]     Although replies and surreplies are not contemplated or addressed in the Local Rules, plaintiffs filed a reply to defendants' response on February 10, 1997, and defendants filed a surreply on February 21, 1997.

- 3 -

non-original equipment manufacturer ("non-OEM") crash parts.[4]
Those parts were as follows:  front bumper face bar, front bumper
valance panel, grille, grille stone deflector, grille
reinforcement, right headlamp door, left headlamp door, right
headlamp assembly, left headlamp assembly, hood panel, right
fender panel, and left fender panel.

While his truck was at the dealership, Murray went to check
on the status of the repairs.  Because it appeared to Murray that
some of the non-OEM parts did not fit properly and had finish
problems, Murray complained to a State Farm employee about those
parts.  Murray alleges that although some original equipment
manufacturer ("OEM") crash parts were ultimately used in
repairing his truck, several non-OEM crash parts were also used.
Murray contends that the non-OEM crash parts installed on his
vehicle were not of "like kind and quality" to their Ford
counterparts and were not adequate to restore his vehicle to its
"pre-loss condition."

---

[4]    Plaintiffs define "crash parts" as including, but not limited to, (1)
metal automobile parts such as bumpers, deck lids, door shelves, fenders,
grilles, headlight bezels, hoods, pick-up truck beds and box sides, quarter
panels, radiator supports, side moldings, tailgates, and related parts; and (2)
plastic automobile parts such as bumper covers, fenders, front and rear fascias,
grilles, header panels, headlight assemblies, grille reinforcements, grille
moldings, headlight bezels, hoods, side moldings, and related parts.  Second Am.
Compl. at ¶21.

- 4 -

Plaintiff Parker has had vehicle casualty insurance coverage with State Farm, including coverage for property damage, since 1965. In August 1996, Parker's wife was involved in an accident while driving Parker's vehicle, a 1992 Honda Accord. Parker subsequently submitted a claim to State Farm for the damage to his vehicle that occurred as a result of the accident, and an estimate of repair was prepared. That estimate specified the use of some non-OEM crash parts. Parker subsequently complained to a State Farm employee and informed her that he wanted Honda (OEM) parts used in the repair of his vehicle. Parker alleges that the State Farm employee informed him that, if he insisted on OEM crash parts for his repair, he would have to pay the difference in cost between the non-OEM crash parts specified in the estimate and their Honda (OEM) counterparts. Parker's vehicle, however, was eventually treated as a total loss, and State Farm paid Parker the actual cash value of his vehicle, less a $500 deductible.

1.   Complaint

In their second amended complaint, filed December 12, 1996, plaintiffs allege causes of action for (1) breach of contract, (2) violations of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 et seq., and (3) fraudulent misrepresentations. In particular, plaintiffs challenge the following practices:

- 5 -

At all times relevant to this cause of action, when a Tennessee State Farm insured has asserted a claim for property damage to their vehicle that was covered under their State Farm vehicle casualty insurance policy and that required the replacement of crash parts, State Farm has been obligated under the provisions of its policy to pay for the cost of a repair that included replacement crash parts that were of "like kind and quality" to the crash parts replaced and were adequate to restore their vehicle to its "pre-loss condition."

At all times relevant to this cause of action, thousands of Tennessee State Farm insureds have made property damage claims for the repair of their vehicles that were covered under their State Farm vehicle casualty insurance policies. Many of those repairs have required the removal of crash parts from the insureds' vehicles that were beyond repair and the replacement of those crash parts.

At all times relevant to this cause of action, it has been State Farm's practice throughout the State of Tennessee to specify non-original equipment manufacturer crash parts ["non-OEM crash parts"] in estimates that have been prepared by State Farm's employees for the repair of Tennessee State Farm insureds' vehicles, when those parts were available and were cheaper than original equipment manufacturer crash parts ["OEM crash parts"].

At all times relevant to this cause of action, it has been State Farm's practice throughout the State of Tennessee to require the use of non-OEM crash parts, when those parts were available and were cheaper than their OEM counterparts, in the repair of Tennessee State Farm insureds' vehicles and to require Tennessee State Farm insureds to pay the difference in cost between the non-OEM crash parts specified on the State Farm final estimate and their OEM counterparts if the insured insisted that OEM crash parts be installed during the repair of their vehicle.

Second Am. Compl. at ¶¶17-20. Plaintiffs contend that their

insurance policies with State Farm provide that, when an insured

suffers property damage to a covered vehicle that requires the

use of replacement crash parts in the subsequent repair of that

- 6 -

vehicle, "State Farm is obligated to pay for the cost of a repair to their vehicle that includes replacement crash parts that are of 'like kind and quality' to the crash parts replaced and [that] are adequate to restore their vehicle to its 'pre-loss condition.'" Id. at ¶128.[5]  Plaintiffs contend that non-OEM crash parts are insufficient to meet State Farm's obligation under the insurance policies and, as such, seek monetary damages and injunctive relief.

As to the monetary relief sought, plaintiffs request money damages representing (1) the difference between the cost of non-OEM crash parts used in the repair of State Farm insureds' vehicles and their OEM counterparts, and (2) excess premiums that have been paid by insureds as a result of the allegedly lesser insurance coverage actually provided by State Farm under its insurance policies.  As to the injunctive relief sought, plaintiffs contend that they are entitled to an order "permanently enjoining State Farm from [(1)] specifying non-OEM crash parts in estimates prepared by State Farm employees for the repair of Tennessee State Farm insureds' vehicles that are not of 'like kind and quality' to the crash parts replaced and are not

---

[5]     The insurance policies at issue provide, in pertinent part, that State Farm has the right to settle a loss with the insured or the owner of the property by, among other things, paying "to repair or replace the property or part with like kind and quality" (coverage prior to March 1993), or paying for replacement parts "sufficient to restore the vehicle to its pre-loss condition" (coverage since March 1993).

adequate, when used in the repair of Tennessee State Farm insureds' vehicles, to restore those vehicles to their 'pre-loss condition,'" id. at ¶130, and (2) "engaging in deceptive acts or making fraudulent representations with regard to the scope of the insurance coverage provided by its vehicle casualty insurance policy, the quality of non-OEM crash parts[,] and the significance of CAPA certification," id. at ¶131.

In addition, plaintiffs seek certification of a class of plaintiffs consisting of "all Tennessee residents who have had a vehicle casualty insurance policy with State Farm that included coverage for property damage to their vehicle(s) at any time during the period beginning on April 22, 1990, and continuing until the present." Id. at ¶20.

2.    Motion for Class Certification

In their motion for class certification pursuant to Fed. R. Civ. P. 23, filed December 30, 1996, plaintiffs seek certification of the following three classes:

> (1) a class under Rule 23(b)(2) consisting of all current Tennessee State Farm insureds who are insured under a vehicle casualty insurance policy issued by State Farm, seeking to enjoin State Farm from continuing to pursue its non-OEM crash parts policy in Tennessee;

> (2) a class under Rule 23(b)(3) consisting of all Tennessee residents who have been insured under a State Farm casualty insurance policy at any time during the period beginning April 22, 1990, and continuing until

- 8 -

the present, seeking an award of money damages for
alleged excess premiums charged by State Farm; and

(3) a sub-class under Rule 23(b)(3) consisting of all
Tennessee State Farm insureds who had at least one non-
OEM crash part included in a final estimate prepared by
a State Farm employee for the repair of a vehicle
pursuant to their State Farm vehicle casualty insurance
policy, seeking an award of money damages for the
damages that they have suffered as a result of having
allegedly inferior non-OEM crash parts installed on
their vehicle or of having to pay the difference in
costs between the non-OEM crash parts so specified and
their OEM counterparts.

Pls.' Mem. in Supp. of Mot. for Class Certification at 1-2.


The Court will now examine the proposed classes in light of
the requirements set forth in Rule 23. Rule 23(a) provides:

Prerequisites to a Class Action. One or more members
of a class may sue or be sued as representative parties
on behalf of all only if (1) the class is so numerous
that joinder of all members is impracticable, (2) there
are questions of law or fact common to the class, (3)
the claims or defenses of the representative parties
are typical of the claims or defenses of the class, and
(4) the representative parties will fairly and
adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b) provides, in relevant part:

Class Actions Maintainable. An action may be
maintained as a class action if the prerequisites of
subdivision (a) are satisfied, and in addition:

. . .                                    ;

(2) the party opposing the class has acted or refused
to act on grounds generally applicable to the class,
thereby making appropriate final injunctive relief or
corresponding declaratory relief with respect to the
class as a whole; or

(3) the court finds that the questions of law or fact
common to the members of the class predominate over any
questions affecting only individual members, and that a

- 9 -

class action is superior to other available methods for
the fair and efficient adjudication of the controversy.
The matters pertinent to the findings include: (A) the
interest of members of the class in individually
controlling the prosecution or defense of separate
actions; (B) the extent and nature of any litigation
concerning the controversy already commenced by or
against members of the class; (C) the desirability or
undesirability of concentrating the litigation of the
claims in the particular forum; (D) the difficulties
likely to be encountered in the management of a class
action.

Fed. R. Civ. P. 23(b).


A district court must "conduct a 'rigorous analysis' into
whether the prerequisites of Rule 23 are met before certifying a
class." In re American Medical Sys., Inc., 75 F.3d 1069, 1078-79
(6th Cir. 1996) (citing General Tel. Co. v. Falcon, 457 U.S. 147,
161 (1982)). Although the trial court has broad discretion in
deciding whether to certify a class, that discretion must be
exercised within the framework of Rule 23. Id. at 1079 (citing
Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981); Cross v.
National Trust Life Ins. Co., 553 F.2d 1026, 1029 (6th Cir.1977)
(explaining that a "district court has broad discretion in
determining whether a particular case may proceed as a class
action so long as it applies the criteria of Rule 23
correctly")).


It is well settled that "[a] class is not maintainable as a
class action by virtue of its designation as such in the
pleadings. . . .

- 10 -

'Mere repetition of the language of Rule 23(a) is not
sufficient. There must be an adequate statement of the
basic facts to indicate that each requirement of the
rule is fulfilled. Maintainability may be determined
by the court on the basis of the pleadings, if
sufficient facts are set forth, but ordinarily the
determination should be predicated on more information
than the pleadings will provide. . . . The parties
should be afforded an opportunity to present evidence
on the maintainability of the class action.'"

Id. (quoting Weathers v. Peters Realty Corp., 499 F.2d 1197, 1200

(6th Cir. 1974) (citation omitted)). It is equally well settled

that "[t]he party seeking the class certification bears the

burden of proof." Id.

In order to carry its burden, the moving party must satisfy

all four prerequisites of Rule 23(a) and "must also demonstrate

that it falls within at least one of the subcategories of Rule

23(b)." Id. Turning first to the four prerequisites of Rule

23(a), Rule 23(a)(1) requires that the class be "so numerous that

joinder of all members is impracticable." Fed. R. Civ. P.

23(a)(1). "The reason for [the impracticability] requirement is

obvious. Only when joinder is impracticable is there a need for

a class action device." 1 Herbert B. Newberg & Alba Conte,

Newberg on Class Actions, § 3.01, at 3-4 (3d ed. 1992). Although

there is no strict numerical test for determining

impracticability of joinder, "[t]he numerosity requirement

requires examination of the specific facts of each case and

imposes no absolute limitations. When class size reaches

substantial proportions, however, the impracticability

- 11 -

requirement is usually satisfied by the numbers alone." American Medical Sys., 75 F.3d at 1079 (citations and quotations omitted).

In this case, plaintiffs contend that the numerosity requirement is met because there are approximately 875,000 Tennessee State Farm insureds. In addition, plaintiffs argue that the sub-class may consist of thousands of Tennessee State Farm insureds. In their response in opposition to plaintiffs' motion, defendants do not contest this requirement. Because the proposed class size is of substantial proportions, the Court finds that plaintiffs have satisfied the numerosity requirement of Rule 23(a).

Rule 23(a)(2) requires that for certification there must be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The commonality requirement is interdependent with the impracticability of joinder requirement, and the 'tests together form the underlying conceptual basis supporting class actions.'" American Medical Sys., 75 F.3d at 1080 (quoting 1 Newberg, supra, § 3.10, at 3-47). In General Telephone Co. v. Falcon, 457 U.S. 147 (1982), the Supreme Court explained:

> The class-action was designed as an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. Class relief is peculiarly appropriate when the issues involved are common to the class as a whole and when they turn on questions of law applicable in the same manner to each member of the class. For in such cases, the class-action device saves the resources of both the

- 12 -

> courts and the parties by permitting an issue
> potentially affecting every [class member] to be
> litigated in an economical fashion under Rule 23.

Id. at 155 (quotations omitted). "The commonality test 'is

qualitative rather than quantitative, that is, there need be only

a single issue common to all members of the class.'" American

Medical Sys., 75 F.3d at 1080 (quoting 1 Newberg, supra, § 3.10,

at 3-50).


    In this case, plaintiffs assert that there are questions of

fact and law common to the class. Specifically, plaintiffs

contend that "there is one issue that underlies all of the

Plaintiffs' factual and legal allegations[:] . . . whether State

Farm's non-OEM crash parts policy has damaged and continues to

damage its Tennessee insureds." Pls.' Mem. at 58. Plaintiffs

also contend that there is one additional common question of

fact:  "[W]hether non-OEM crash parts are equal in quality to

their OEM counterparts, are of 'like kind and quality' to their

OEM counterparts, and are adequate to restore a vehicle to its

'pre-loss condition.'" Id.


    In addition, plaintiffs assert that there are the following

additional common questions of law:  (1) whether State Farm has

breached its contractual obligations with its insureds by

pursuing its non-OEM crash parts policy; (2) whether State Farm

has made fraudulent representations regarding the scope of

- 13 -

coverage under its vehicle casualty insurance policies, the quality of non-OEM parts, and the significance of CAPA certification; (3) whether State Farm violated the Tennessee Consumer Protection Act; and (4) whether injunctive relief should be granted. Id. at 59.

In their response, although acknowledging that State Farm has a practice of specifying the use of non-OEM parts in estimates for the repair of its insureds' vehicles, defendants argue that plaintiffs have not identified any common questions of law or fact. Specifically, defendants contend that "Plaintiffs' purported 'common' question of fact -- whether non-OEM parts are adequate to restore a vehicle to its pre-loss condition . . . -- presupposes a massive effort to investigate and test virtually thousands of individual non-OEM crash parts as well as an investigation into the pre-loss condition of each Plaintiff's vehicle." Defs.' Mem. in Opp. to Pls.' Mot. for Class Certification at 37 (emphasis in original). In addition, defendants argue that to determine whether State Farm has breached any contract or committed any fraud necessarily requires an individualized determination for each Tennessee State Farm insured. Moreover, defendants reiterate that whether non-OEM crash parts are always inferior to OEM crash parts, as plaintiffs contend, will require the testing of thousands of parts from

- 14 -

several different manufacturers in order to determine what non-OEM crash parts, if any, are inferior.

In this case, plaintiffs' asserted underlying issue, i.e., whether State Farm's non-OEM crash parts policy has damaged and continues to damage its Tennessee insureds, is necessarily dependent on plaintiffs' allegation that non-OEM crash parts are inferior to OEM crash parts. That is, if non-OEM crash parts are not inferior to OEM crash parts, then their use in the repair of State Farm's vehicles has not damaged any one.

Plaintiffs' additional common question of fact, i.e., whether non-OEM crash parts are inferior to OEM crash parts, demonstrates its own defect: Although there may be questions of fact as to whether a particular non-OEM crash part is inferior to its OEM counterpart, those questions are certainly not common. In fact, as defendants explain, this determination, given the differences in vehicle makes and models and the fact that there are several manufacturers of non-OEM crash parts, would require the testing of thousands of individual crash parts. In addition, the defects, if any, would most likely have their own unique characteristics. Moreover, plaintiffs' common questions of law are dependent on a finding that non-OEM crash parts are inferior to their OEM counterparts. As such, the Court finds that plaintiffs have not demonstrated that the proposed classes

- 15 -

satisfy the commonality requirement of Rule 23(a)(2).  The Court
will, however, examine the remaining arguments.

Rule 23(a)(3) requires that "claims or defenses of the
representative parties [be] typical of the claims or defenses of
the class."  Fed. R. Civ. P. 23(a)(3).

> "Typicality determines whether a sufficient
> relationship exists between the injury to the named
> plaintiff and the conduct affecting the class, so that
> the court may properly attribute a collective nature to
> the challenged conduct.  In other words, when such a
> relationship is shown, a plaintiff's injury arises from
> or is directly related to a wrong to a class, and that
> wrong includes the wrong to the plaintiff.  Thus, a
> plaintiff's claim is typical if it arises from the same
> event or practice or course of conduct that gives rise
> to the claims of other class members, and if his or her
> claims are based on the same legal theory."

American Medical Sys., 75 F.3d at 1082 (quoting 1 Newberg, supra,
§ 3-13, at 3-76 (footnote omitted)).  "A necessary consequence of
the typicality requirement is that the representative's interests
will be aligned with those of the represented group, and in
pursuing his own claims, the named plaintiff will also advance
the interests of the class members."  Id. (citation omitted).

As to typicality, plaintiffs argue that the claims of Murray
and Parker, the remaining class representatives in this matter,
are typical of the classes they seek to represent.  Specifically,
plaintiffs argue that Murray and Parker are both State Farm
insureds and are both subject to State Farm's non-OEM crash parts
policy.  In addition, plaintiffs allege that both Murray and

- 16 -

Parker have paid excess premiums due to State Farm's non-OEM crash parts policy.  Moreover, plaintiffs argue that Murray's claims are typical of that of the sub-class because he had allegedly inferior non-OEM parts installed on his vehicle when it was repaired in 1996.

Defendants argue that Murray's and Parker's claims are not typical of the classes they seek to represent because each has been affected differently by State Farm's non-OEM crash parts policy -- i.e., Murray had non-OEM crash parts used in the repair of his vehicle, while Parker's vehicle was treated as a total loss.  In addition, defendants explain that Murray does not challenge State Farm's use of non-OEM crash parts in general but challenges only their use with respect to those non-OEM parts that do not fit properly.  As such, defendants argue that Murray's position is at odds with the complaint, which seeks to declare all non-OEM crash parts as inferior.  Moreover, defendants argue that Parker's claims are not typical of the classes that he seeks to represent because he objects to the use of all non-OEM parts, not just non-OEM crash parts, which is, again, in conflict with the complaint.  Finally, defendants argue that Parker's and Murray's interests are inherently different because each owns a vehicle that is of a different make and model.

In this case, the Court finds that, because plaintiffs' claims arise from the same practice or course of conduct (i.e., State Farm's non-OEM crash parts policy) and because their claims are based on the same legal theories (i.e., breach of contract, misrepresentation, and violations of the Tennessee Consumer Protection Act), Murray's and Parker's claims are typical of the classes that they seek to represent. Thus, plaintiffs have met the typicality requirement of Rule 23(a)(3). See American Medical Sys., 75 F.3d at 1082.

Under Rule 23(a)(4), class certification is appropriate only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members." American Medical Sys., 75 F.3d at 1083 (citations omitted). In Senter v. General Motors Corp., 532 F.2d 511 (6th Cir. 1982), the Sixth Circuit articulated two criteria for determining adequacy of representation: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." Id. at 525 (citation omitted). "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to

- 18 -

pursue the claims of the other class members." American Medical Sys., 75 F.3d at 1083.

As to whether there is fair and adequate protection of the class' interests in this case, plaintiffs argue that Murray and Parker are adequate representatives because they seek to have State Farm enjoined from breaching its obligations under its insurance policies and from making fraudulent representations to its insureds. In addition, plaintiffs explain that they are also seeking to recover excess premiums paid and damages suffered as a result of State Farm's non-OEM crash parts policy. Moreover, plaintiffs assert that they have retained competent counsel to represent them in this matter.

Defendants argue that plaintiffs cannot fairly and adequately protect the class' interests because serious and pervasive conflicts exist among the members of the proposed classes. Specifically, defendants contend that there are conflicts within the proposed Excess Premium class because this class will consist of (1) State Farm insureds who have never asserted a property damage claim, (2) State Farm insureds who have filed claims but had only OEM crash parts specified, and (3) State Farm insureds who have filed claims and for whom State Farm specified non-OEM crash parts. As such, defendants argue that (a) those in the first group have actually benefitted from State

- 19 -

Farm's policy of specifying non-OEM crash parts because the lower costs to State Farm have been passed on to them through lower premiums; and (b) those in the second group "got what they paid for." Defendants assert that the relief sought by plaintiffs -- OEM crash parts, no matter what the cost -- conflicts with the interests of the first two groups.

Defendants also argue that there are conflicts within the proposed Injunction Class. Specifically, defendants contend that if the proposed injunction is entered, it will have the effect of driving up insurance costs, which will affect all insureds even though only a small portion of those insureds have actually or will ever assert a property damage claim. Lastly, defendants argue that plaintiffs' counsel has not adequately represented the class. Defendants base their argument on the fact that two of the original named representatives have been dismissed from the case and because plaintiffs' counsel is also representing a similar class in Arkansas, which allegedly places plaintiffs' counsel in a position to use one of the classes as a "test" case to the detriment of the other.

In this case, it is clear that there are potential conflicts among the class representatives and the unnamed class members and that these conflicts may not be resolvable. Thus, as outlined by defendants, it does not appear that the class representatives

- 20 -

have common interests with each other, let alone the unnamed
members of the class. Accordingly, plaintiffs have not met the
adequate representation requirement of Rule 23(a)(4). <u>See</u>
<u>Senter</u>, 532 F.2d at 525.

Although the Court finds that plaintiffs have failed to meet
the requirements of Rule 23(a)(2) and (a)(4), the Court will next
examine whether plaintiffs have satisfied the requirements of
Rule 23(b) as to any of the three proposed classes. In order to
certify a class under Rule 23(b)(2), the Court must find that
"the party opposing the class has acted or refused to act on
grounds generally applicable to the class, thereby making
appropriate final injunctive relief or corresponding declaratory
relief with respect to the class as a whole." Fed. R. Civ. P.
23(b)(2). As to the class sought to be certified under Rule
23(b)(2) in this case, plaintiffs contend that certification "is
particularly appropriate . . . because the Plaintiffs' primary
purpose in bringing this lawsuit is to enjoin State Farm from
continuing to pursue its non-OEM crash parts policy to the
detriment of its Tennessee insureds. In that regard, the
requirements of Rule 23(b)(2) are almost automatically satisfied
if injunctive relief is the primary remedy sought on behalf of
the class." <u>Pls.' Mem.</u> at 66:

- 21 -

Defendants argue that certification under Rule 23(b)(2) would be improper because State Farm has not acted "on grounds generally applicable to the class." Specifically, defendants argue that plaintiffs' claims are not susceptible to a single proof or a single injunctive remedy and that final injunctive relief is not appropriate. As to its second point, defendants explain that (1) plaintiffs cannot demonstrate irreparable harm; (2) the threatened injury is remote, speculative, and essentially hypothetical; (3) judicial enforcement of the requested injunction would require the Court to supervise potentially thousands of individual claims and repairs well into the indefinite future; and (4) each individual plaintiff can simply avoid the threatened injury altogether by changing insurance companies.

The Court agrees with defendants. In this case, it is clear that plaintiffs have not shown that they will suffer irreparable harm if State Farm is not enjoined from continuing to implement its non-OEM crash parts policy. See Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992) (explaining that irreparable harm is one of the elements that must be considered in determining the propriety of granting injunctive relief); In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985) (same)). In addition, given the speculative nature of any future harm and the fact that plaintiffs and the proposed class members can avoid

- 22 -

any such harm by changing insurance companies, plaintiffs have not shown that injunctive relief is appropriate in this matter. Accordingly, plaintiffs have not met the requirements of Rule 23(b)(2).

In order to certify a class under Rule 23(b)(3), the Court must find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "Subdivision (b)(3) parallels subdivision (a)(2) in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." American Medical Sys., 75 F.3d at 1084 (citation omitted).

In this case, plaintiffs argue that they have satisfied Rule 23(b)(3) because one common issue predominates -- whether Tennessee State Farm insureds have suffered and continue to suffer as a result of State Farm's non-OEM crash parts policy, or, stated alternatively, whether State Farm has been unjustly enriched at the expense of its Tennessee insureds as a result of its non-OEM crash parts policy -- and because a class action lawsuit is a superior means to adjudicate this controversy. In

addition, plaintiffs contend that (1) there is no indication that potential class members will seek to exclude themselves from the proposed class; (2) there is no similar litigation pending in Tennessee; (3) the representative plaintiffs reside in the Western District of Tennessee, as do many potential witnesses; and (4) no unreasonable difficulty will be encountered if the classes are certified.

Defendants argue that common questions do not predominate over individual questions because plaintiffs' assertion that all non-OEM crash parts are inferior to OEM parts is not capable of generalized class-wide proof. Specifically, defendants argue that, because each non-OEM crash part varies, there is no way of determining the inferiority of any given part without an individualized examination. Defendants explain that non-OEM crash parts cannot be treated generally because they vary by (1) the make of the vehicle, (2) the model of the vehicle, (3) the design year of the model, (4) the type of crash part itself, (5) the manufacturer of the replacement crash part, and (5) the lot number of the part. Moreover, defendants contend that any liability for fraud will require individualized proof of reliance by each class member.

Defendants also argue that, largely as a result of the individualized determinations required, a class action is not a

- 24 -

superior means of resolving this dispute.  Specifically,
defendants contend that a class action would be unmanageable and
that only plaintiffs' counsel stand to benefit in this case.

In this case, as discussed previously, common questions of
law or fact do not exist.  Even if they did, however, it is clear
that given the variety of vehicle makes, models, and years, the
different types of crash parts, and the number of part
manufacturers, it cannot be said that common issues predominate
over the individual issues.  In this respect, this case is
similar to In re American Medical Systems, Inc., 75 F.3d 1069
(6th Cir. 1996).

In American Medical Systems, the plaintiffs sought to
certify a class consisting of persons who had suffered damages as
a result of the implantation of penile protheses manufactured by
the defendant.  In finding that the plaintiffs had not satisfied
the requirements of Rule 23(b)(3), the court explained:

> As this case illustrates, the products are different,
> each plaintiff has a unique complaint, and each
> receives different information and assurances from his
> treating physician.  Given the absence of evidence that
> common issues predominate, certification was improper.
> In this situation, the economies of scale achieved by
> class treatment are more than offset by the
> individualization of numerous issues relevant only to a
> particular plaintiff. . . .
>
> Thus, even assuming common questions of law or
> fact, it cannot be said that these issues predominate,
> and that class treatment would be superior to other
> methods of litigation. . . .

- 25 -

The superiority aspect of Rule 23(b)(3) also has not been established. A single litigation addressing every complication in every model of prosthesis, including changes in design, manufacturing, and representation over the course of twenty-two years, as well as the unique problems of each plaintiff, would present a nearly insurmountable burden on the district court. By contrast, an individual case of this type is relatively simple to litigate if narrowly focused on a claim regarding a specific model, a specific component, or specific statements made to a particular urologist during a particular period of time.

Id. at 1085 (citations omitted).

In this case, as explained above, it is clear that the difficulties likely to be encountered in the management of a class action would be great and would, in essence, require hundreds or thousands of mini-trials in order to determine if plaintiffs were entitled to recover. Because this would constitute a nearly insurmountable burden on this Court, plaintiffs have not shown that certification under Rule 23(b)(3) is appropriate. See id.; Fed. R. Civ. P. 23(b)(3)(D).

In sum, plaintiffs have not carried their burden under Rule 23 as to any of the three proposed class. Accordingly, plaintiffs' motion for class certification is DENIED.

- 26 -

<u>CONCLUSION</u>

For the reasons set forth above, plaintiffs' motion for class certification is DENIED.

IT IS SO ORDERED this ___9___ day of August 1997.

_____
JON P. McCALLA
UNITED STATES DISTRICT JUDGE

- 27 -





# CIC Parts Demonstration

## *Corrected 1/17/00
**(the names of parts # 4 and #5 had been tranposed, but the numbers were correct)**

## CIC Orlando Meeting - December 2000

Prior to changing parts on the vehicle, the fit of the original parts were rated.
Then the original parts were replaced with off-the-shelf non-OEM and OEM parts.
Observers were unaware of the type of part they were rating. They were rated 1 to 5, 5 being best.
Reviewers were also asked, yes or no, if the parts were acceptable to sell to customers.

## 2001 Ford F150 pickup

The non-OEM left front fender was a CAPA-certified part manufactured by Gordon.
The non-OEM right front fender was CAPA-certified and was manufactured by Yung Shine.
The non-OEM left front headlamp and non-OEM left front signal lamp were not certified by CAPA
(CAPA doesn't certify lamps) and were manufactured by TYC.

## Comparative Summary

|  | # Responses | Fit | Finish | Acceptability |
|---|---|---|---|---|
| Original LF Fender | 28 | 2.89 | 3.52 | 64% |
| Original RF Fender | 27 | 3.41 | 3.50 | 81% |
| Original LF Headlamp | 27 | 3.37 | 3.89 | 88% |
| Original LF Signal Lamp | 27 | 3.67 | 3.91 | 80% |
| Part # 1 AM LF Fender | 42 | 3.40 | 3.81 | 61% |
| Part # 2 OE RF Fender | 44 | 2.89 | 3.22 | 31% |
| Part # 3 OE LF Headlamp | 41 | 3.17 | 3.59 | 57% |
| Part # 4 OE LF Signal Lamp | 37 | 3.51 | 3.85 | 85% |
| Part # 5 OE LF Fender | 33 | 2.94 | 3.36 | 56% |
| Part # 6 AM RF Fender | 31 | 3.16 | 3.56 | 70% |
| Part # 7 AM LF Headlamp | 30 | 3.37 | 3.64 | 82% |
| Part # 8 AM LF Sig. Lamp | 29 | 3.59 | 3.71 | 71% |
| Orig. Parts Overall | 27 | 3.33 | 3.71 | 78.07% |
| OE Replacement Parts Overall | 38 | 3.13 | 3.50 | 57.37% |

| Non-OE Replacement Parts Overall | 30 | 3.37 | 3.63 | 74.52% |
|---|---|---|---|---|

| 2000 Parts Demonstration Results | 1999 Parts Demonstration Results |
|---|---|
| Orlando-December 2000 | Overall 1999 Results Page |
| Nashville-September 2000 | Minneapolis - September1999 |
| Toronto-July 2000 | Chicago (St. Charles) - July 1999 |
| Kansas City -April 2000 | Palm Springs - Jan. 1999 |







# CIC Parts Demonstration

## CIC Nashville Meeting - September 2000

Prior to changing parts on the vehicle, the fit of the original parts were rated.
Then the original parts were replaced with off-the-shelf non-OEM and OEM parts.
Observers were unaware of the type of part they were rating. They were rated 1 to 5, 5 being best.
Reviewers were also asked, yes or no, if the parts were acceptable to sell to customers.

## 1998 Honda Civic

The non-OEM hood was a CAPA-certified part manufactured by Cobra King.
The non-OEM fender was CAPA-certified and was manufactured by Da Juane.
The non-OEM bumper cover was not certified and was manufactured by Tong Yang.
The non-OEM headlamp was manufactured by TYC.

## Comparative Summary

|  | # Responses | Fit | Finish | Acceptability |
|---|---|---|---|---|
| Original Bumper Cover | 11 | 4.18 | 4.45 | 86% |
| Original Hood | 10 | 3.90 | 4.36 | 89% |
| Original RF Fender | 11 | 4.00 | 4.09 | 80% |
| Original RF Headlamp | 10 | 4.50 | 4.60 | 100% |
| Part # 1 AM Bumper Cover | 19 | 3.53 | 4.19 | 77% |
| Part # 2 OE Hood | 18 | 3.39 | 3.63 | 69% |
| Part # 3 AM RF Fender | 18 | 4.00 | 4.81 | 92% |
| Part # 4 OE RF Headlamp | 20 | 3.65 | 4.50 | 79% |
| Part # 5 OE Bumper Cover | 17 | 4.12 | 4.27 | 100% |
| Part # 6 AM Hood | 18 | 4.22 | 4.50 | 91% |
| Part # 7 OE RF Fender | 17 | 3.65 | 4.21 | 90% |
| Part # 8 AM RF Headlamp | 15 | 3.93 | 4.40 | 79% |
| OE Replacement Parts Overall | 70 | 3.70 | 4.15 | 84.45% |
| Non-OE Parts Overall | 72 | 3.92 | 4.48 | 84.52% |

| 2000 Parts Demonstration Results | 1999 Parts Demonstration Results |
|---|---|
| Nashville-September 2000 | Overall 1999 Results Page |
| Toronto-July 2000 | Minneapolis - September 1999 |
| Kansas City -April 2000 | Chicago (St. Charles) - July 1999 |
| . | Palm Springs - Jan. 1999 |



http://www.ciclink.com/partsdemonash.htm

12/19/00



# CIC Parts Demonstration

## CIC Palm Springs Meeting - January 1999

Prior to changing parts on the vehicle, the fit of the original parts were observed. It is interesting to note that some observed that there appeared to be a defect in the factory-installed hood, which may or may not have affected the results of the demonstration.

Then the original parts were replaced with off-the-shelf non-OEM and OEM parts. Observers were unaware of the type of part they were rating.

## 1996 Ford Windstar Minivan

## Comparative Summary

|  | Fit | Finish | Acceptability |
|---|---|---|---|
| Part #1 OEM RF Fender | 3.91 | 3.80 | 91% |
| Part #2 Non-OEM CAPA-cert. RF Fender | 3.88 | 4.02 | 91% |
| Part #3 OEM LF Fender | 2.48 | 2.88 | 47% |
| Part #4 Non-OEM CAPA-cert. LF Fender | 2.98 | 2.78 | 63% |
| Part #5 Non-OEM Right Headlamp Assembly | 3.05 | 3.64 | 70% |
| Part #6 OEM Right Headlamp Assembly | 3.93 | 4.13 | 88% |
| OE Parts Overall | 3.44 | 3.60 | 75% |
| Non-OE Parts Overall | 3.30 | 3.48 | 74.6% |
| OE Sheetmetal Overall | 3.20 | 3.34 | 69% |
| Non-OE Sheetmetal Overall | 3.43 | 3.40 | 77% |

| 2000 Parts Demonstration Results | 1999 Parts Demonstration Results |
|---|---|
| Nashville-September 2000 | Overall 1999 Results Page |
| Toronto-July 2000 | Minneapolis - September1999 |
| Kansas City -April 2000 | Chicago (St. Charles) - July 1999 |
|  | Palm Springs - Jan. 1999 |





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6035-CIV-MOORE
Magistrate Judge O'Sullivan

KIMBERLY JONES HUBBARD, on behalf
of herself and all other similarly
situated,

      Plaintiff,

v.

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,

      Defendant.

_____

**PLAINTIFF, KIMBERLY JONES HUBBARD'S, NOTICE OF PROVIDING VERIFIED ANSWERS
TO DEFENDANT, GOVERNMENT EMPLOYEES INSURANCE
COMPANY'S, FIRST SET OF INTERROGATORIES TO PLAINTIFF**

The Plaintiff, Kimberly Jones Hubbard, On Behalf Of Herself And All Others Similarly

Situated, by and through her undersigned attorneys, hereby gives notice of serving her Verified

Answers to Interrogatories Propounded by Defendant, Government Employees Insurance Company,

dated July 14, 2000.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S.

Mail to all counsel on the attached list this 31st day of January, 2001.

_____
Sean C. Domnick, Esq.
Florida Bar No.:  843679
Jack Scarola, Esq.
Florida Bar No.: 169440
Searcy Denney Scarola Barnhart
 & Shipley, P.A.
2139 Palm Beach Lakes Blvd.
Post Office Drawer 3626
West Palm Beach, FL 33402-3626
(561) 686-6300
(561) 478-0754 (Fax)
**Attorneys for Plaintiff**

**Interrogatory No. 1**

Identify each automobile part that you contend is an "after-market part" as that term ("after-market")

is used in the proposed class definition and throughout the Amended Complaint to refer to the parts

at issue in this putative class action.

**Answer No. 1**

After-market crash parts are replacement parts made by manufacturers other than by the Original
Equipment Manufacturer or manufacturer authorized by the OEM to its specifications. As of this
time, the after-market crash parts include, but are not limited to the following: Fenders, hoods, front
covers, door shell, quarter panels, bumper covers, bumpers and components, grills, headlights, tail
lights, turn lights, fog lights, doors, trunk lids, fascias, rear covers, head panel, wheel house, radiator
support, tie bars, front air dam, valance, nose panel, deflector, tailgate, rebars, bumper
reinforcements, lamps and assemblies, roofs, front section, and rear section. Parts such as batteries,
filters, spark plugs and shock absorbers are not included in the definition. Discovery continues on
the issue as GEICO has within its possession and control the repair estimates of prospective class
members which further reflect the extent to which GEICO was using aftermarket crash parts. It is
anticipated that this information may be determined in whole or in part from GEICO repair
estimates. See answer to Interrogatory #2.

**Interrogatory No. 2**

For every claimant, including each putative class member should the proposed class be certified,

identify each and every aftermarket part that you contend is "inferior," not of "like, kind and

quality," or otherwise an inadequate substitute for its original equipment manufacturer counterpart.

For each such "after-market part," identify:

    (a)    the type of part (*e.g.*, fender, hood, headlamp, etc.);

    (b)    the manufacturer(s) of the part;*

    (c)    the make(s), model(s) and year(s) of the vehicle for which the part is sold;

    (d)    the basis for your contention that the part is inferior;

    (e)    the manufacturer of the comparable original equipment part;

    (f)    where the comparable original equipment part was manufactured;

(g)  the material(s) from which the comparable original equipment part was made, including, for example, the specific gauge of steel and/or the type of plastic; and

(h)  the quality control procedures of the manufacturer of the comparable original equipment part.

**Answer No. 2**

As of this date, this question, as posed, cannot be answered. The repair estimates which would allow, in whole or in part, the answer to this question are in the possession of GEICO and have not yet been produced to the Plaintiff. Furthermore, a jury has already determined that all aftermarket crash parts are inferior to their OEM counterparts. To the extent that GEICO uses only CAPA Certified Parts, GEICO has in its possession and control the parts, part description, OEM number, and after-market number for the relevant time period. Discovery continues on these issues.

_Kimberly Jones Hubbard_
KIMBERLY JONES-HUBBARD

STATE OF            )
COUNTY OF          )

The foregoing instrument was acknowledged before me this _11th_ day of October, 2000, by ____Kimberly Jones Hubbard____, who is personally known to me or who has produced_____ as identification and who did not take an oath.

(SEAL)

_Leah Schrib_
(Notary signature)

LEAH SCHRIB
Notary Public - State of Florida
My Commission Expires Sep 7, 2003
Commission # CC869478

_____
(Notary name - print)

NOTARY PUBLIC, State of Florida

_____
(Serial number, if any)



1992 WL 372354
1992-2 Trade Cases P 70,042
(Cite as: 1992 WL 372354 (S.D.Fla.))
<KeyCite History>

United States District Court, S.D. Florida.

Carole HALL, et al., Plaintiffs,
v.
BURGER KING CORP., Defendant;
BURGER KING CORP., Counterclaim
Plaintiff,
v.
Carole HALL, et al., Counterclaim
Defendants, and Leedot Enterprises, Inc.,
et
al., Additional Counterclaim Defendants.

Civ.A. No. 89-0260-CIV-KEHOE.

Oct. 26, 1992.

Memorandum Order Denying Plaintiffs'
Motion for Class Certification

KEHOE, District Judge.

*1 Plaintiffs have moved, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to certify a class in this putative class action against defendant Burger King Corporation ("BKC"). For the reasons stated below, plaintiffs' motion is denied.

*Facts*
A. *Plaintiffs and Their Claims*

Plaintiffs are twenty-four past and present franchisees of BKC. They commenced this action on behalf of themselves and an alleged class of Black, Hispanic and Asian-Indian Americans who were or are franchisees of BKC. [FN1]

The gravamen of plaintiffs' complaint is that BKC allegedly discriminates against Black, Hispanic and Asian-Indian American franchisees as a class and, further, that BKC conspires with its white franchisees to allocate markets for the sale of Burger King franchises. Based upon these and other allegations, Counts I and II of plaintiffs' Second Amended Complaint ("Cplt.") seek relief based upon the Civil Rights Act of 1866, 42 U.S.C. §§ 1982 and 1981; Count III seeks

relief on a state law theory of deceit; Count IV seeks relief for BKC's alleged intentional interference with contractual relations; [FN2] and Count V seeks relief under the Sherman Antitrust Act, 15 U.S.C. § 1.

While plaintiffs make general across-the-board allegations of race discrimination, the alleged discrimination boils down to a laundry list of each plaintiff's highly personal and individualized grievances against BKC. As plaintiffs' own pleadings demonstrate, it is a list which encompasses virtually every disputed business dealing that a franchisee can have with a franchisor. For example, plaintiffs' different grievances, set forth at length in their complaint, affidavits and deposition testimony, range from the Stephenses' claim about allegedly shoddy restaurant construction, to Carole Hall's complaint about her torn-up parking lot, to Peter Brown's claim about the receipt of spoiled food products from BKC's distributor. Other plaintiffs' grievances include Idress Agad's charge that BKC failed to disclose an easement when it sold him the land for his restaurant's drive-thru, plaintiff Kelly's claim that BKC did not fix his restaurant's equipment, Samuel Price's contention that BKC did not help him find a buyer for his restaurant, and Anna Hollis' claim that BKC forced her to install a self-service beverage station in her restaurant. The only common thread is that plaintiffs attribute to racial bias all that has happened to them in their unconnected business dealings with BKC over the past twenty years.

B. *The Regional Organization of Burger King Corporation*

BKC operates and franchises others to operate Burger King restaurants throughout the United States and abroad. Of the more than 6,000 Burger King restaurants presently in operation, 85% are licensed to franchisees.

While maintaining its corporate headquarters in Miami, at times relevant to this motion BKC's operations were conducted through an

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

extensive network of twelve region and sixteen area offices located across the United States. Plaintiffs themselves acknowledge BKC's widely decentralized structure:

*2 BKC operates its system through eleven regions, each of which is headed by an executive with the title Vice President and Region General Manager ("RGM"). The RGM has the overall responsibility for all aspects of the BKC system within the region, including the operation of both company stores and franchises, through area and district managers, and the evaluation, acquisition and development of new sites. The RGM and his staff have broad discretion with respect to the location of new sites, the granting of new franchises, the sale of company stores, and the approval of the purchase and sale of franchises. While the "head office" has ultimate decision-making authority, it will generally follow the recommendation of the RGM.

(Memorandum in Support of Plaintiffs' Motion for Class Certification ("Pl.Br.") at 7 (footnote omitted)).

It is undisputed that each BKC region office assumed almost total responsibility for the franchisees operating within its region. Thus, each region office was responsible for, among other things, determining whether its franchisees were expandable (i.e., approved to acquire additional Burger King restaurants), selecting or assisting in the selection of restaurant sites, overseeing the construction of new company-owned restaurants, assisting franchisee construction, reviewing and grading restaurant operations through BKC's Quality, Service and Cleanliness ("QSC") and Restaurant Progress Reports ("RPR"), negotiating the sale to franchisees of company-owned restaurants, and otherwise dealing with the franchisees in the region on a day-to-day basis with regard to all facets of the operation of their Burger King restaurants.

Because of BKC's regional organization, decisions with respect to franchisee expansion, site selection, financial assistance, restaurant operations and other important matters were not made by BKC on an institutional basis.

Rather, these decisions were made by different BKC personnel in different BKC region offices on a franchisee-by-franchisee basis. The decisions necessarily varied depending upon who the decisionmaker was and the particular circumstances of each case.

C. *Class Action Proceedings*

Nearly three years after commencing this action, and almost a year after the expiration of their last extension of time to move for class certification, plaintiffs filed the instant motion. [FN3] Plaintiffs have not sought an evidentiary hearing. Rather, they rely on the allegations of their complaint, as supplemented by the numerous affidavits filed in support of this motion. Significantly, plaintiffs offer no facts or proof allegedly uncovered by them in discovery on the class issues, including documentary or other evidence of any "system-wide" discriminatory policies or practices of BKC which are said to have had a class-wide impact.

In opposing class certification, BKC relies on, among other things, the extensive discovery it has taken on the issue of class certification, including the depositions of nineteen of the named plaintiffs.

*3 In light of the voluminous evidentiary record submitted to the Court on this motion, and because it is clear that to certify a class here would run counter to virtually every tenet of Rule 23, the Court dispensed with an evidentiary hearing. See *Lewis v. Heckler,* 752 F.2d 555, 557 (11th Cir.1985); *McGowan v. Faulkner Concrete Pipe Co.,* 659 F.2d 554, 559 (5th Cir.1981). [FN4]

*Discussion*
I.
*Requirements to Be Met for Class Certification Under Rule 23(a)*

It is settled that a class action "may only be certified if the trial Court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. v. Falcon,* 457 U.S. 147, 161 (1982). Thus, in order to certify a class, the Court must find

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

that:
(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *Jackson v. City of Belle Glade,* 95 F.R.D. 384, 385 (S.D.Fla.1982). Plaintiffs here fail to satisfy even a single prerequisite of Rule 23(a).

### A. *Plaintiffs Have Not Established Commonality*

It has long been settled in this Circuit "that the bare allegation of race discrimination does not satisfy Rule 23(a)'s requirement of commonality and typicality." *Nelson v. United States Steel Corp.,* 709 F.2d 675, 679 (11th Cir.1983) (footnote omitted). Thus, " '[t]he mere fact that an aggrieved private plaintiff is a member of an identifiable class of persons of the same race or national origin is insufficient to establish his standing to litigate on their behalf all possible claims of discrimination against a common [franchisor].' " *Coon v. Georgia Pac. Corp.,* 829 F.2d 1563, 1566 (11th Cir.1987) (quoting *General Tel. Co. v. Falcon, supra,* 457 U.S. 147, 159 n. 1 (1982). The burden is on the plaintiffs to show "the required commonality between [their] claims and those of the putative class." *Nelson v. United States Steel Corp., supra,* 709 F.2d at 680. As *Nelson* makes clear, "[a] court cannot simply presume that the commonality requirement has been satisfied; the plaintiff bears the burden of proof on this issue." *Id.* at 679-80 (citation omitted).

Plaintiffs have not come forward with a shred of proof to demonstrate that any of their claims are common to other BKC minority franchisees. Instead, they rely solely on their *ipse dixit* that BKC mistreated them and, since they are not white, BKC must have discriminated against all nonwhite franchisees. This is not enough under Rule 23. See *Morrison v. Booth,* 763 F.2d 1366, 1371 (11th Cir.1985) (certification denied where "(p)laintiffs simply leap from the premise that

they were the victims of discrimination to the position that others must also have been"); *Ezell v. Mobile Housing Board,* 709 F.2d 1376, 1380 (11th Cir.1983) (class decertified where "[i]nstead of introducing evidence of class-wide discrimination, [plaintiffs] introduced only evidence of the [defendants'] treatment of them individually); *Nelson v. United States Steel Corp., supra,* 709 F.2d at 679. On this ground alone, certification must be denied.

*4 Most importantly, plaintiffs' claims simply do not lend themselves to generalized proof. That is because the decisions challenged here were not made by BKC on an institutional basis. In order to determine whether particular BKC employees were racially motivated, the Court would have to examine separately thousands of decisions which were made on an individual basis by different BKC employees throughout the country over a twenty-year period. This would necessitate hundreds of mini-trials to resolve thousands of discrete factual issues. By definition, commonality is absent here.

The Court addressed this very issue in *Lucky v. Board of Regents,* 26 EMPLOYMENT PRACTICES DECISIONS (CCH) ¶ 32,071, at 21,832 (S.D.Fla. June 29, 1981). There, the plaintiffs sought to represent a class of black employees and rejected applicants alleging sex and race discrimination at Florida International University ("FIU"). Making general "across-the-board ... allegations of ... 'race discrimination,' " plaintiffs submitted affidavits from several black employees of FIU "detailing grievances factually unrelated except for alleged discrimination...." *Id.* at 21,834. However, just as in this action, the decisions being challenged were "not made on a broad institutional basis" and varied "within the numerous units and departments" of the University. Noting this, and the "individual nature of the ... decisions" being challenged, this Court found commonality lacking:
Whether race caused any of the employment decisions challenged by plaintiffs would require separate analysis of each decision, the qualifications of the individuals involved, and the [defendant's] reasons for the decisions.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

*Id.* at 21,837. Certification was thus denied, because

> innumerable and dissimilar questions ... predominate over the alleged common "animus" question and to fail to render the class action a superior, necessary, or appropriate device for the resolution of this controversy.

*Id.* at 21,835-36.

Similarly, in *Love v. Turlington,* 733 F.2d 1562, 1565 (11th Cir.1984), the Eleventh Circuit affirmed the district court's refusal to certify an action challenging the constitutionality of a basic skills test (the "SSAT-I") administered to eleventh graders throughout the State of Florida. There, too, the plaintiff made across-the-board allegations of discrimination, arguing that a disproportionately large number of the students who failed the test, and who were therefore targeted for remedial assistance, were black. *Id.* at 1563. As in *Lucky,* however, the Eleventh Circuit noted that the decisions being challenged were not made on an institutional basis. Rather, "[e]ach [school] district is responsible for its own remedial program for such students." *Id.* at 1564. Even within any single school district, the court noted, the

> determinations of whether students failing the SSAT-I are ultimately eligible for a diploma are made by individual teachers on the basis of students' individual achievements. Each student's situation differs, and the diploma is denied each student for reasons which are unique to his situation, and which do not necessarily correspond to his performance on the SSAT-I.

**\*5** *Id.* at 1564. Accordingly, given that decisions were made on a "district-by-district basis, and ... for each student individually," *id.,* the court affirmed the district court's denial of class certification "on grounds that the commonality and typicality required by Fed.R.Civ.P. 23(a)(2) and (3) are absent in this case." *Id.*

The Fifth Circuit upheld the district court's denial of class certification on similar grounds in *Merrill v. Southern Methodist University,* 806

F.2d 600 (5th Cir.1986). In *Merrill,* the plaintiff alleged that she was denied tenure by Southern Methodist University ("SMU") on the basis of her sex and religion. Plaintiff brought suit on behalf of herself and a class of females who might be adversely affected by the practices complained of. *Id.* at 607. The district court denied the motion for class certification and, following trial, plaintiff appealed. On appeal, the Fifth Circuit observed that notwithstanding the claims of class-wide discrimination, the evidence showed that plaintiff's own claims were not necessarily common to or shared by other class members. To the extent they were, the decisions being challenged were made by SMU on an individual basis in the case of each professor and simply did not lend themselves to class treatment:

> [D]iscrimination may take such a wide variety of guises in this setting that the facts of one woman's claim may be markedly different from another's. Moreover, [the defendant] would have individually tailored justifications for the alleged discrimination in each case. Here, the evidence adduced to prove and rebut institutional discrimination would not have overlapped to an extent consistent with the goal of efficiency that underlies Rule 23(a).... For example, ... [plaintiff's] chief claim was denial of tenure. Each tenure denial turns on unique facts: the quality of *this* professor's teaching, the substance of *her* publications, the range of *her* service.... The class action that [plaintiff] proposed would have quickly disintegrated into a plethora of individual claims. Rather than address this obvious danger, [plaintiff] relied on vague allegations of commonality that the district court found insufficient to justify certification.

*Id.* at 608; see *Grimes v. Pitney Bowes, Inc.,* 100 F.R.D. 265, 270 (N.D.Ga.1983); *Jamerson v. Board of Trustees,* 80 F.R.D. 744, 747 (N.D.Ala.1978), aff'd 662 F.2d 320 (5th Cir.1981); *Wells v. General Elec. Co.,* 78 F.R.D. 433, 438 (E.D.Pa.1978). [FN5]

While plaintiffs approach this motion as if this were a garden variety civil rights action to redress centralized corporate decisions or

1992 WL 372354                                                                 Page  5
(Cite as: 1992 WL 372354, *5 (S.D.Fla.))

policies which have had a class-wide impact, nothing could be further from the mark. Plaintiffs' own pleadings demonstrate that this action is about the highly individual grievances of each of the plaintiffs, grievances which share nothing in common except an alleged racial animus. As *Nelson* holds, however, "the bare allegation of race discrimination does not satisfy Rule 23(a)'s requirement of commonality...." 709 F.2d at 679.

B. *Joinder of All Potential Class Members Is Not Impracticable*

**\*6** Rule 23(a) requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a). "The basic question is practicability of joinder, not number of interested persons per se." *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir.1980), cert. denied, 449 U.S. 1113 (1981). In determining whether joinder is practicable, the Court must examine

a number of facts other than the actual or estimated number of purported class members ...; these include, for example, the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim.

*Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir.1981). Since joinder of all potential class members is practicable here, plaintiffs have not satisfied the numerosity requirement.

This is not a consumer or shareholder action involving thousands of claimants possessing small claims who are unable to proceed individually. *Cf. Newberry v. Washington Post Co.* [1976-1 TRADE CASES ¶ 60,736], 71 F.R.D. 25, 27 (D.D.C.1976). Notably, plaintiffs have presented no evidence indicating that they are financially unable to sustain this action individually. To the contrary, BKC has submitted evidence that several plaintiffs are multiple- franchise operators who have invested substantial sums in their businesses. Many of the plaintiffs are educated and experienced businessmen who

were regularly assisted by professionals in their business dealings with BKC. See *Franklin Container Corp. v. International Paper Co.*, [1983-2] TRADE CASES (CCH) ¶ 65,727, at 69,721 (E.D.Pa. May 12, 1982). Because they each seek millions of dollars in damages from BKC, plaintiffs have every incentive to press their individual claims for relief. See *Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 655 F.Supp. 1281, 1285 (S.D.N.Y.1987), aff'd, 838 F.2d 66 (2d Cir.1988); *Reilly v. Frederick*, 21 Fed.R.Serv.2d 163, 167 (N.D.Ala.1976).

Further, plaintiffs concede that even though the proposed class is nationwide, its members can be identified with substantial certainty. See *Lucky v. Board of Regents, supra*, 26 EMPLOYMENT PRACTICES DECISIONS (CCH) at 21,838 (no joinder problems since class members were easily identifiable). In fact, the unrefuted evidence submitted by BKC shows that plaintiffs and their counsel have already met with the putative class members in an effort to solicit as many as possible to join in this action. Plaintiffs' own actions thus demonstrate that joinder is indeed practicable.

C. *Plaintiffs' Claims Are Not Typical of Absent Class Members*

The innumerable dissimilarities in the plaintiffs' claims which preclude a finding of commonality, likewise preclude a finding of typicality. See *Love v. Turlington, supra*, 733 F.2d at 1564; *Lucky v. Board of Regents, supra*, 26 EMPLOYMENT PRACTICES DECISIONS (CCH) at 21,836-37. That is because in attempting to prove their own claims, plaintiffs would not necessarily prove the claims of any, let alone all, of the absent class members. See *Amswiss Int'l Corp. v. Heublein, Inc.*, 69 F.R.D. 663, 667 (N.D.Ga.1975).

**\*7** Plaintiffs have made no showing of typicality beyond the naked allegation that BKC has engaged in discriminatory practices. But the facts alleged as to the purported discrimination show not typicality, but uniqueness as to each. "[T]he common theme of racial discrimination," as plaintiffs put it, is

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 372354
(Cite as: 1992 WL 372354, *7 (S.D.Fla.))

Page 6

not enough to establish typicality. This Court long ago pointed out that

the ability to group individual claims under common labels does not necessarily mean that "typicality" exists such as to make class certification mandatory.

*Lucky v. Board of Regents, supra,* 26 EMPLOYMENT PRACTICES DECISIONS (CCH) at 21,837. Here, just as in *Jackson v. City of Belle Glade, supra,* 95 F.R.D. at 385, "[a]lthough the plaintiffs allege generally that all of the members suffer from discriminatory practices, the plaintiffs have failed to show that the claims of the representative parties are typical of the members of the proposed class."

Recognizing this, plaintiffs have attempted to manufacture common issues by including in their complaint conclusory statements, such as that BKC "has enacted and effected national policies and practices of deliberate, unlawful and systematic exclusion of and discrimination against [B]lacks, Hispanics and Asian-Indian Americans as a Class...." (Cplt. ¶ 32.) [FN6] However, the claims and circumstances vary wildly from plaintiff to plaintiff.

Thus, contrary to their claim that they have been restricted to restaurant sites in inner-city or minority areas, according to their own testimony at least seventeen of the plaintiffs have operated one or more Burger King restaurants in predominantly white or racially mixed areas. In Rubin and Adrienne McCollum's case, they have never operated a restaurant in a minority area, yet inexplicably complain about alleged "class-wide" "redlining". Moreover, there are scores of different reasons why plaintiffs' restaurants ended up located where they were. For example, many of the plaintiffs admittedly selected sites in inner-city or minority areas because they believed the sites would be profitable. In fact, one of Carole Hall's chief complaints is that she was denied a site in a predominantly black area in Highland Park, Michigan. In other cases, the area changed after the plaintiffs opened their restaurants. There are so many different reasons why each plaintiff's restaurants are located where they

are that the claim of discriminatory site selection can only be tried on an individual basis. [FN7]

Similarly, while plaintiffs complain that BKC sold restaurants to them at discriminatorily higher prices, only thirteen of their forty-seven Burger King restaurants were even purchased from BKC. And in those cases where restaurants were sold by BKC, the sales price of each was separately negotiated at the region level, by different BKC regional personnel who arrived at a price after consideration of numerous factors which varied from sale to sale. In order to draw any meaningful conclusions with regard to whether a particular sale compared favorably or unfavorably to the sale of similar restaurants to white franchisees in the same region, the Court would have to analyze each and every sale separately. That is not what Rule 23 had in mind.

*8 While plaintiffs further complain that there has been a "class-wide" lack of financial assistance to minority franchisees, the evidence submitted by BKC--and not controverted by the plaintiffs--shows that in many cases the financial assistance provided by BKC to the plaintiffs has been enormous. The McCollums alone have received to date over $1 million in financial assistance from BKC. This is not an issue where the Court will be able to generalize on a class-wide basis. Decisions on financial assistance were made by BKC on a case-by-case basis at the region level. A separate analysis would have to be made of the assistance provided to each plaintiff to determine whether it compared favorably or unfavorably with the assistance provided to white franchisees in the same region who were experiencing the same or similar problems.

The lack of commonality and typicality is nowhere more apparent than in the purported antitrust conspiracy alleged between BKC and its white franchisees. (Cplt. ¶¶ 211-23.) In fact, plaintiffs have testified that they have no knowledge of the company-wide conspiracy alleged in their complaint. Rather, at deposition each plaintiff testified about a

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

different local conspiracy, purportedly entered into between different BKC regional employees and different white franchisees during a different time period. One of the plaintiffs even testified that BKC conspired not with its white franchisees, but with other black franchisees, including one of his co-plaintiffs. Even franchisees operating in the same BKC region allege different conspiracies, and eight of the plaintiffs testified that they were not aware of any conspiracy at all.

In addition, the presence of unique or individual defenses against the plaintiffs further precludes any finding of typicality (or commonality). See *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir.1984) (presence of individual or unique defenses to plaintiff's claims "does present a sufficient question of typicality to justify a district court's decision to deny class certification"); *Brooks v. Southern Bell Tel. & Tel. Co., supra,* 133 F.R.D. at 57; *Masri v. Wakefield,* 106 F.R.D. 322, 325 (D.Colo.1984); *Lewis v. Johnson,* 92 F.R.D. 758, 760 (E.D.N.Y.1981). For example, plaintiffs do not deny that they have executed numerous releases in favor of BKC-- eighty-three by BKC's count. Each plaintiff will necessarily need to address the unique questions pertaining to the validity of these releases. This may necessitate examination of the circumstances under which each release was executed. In *Abercrombie v. Lum's Inc., supra,* 345 F.Supp. 387 (S.D.Fla.1972), Judge King refused to certify a class of Lum's franchisees for this very reason:

Ergo, another issue of fact is raised requiring examination of the intent of each of 127 parties who executed such a release. Indeed, the existence of the plaintiffs' claim could well be submerged in the welter of possibly conflicting, contradictory and disparate claims by other franchisees, each vying for its full share of judicial attention. The Court sees no superiority to other available methods in such an omnibus time-consuming and unnecessary procedure.

*9 *Id.* at 393. And in *Plekowski v. Ralston Purina Co.* [1975-2 TRADE CASES ¶ 60,411], 68 F.R.D. 443, 451 (M.D.Ga.1975), the court denied plaintiff's motion for class certification because the "questions of whether a release has been executed, whether it is valid and whether it covers the subject matter of this lawsuit would require an analysis of each releasor's particular circumstances." The same holds true here.

Moreover, plaintiff after plaintiff testified at deposition that they were allegedly discriminated against many years ago, but did not bring suit against BKC until October 1988. The defense of the statute of limitations raises a plethora of yet additional individual issues which the Court will need to examine. See *Brooks v. Southern Bell Tel. & Tel. Co., supra,* 133 F.R.D. at 57. [FN8]

D. *Plaintiffs Will Not Adequately Represent the Class*

The requirement that the class representatives "fairly and adequately protect the interests of the class," Fed.R.Civ.P. 23(a)(4), is mandated by fundamental due process because "[i]f the absent members are to be conclusively bound by the result of an action prosecuted or defended by a party alleged to represent their interests, basic notions of fairness and justice demand that the representation they receive be adequate." 7A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure* § 1765, at 266-67 (1986). There are several reasons why the plaintiffs here cannot adequately represent any class.

First, "[w]here it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative." *Koos v. First National Bank,* 496 F.2d 1162, 1164 (7th Cir.1974). See *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990), cert. denied, 111 S.Ct. 675 (1991). As discussed above, that is precisely the case here.

Second, "[q]uality of representation embraces both the competence of the legal counsel of the representative and the stature and interest of the named parties themselves." 7A C.

1992 WL 372354
(Cite as: 1992 WL 372354, *9 (S.D.Fla.))

Page  8

Wright, A. Miller & M. Kane, *supra*, § 1766, at 297-98 (footnotes omitted); accord *Kendler v. Federated Department Stores, Inc.*, 88 F.R.D. 688, 693-94 (S.D.N.Y.1981). In assessing the adequacy of the named representatives, the court must look "to factors such as their honesty, conscientiousness, and other affirmative personal qualities." 7A C. Wright, A. Miller & M. Kane, *supra*, § 1766 at 308 (footnote omitted); see *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.1987), cert. denied, 485 U.S. 959 (1988); *Armour v. City of Anniston*, 89 F.R.D. 331, 332 (N.D.Ala.1980), aff'd, 654 F.2d 382 (5th Cir.1981); *Massengill v. Board of Education*, 88 F.R.D. 181, 185 (N.D.Ill.1980); *Cobb v. Avon Products, Inc.*, 71 F.R.D. 652, 655 (W.D.Pa.1976).

Many of the plaintiffs have displayed a lack of credibility or honesty which is fatal to their representative status. For example, plaintiff Peter Brown was recently sanctioned by another judge of this District, who noted that Brown "came into the courts of the United States with unclean hands and deceitful purpose...." *Glendalough, Inc. v. Burger King Corp.*, Case No. 87 Civ. 1570 (S.D.Fla. Aug. 31, 1987). And Reginald Smith, who unsuccessfully sued BKC fourteen years ago for discrimination and then signed a general release, admittedly was added as a plaintiff for the improper purpose of pushing BKC to settlement "by raising [his] dead skeleton." Jorge and Manuel Triana have previously been enjoined by another District Court from wilfully infringing BKC's trademarks, see *Burger King Corp. v. Jorge A. Triana & Manuel Triana*, No. 88 C 4364, 1988 WL 58614, 1988 U.S.Dist. LEXIS 5102 (N.D.Ill. May 27, 1988), as have plaintiffs Majeed, Underwood, Rubin and Adrienne McCollum, John Davis, Kelly and Allen by this Court. See *Burger King Corp. v. Majeed*, No. 95-1572-Civ-Kehoe. So has the lead plaintiff Carole Hall who, after vehemently insisting to this Court in another action that she was not the franchisee of Burger King Restaurant No. 1813, on this motion once again claims that she was. See *Burger King Corp. v. Hall*, 770 F.Supp. 633 (S.D.Fla.1991). Two of the plaintiffs, William and Melinda Stephens, were recently indicted

in the State of Pennsylvania for failing to file or remit sales and employer withholding taxes.

*10 Finally, the plaintiffs owe enormous sums of money to BKC which are the subject of numerous counterclaims. In the face of these counterclaims, the plaintiffs cannot adequately protect the interests of the class because they may well place their own interests in resolving these liabilities "above the interests of the class...." *Kendler v. Federated Dep't Stores, Inc., supra*, 88 F.R.D. 694; see *TBK Partners v. Chomeau*, 104 F.R.D. 127, 132 (E.D.Mo.1985); *Chestnut Fleet Rentals, Inc. v. Hertz Corp.* [1977-1 TRADE CASES ¶ 61,307], 72 F.R.D. 541, 546 (E.D.Pa.1976).

In sum, plaintiffs have not satisfied a single prerequisite of Rule 23(a), let alone each prerequisite as required in order to certify a class.

## II.
### *Plaintiffs Have Not Satisfied the Requirements of Rule 23(b)(1)(A)*

Rule 23(b)(1) permits certification of a class action only under narrowly limited circumstances--i.e., where it appears that "the prosecution of separate actions by" individual class members would "create a risk" of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class...." Fed.R.Civ.P. 23(b)(1)(A) [FN9]

Certification of this case under Rule 23(b)(1)(A) is prohibited by the Eleventh Circuit's decision in *In re Dennis Greenman Securities Litigation*, 829 F.2d 1539, 1545 (11th Cir.1987), which flatly holds that Rule 23(b)(1)(A) certification is not available to a class of plaintiffs who seek "compensatory damages." In *Greenman*, the court noted that: Many courts confronting the issue [of "inconsistent or varying adjudications"] have held that Rule 23(b)(1)(A) does not apply to actions seeking compensatory damages.... These courts reason that inconsistent standards for future conduct are not created

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

because a defendant might be found liable to some plaintiffs and not to others.... Implicit in these decisions is the view that only actions seeking declaratory or injunctive relief can be certified under this section.

*Id.* "[S]ince the plaintiffs sought compensatory damages," the Eleventh Circuit held that "the district court erred by certifying the class pursuant to (b)(1)(A)." *Id.* (footnote omitted).

Under *Greenman,* plaintiffs' claims cannot be certified under Rule 23(b)(1)(A) because they seek compensatory and punitive damages from BKC of over $2 billion. Moreover, it is clear that the recovery sought by plaintiffs is premised upon BKC's purported violation of the antitrust and civil rights laws and is not for equitable restitution. [FN10] Since *Greenman* definitively holds that Rule 23(b)(1)(A) is not available where compensatory damages are being sought, Rule 23(b)(1)(A) is simply inapplicable here.

### III.
#### *Plaintiffs Have Not Satisfied the Requirements of Rule 23(b)(2)*

Under Rule 23(b)(2), a class may be certified only if the defendant "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole...." The Advisory Committee Notes make clear, however, that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." *Rules Advisory Committee Notes to 1966 Amendments to Rule 23,* 39 F.R.D. 69, 102 (1966).

*11 Here, the predominant relief being sought by the plaintiffs is money damages, in an amount in excess of $2 billion. While plaintiffs attempt to downplay their request for money damages in an effort to fit under the more relaxed requirements of Rule 23(b)(1) or (2), as the court held in *Fertig v. Blue Cross* [1975-2 TRADE CASES ¶ 60,646], 68 F.R.D. 53, 59 (N.D.Iowa 1974):

[I]t is almost ludicrous to assert that damages do not predominate. The prayer is in excess of $500,000,000.

Moreover, plaintiffs concede that they have requested injunctive relief only to supplement their damage claims because "the payment of damages will not be a sufficient remedy" and that the importance of obtaining class-wide injunctive relief is only "absolutely essential" for "existing franchisees." (Pl.Br. at 40.) Thus, for the seventeen plaintiffs and many putative class members who no longer are existing BKC franchisees, injunctive relief is totally inconsequential. In similar circumstances, the court in *Halverson v. Convenient Food Mart, Inc.* [1975-1 TRADE CASES ¶ 60,254], 69 F.R.D. 331, 334 (N.D.Ill.1974), denied certification holding that "[w]here as here it appears that a substantial number of plaintiffs and a substantial portion of the class they seek to represent can recover only money damages, certification under 23(b)(2) is inappropriate." And in *McCoy v. Convenient Food Mart, Inc.* [1975-2 TRADE CASES ¶ 60,569], 69 F.R.D. 337, 339-40 (N.D.Ill.1975), "Rule 23(b)(2) was rejected because ... money damages ... was the only relief available to former franchisees."

In addition, it is settled that where antitrust plaintiffs seek treble damages, certification under Rule 23(b)(2) is improper even if injunctive relief is sought as well. See *In re Sugar Indus. Antitrust Litig.* [1976-2 TRADE CASES ¶ 61,215], 73 F.R.D. 322, 342 (E.D.Pa.1976); *Albertson's, Inc. v. Amalgamated Sugar Co.* [1974-1 TRADE CASES ¶ 74,875], 62 F.R.D. 43, 49 (D.Utah 1973), modified as to state law claims [1974-2 TRADE CASES ¶ 75,261], 503 F.2d 459 (10th Cir.1974); accord *Christiana Mortgage Corp. v. Delaware Mortgage Bankers Ass'n* [1991-2 TRADE CASES ¶ 69,462], 136 F.R.D. 372, 382 (D.Del.1991). Here, just as in *In re Arthur Treacher's Franchise Litigation,* 93 F.R.D. 590 (E.D.Pa.1982), [a]n examination of plaintiff's prayer for relief demonstrates that the nature of the action is primarily one seeking monetary damages. This is so despite the fact that plaintiff has attempted to couch the relief sought, at least in part, in terms of an

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

injunction ...

*Id.* at 594; see *In re School Asbestos Litig.,* 789 F.2d 996, 1008 (3d Cir.), cert. denied, 479 U.S. 852 (1986).

In any event, even if plaintiffs had pointed to a specific policy or practice of BKC that was shown to have had an adverse impact on all class members, certification of a class would be unnecessary to achieve class-wide injunctive relief. As this court held in *Lucky v. Board of Regents, supra,* 26 EMPLOYMENT PRACTICES DECISIONS (CCH) at 21,839, class certification is unnecessary when an individual can obtain injunctive or declaratory relief which would benefit the other class members because

*12 the relief ordered in connection with an individual's claim or action insofar as the Court may direct the defendant to make changes of such criteria or practices would of necessity inure to the benefit of others.

See *McArthur v. Firestone,* 690 F.Supp. 1018, 1019 (S.D.Fla.1988). "Whether plaintiff proceeds as an individual or on a class suit basis, the requested [injunctive] relief generally will benefit not only the claimant but all other persons subject to the practice of the rule under attack.' " *Sandford v. R.L. Coleman Realty Co.,* 573 F.2d 173, 178 (4th Cir.1978) (quoting 7A C. Wright, A. Miller & M. Kane, *supra,* § 1771, at 663-64); see also *Bailey v. Patterson,* 323 F.2d 201, 206 (5th Cir.1963), cert. denied, 376 U.S. 910 (1964); *United Farmworkers Housing Project, Inc. v. City of Delray Beach,* 493 F.2d 799, 812 (5th Cir.1974).

### IV.
*Plaintiffs Have Not Satisfied the Requirements of Rule 23(b)(3)*

In the case at bar, since plaintiffs have not established commonality of claims and defenses under Rule 23(a)(2), *a fortiori* they have not established that common questions predominate under Rule 23(b)(3). See 7A C. Wright, A. Miller & M. Kane, *supra,* § 1763 at 227-28. Indeed, even if plaintiffs could establish that there existed some common question of law or fact, they would still have fallen short of the requirement of Rule 23(b)(3) that common questions predominate.

The facts of *Di Costanzo v. Chrysler Corp.* [1973-1 TRADE CASES ¶ 74,321], 57 F.R.D. 495 (E.D.Pa.1972), are particularly apposite. In that case, a franchised dealer of Chrysler Corp. ("Chrysler") brought suit alleging violations of the Federal antitrust laws, the Lanham Act as well as common law fraud, breach of contract, breach of fiduciary duty and interference in plaintiff's business. On plaintiff's motion for class certification, the court noted that "[c]laims which turn on evidence concerning the history of many different dealerships simply would not, as a rule, easily fit the requirements of Fed.R.Civ.P. 23, which requires that " 'questions of law or fact common to the members of the class predominate over any questions affecting only individual members.' " *Id.* at 498 (footnote omitted). Since, just as in the case at bar, plaintiffs' complaint consisted "essentially, of a check list of every conceivable grievance involving an automobile dealership, the resolution of which would require a detailed review of almost every aspect of the history of each dealership," *id.,* the court denied plaintiff's motion. The Court held that:

[E]ven if there are some common questions of law and fact under 23(a)(2), these common questions clearly do not predominate over individual questions of law and fact. Accordingly, the 'predominance requirement of Rule 23(b)(3) is not satisfied.

*Id.* at 499.

Similarly, in *Abercrombie v. Lum's Inc., supra,* 345 F.Supp. 387, plaintiff sought to represent approximately four hundred past and present Lum's franchisees in an action alleging that defendants violated §§ 1 and 2 of the Sherman Act and § 3 of the Clayton Act by imposing illegal tying arrangements on their franchisees. Reasoning that "proof of the tie-ins, if they exist, must come from an examination of each individual franchisee's dealings with Lum's," *id.* at 391, the court stated that:

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 372354
(Cite as: 1992 WL 372354, *13 (S.D.Fla.))

Page  11

**\*13** Such proof will necessarily vary from franchisee to franchisee. If the Abercrombies were to establish that they made forced purchases it would not necessarily follow that other franchisees were similarly coerced. Thus, while the Abercrombies may have purchased equipment from Lum's, it appears that other Lum's franchisees purchased none. Franchisees may have purchased items from defendants for a variety of reasons ranging from convenience, to attractiveness of the product, to, as the Abercrombies claim, coercion.    Determination of the issue requires separate, distinct and individual, not common, proof.

*Id.* at 391-92 (footnote omitted).  Since "[t]he individuality of the proof required would cause [the] suit to degenerate at trial into multiple lawsuits ... exploring the relationships between each of over 400 members and the defendants on numerous alleged ties," *id.* at 393, the court refused to allow the case to proceed as a class action.

And in *McCoy v. Convenient Food Mart, Inc., supra,* 69 F.R.D. 337, the court refused to certify a class of Convenient Food Mart franchisees noting that "the individuality of factual issues" presented "will necessarily involve the conduct of the regional franchisors ... vis-a-vis the retail franchisees who comprise the class," a situation clearly "not conducive to 23(b)(3) certification." *Id.* at 342.  See *Smith v. Denny's Restaurants, Inc.* [1974-1 TRADE CASES ¶ 75,028], 62 F.R.D. 459, 462 (N.D.Ca.1974) ("despite the wide allegations of antitrust conspiracy, the only common issues presented are that each plaintiff alleges Sherman and Clayton Acts violations.  These issues do not concern themselves to class action treatment."); *In re 7-Eleven Franchise Antitrust Litig.,* 16 Fed.R.Serv.2d 537, 538 (N.D.Cal.1972) (denying class certification based on the number of divergences among the 7-Eleven franchisees; "[v]irtually the only common nexus among the claims of the numerous franchisees is that they are brought in part under Section 1 of the Sherman Act...."); *Lah v. Shell Oil Co.* [1970 TRADE CASES ¶ 73,214], 50 F.R.D. 198, 200 (S.D.Ohio 1970) (denying class certification

because whether Shell compelled each of its 140 dealers to sign a lease for a term of one year "is not one question, but 140 separate questions of fact").

In the case at bar, just as in *Di Costanzo, Abercrombie* and *McCoy,* the need for individual examination of each franchisee's factual circumstances in order to determine whether there is liability must result in denial of class certification under Rule 23(b)(3). [FN11]

While plaintiffs argue that the common issue is the existence of an alleged pattern or practice of discrimination against BKC's minority franchisees, where "(t)he only common thread shown to link plaintiffs' grievances is race," certification is not proper under Rule 23(b):
[The] particular grievances as outlined in [plaintiffs'] affidavits ... only underscore the individual nature of the ... decisions they challenge and the unavoidable need the Court would have with or without certification to examine the merits of each particular decision.

**\*14** *Lucky v. Board of Regents, supra,* 26 EMPLOYMENT PRACTICES DECISIONS (CCH) at 21,839.  Plainly those issues which "'are subject only to individualized proof,'" *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1558 (11th Cir.1989) (quoting *Nichols v. Mobile Bd. of Realtors, Inc.* [1982- 2 TRADE CASES ¶ 64,729], 675 F.2d 671, 676 (5th Cir.1982)), predominate over any issues which would be "'subject to generalized proof'" in this action. *Id.*

Rule 23(b)(3) also requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy."    Fed.R.Civ.P.    23(b). Maintenance of a class action is not feasible, let alone the superior method for adjudicating the controversy here.

First, the necessity for individualized proof on issues of liability and damages mandates a finding "that the members of the proposed class have a superior interest in individually controlling prosecution of separate actions."

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 372354
(Cite as: 1992 WL 372354, *14 (S.D.Fla.))

*San Antonio Tel. Co. v. AT & T Co.* [1975-2 TRADE CASES ¶ 60,421], 68 F.R.D. 435, 443 (W.D.Tex.1975); *White v. Deltona Corp.*, 66 F.R.D. 560, 564 (S.D.Fla.1975). Second, there is no other litigation pending concerning the discrimination and purported antitrust claims asserted by the plaintiffs. Third, BKC's franchise agreements provide that the contracts are to be governed by Florida law, and that all suits are to be brought in Florida. Thus, if any putative class members desire to litigate claims against BKC in this forum, they may do so regardless of whether this action is certified. Fourth, given the highly individual nature of the proof involved, the countless difficulties sure to be encountered in the management of a class action here are self- evident. "[W]here there is a predominance of individual issues, class certification may properly be denied on that ground alone." *Plekowski v. Ralston Purina Co., supra,* 68 F.R.D. at 454. Finally, in addition to the insurmountable problems of management that would be created if a class was certified on Counts I, II and V, Counts III and IV of plaintiffs' complaint would continue as individual actions for each plaintiff. In these circumstances, it is impossible to conclude that a class action is feasible, let alone the superior method for trying plaintiffs' claims.

### V.
*Plaintiffs' Motion for Class Certification Is Untimely*

Rule 19.A.3 of the Rules of the United States District Court for the Southern District of Florida provides in part:
Within 90 days after the filing of a complaint in a class action, unless this period is extended on motion for good cause appearing, the plaintiff shall move for a determination under subdivision (c)(1) of Rule 23, FedRCivP, as to whether the case is to be maintained as a class action.

Plaintiffs here seek class certification nearly three years after the filing of their initial complaint and almost a year after the expiration of their last extension of time to move for class certification. Plaintiffs' motion

must therefore be denied as untimely. See *Williams v. Southern Bell Tel. & Tel. Co.*, 464 F.Supp. 367, 368 (S.D.Fla.1979) (striking class allegations from complaint when plaintiffs delayed ten months before moving for certification); *Strozier v. General Motors Corp.*, 13 F.E.P. 963, 964 (N.D.Ga.1976); *Winfrey v. General Motors Corp.*, 11 F.E.P. 649, 650 (N.D.Ga.1974); see also *Walton v. Eaton Corp.*, 563 F.2d 66, 74-75 (3d Cir.1977) (denying motion for class certification made 21 months after complaint filed).

### Conclusion

*15 For the reasons set forth above, plaintiffs have failed to satisfy their burden of demonstrating that the prerequisites of class certification under Rule 23 are met and persuading the Court that the class action device is a superior, necessary or appropriate vehicle for resolving the claims advanced in this action.

Accordingly, the Court does hereby

Order and Adjudge that plaintiffs' Motion for Class Certification is Denied.

FN1. This action was originally commenced in October 1988 by twelve present and former Black franchisees of BKC who allege that BKC discriminates against Black franchisees as a class. On December 2, 1988, Plaintiffs filed an Amended Complaint in which, among other things, they added twelve additional plaintiffs and broadened the putative class to include Hispanic and Asian-Indian American BKC franchisees.

FN2. Plaintiffs have not moved to certify their state law claims for deceit and intentional interference with contractual relations (i.e. Counts III and IV of the Second Amended Complaint). Even if their remaining claims are certified, plaintiffs concede that a separate trial will be needed to resolve each of these state law claims.

FN3. By Stipulation dated January 18, 1990, plaintiffs' time to move to certify a class was extended to ninety-days following the completion of class discovery. Thereafter, by order dated July 10, 1990, the Court denied plaintiffs' motion to compel

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

discovery and limited pre-certification discovery to documents and testimony bearing on the issue of class certification. Following the Court's July 10, 1990 Order, plaintiffs sought no additional discovery from BKC and, accordingly, their time to move to certify a class expired no later than ninety-days following the July 10, 1990 Order.

FN4. Moreover, as noted above, plaintiffs did not request a hearing.

FN5. See also *Brooks v. Southern Bell Tel. & Tel. Co.*, 133 F.R.D. 54, 56-58 (S.D.Fla.1990); *Estate of Remley v. Amoco Prod. Co.*, 100 F.R.D. 419, 421 (S.D.Tex.1983); *Harrison v. Simon*, 91 F.R.D. 423, 429- 30 (E.D.Pa.1981); *Nguyen Da Yen v. Kissinger*, 70 F.R.D. 656, 662-64 (N.D.Cal.1976); *Abercrombie v. Lum's Inc.* [1972 TRADE CASES ¶ 74,118], 345 F.Supp. 387, 390-91 (S.D.Fla.1972).

FN6. To the extent BKC had a company-wide policy, it would appear that that policy was one of commitment to minority development. BKC stands alone in the fast-food industry as the only corporation that has voluntarily entered into a covenant with operation PUSH, Inc. ("PUSH"). In fact, at PUSH's recent twentieth annual convention, BKC was awarded the 1991 Corporate Partnership Award honoring BKC's commitment to minorities. Ironically, while plaintiffs purport to represent a class of minority BKC franchisees, when this action was filed the BKC Minority Franchise Association issued a statement specifically disavowing this action and affirming its intention to continue to work with BKC and PUSH in the covenant process.

FN7. In the case of the Trianas, BKC played no role in the selection of their restaurant sites; rather, the Trianas were sub-franchised to operate Burger Ring restaurants by another corporation, Chart House, Inc., which was itself a BKC franchisee. And in Anna Hollis' case, her brother- in-law--a black BKC employee in charge of minority affairs--selected the site for Hollis and her late husband's eight white partners.

FN8. In an attempt to avoid the bar of the statute of limitations, plaintiffs allege that BKC fraudulently concealed its discriminatory and anti-competitive actions. (See Cplt. ¶ 224.) However, plaintiffs' claim of "fraudulent concealment" raises additional questions "requir[ing] individualized proof as to the state of mind of each claimant, the ability of each claimant to have uncovered the fraud, and th[e] extent of each claimant's efforts in doing so." *Krehl v. Baskin-Robbins Ice Cream Co.* [1978-1 TRADE CASES ¶ 61,870], 78 F.R.D. 108, 124 (C.D.Cal.1978). Claims of fraudulent concealment involve "highly individualized questions of fact" and at a minimum, "the questions of exercise of due diligence and success of concealment would have to be answered on an individual basis for each class member." *Bill Minielli Cement Contracting, Inc. v. Richter Concrete Corp.*, 62 F.R.D. 381, 390 (S.D.Ohio 1973). Accordingly, claims of fraudulent concealment cannot properly be tried on a class-wide basis. See *Daniels v. Amerco* [1983-1] TRADE CASES (CCH) ¶ 65,274, at 69,612 (S.D.N.Y.1983); *Wolfson v. Artisans Sav. Bank* [1980-1 TRADE CASES ¶ 63,176], 83 F.R.D. 547, 551-52 (D.Del.1979); *In re Anthracite Coal Antitrust Litig.* [1978-1 TRADE CASES ¶ 62,058], 78 F.R.D. 709, 719-20 (M.D.Pa.1978); *Lohse v. Dairy Comm'n* [1977-2] TRADE CASES (CCH) ¶ 61,805, at 73,338-39 n. 1 (D.Nev. Dec. 21, 1977); *In re Transit Co. Tire Antitrust Litig.* [1975-1 TRADE CASES ¶ 60,144], 67 F.R.D. 59, 74-75 (W.D.Mo.1975); *Chevalier v. Baird Sav. Ass'n* [1976-2 TRADE CASES ¶ 61,126], 72 F.R.D. 140, 153-54 (E.D.Pa.1976).

FN9. Alternatively, Rule 23(b)(1) provides that a class action may be brought when prosecution of separate actions by individual class members would, as a practical matter, work prejudice on those not joining in the litigation, such as when a limited common fund is at stake. See Fed.R.Civ.P. 23(b)(1)(B). Here, plaintiffs neither seek class certification under Rule 23(b)(1)(B), nor is any limited common fund at stake.

FN10. Plaintiffs' reliance on *Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir.1983), *Bolton v. Murray Envelope Corp.*, 553 F.2d 881 (5th Cir.1977) and *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir.), cert. dismissed, 404 U.S. 1006 (1971), is misplaced. In each of those cases, plaintiffs' claims for damages were premised upon the recovery of back pay, which is a type of recovery flowing from injunctive relief granted and thus is "properly categorized as *equitable restitution* rather than legal damages." 1 *Newberg on Class*

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1992 WL 372354
(Cite as: 1992 WL 372354, *15 (S.D.Fla.))

*Actions* § 4.14, at 297 (2d ed. 1985).

FN11. See also *Darms v. McCulloch Oil Corp.*, 720 F.2d 490, 493 (8th Cir.1983) (class certification properly denied where real estate buyers charged developers with fraud; each purchase was a separate transaction with individual facts); *In re Northern Dist. of California, Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 853, 856 (9th Cir.1982), cert. denied, 459 U.S. 1171 (1983) (error to certify class allegedly injured by intrauterine device; no one set of operative facts established defendants' liability); *Wilensky v. Olympic Airways, S.A.*, 73 F.R.D. 473, 478 (E.D.Pa.1977) (certification denied in action alleging breach of airline's obligation to "use its best efforts to carry the passenger ... with reasonable dispatch," since the question whether best efforts had been used called for "an individual inquiry into the treatment received by each passenger").

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



1998 WL 1051961
12 Fla. L. Weekly Fed. D 92
(Cite as: 1998 WL 1051961 (S.D.Fla.))

Page    1

United States District Court, S.D. Florida.

**Karen SAUNDERS and Karen Stephens, individually and as Class Representatives, Plaintiffs,**
v.
**BELLSOUTH ADVERTISING & PUBLISHING CORPORATION, Defendant.**

**No. 98-1885-CIV.**

Nov. 10, 1998.

Peter Loblack, North Miami Beach, FL, for Karen Saunders, Individually and Class Representative.

Leon Nicholas Patricios, Marilyn Joyce Holifield, Holland & Knight, Miami, FL, for Bellsouth Advertising & Publishing Corporation, a Foreign Corporation.

Holland & Knight, Marilyn Joyce Holifield, Holland & Knight, Miami, FL, for Publishing Corporation, a Foreign Corporation.

*ORDER GRANTING DEFENDANT'S MOTION TO DISMISS CLASS ACTION*

UNGARO-BENAGES, J.

*1 THIS MATTER is before the Court upon Defendant's Motion to Dismiss Class Action, filed September 30, 1998.

THE COURT has considered the above-referenced motion and the pertinent portions of the record and is otherwise fully advised in the premises. It is hereby

ORDERED AND ADJUDGED that the Defendant's Motion to Dismiss Class Action is GRANTED for the reasons set forth below.

*BACKGROUND*

On August 6, 1998, the Plaintiffs filed a class action Complaint on behalf of all African-American applicants to and employees of Defendant BellSouth who from May 1, 1994, have applied for better paying positions, tried to obtain training necessary for promotions, and have been reprimanded, suspended, or terminated for protesting allegedly discriminatory employment practices. The Plaintiffs seek injunctive relief as well as $50 million in compensatory and punitive damages. The Defendant filed a Motion to Dismiss Class Action arguing that as a matter of law the Plaintiffs cannot satisfy the requirements of Fed. R. Civ. Pro. 23(b)(2) or 23(b)(3) under which the Plaintiffs seek to maintain their class action. The Plaintiffs did not respond to the Defendant's Motion on its merits, but instead argue that the Motion is procedurally improper. [FN1]

FN1. The Court is unpersuaded by the Plaintiffs' argument that the Motion to Dismiss Class Action is procedurally improper. On the contrary, as the Defendant points out, Fed. R. Civ. Pro. 23(c)(1) requires that courts determine whether a class action can be maintained "[a]s soon as practicable after the commencement of an action brought as a class action...." The Court also notes that the Plaintiffs have failed to file a Motion for Class Certification which was due within 90 days after filing of the Complaint. *See* Local Rule 23.1(b)(3). Nor have the Plaintiffs moved for an extension of time in which to file the Motion for Class Certification. The Complaint in this case was filed on August 6, 1998, and therefore the Motion for Class Certification was due no later than November 6, 1998.

*LEGAL ANALYSIS*

At the outset, the Court notes that it is well established in this Circuit that, as is the situation in this case, "one allegation of specific discriminatory treatment [will no longer be] sufficient to sustain a company-wide class action." *Griffin v. Dugger,* 823 F.2d 1476 (11th Cir.1987); *see also Washington v. Brown & Williamson Tobacco,* 959 F.2d 1566 (11th Cir.1992). Notwithstanding, in order to maintain a class action, the Plaintiffs must satisfy the requirements of Fed. R. Civ. Pro. 23(a) and either Rule 23(b)(1), (2), or (3). In this case, the Plaintiffs seek certification pursuant

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

to Rules 23(b)(1) and 23(b)(2). Because the Court finds that as a matter of law the Plaintiffs' class action claim fails under both Rules 23(b)(1) and 23(b)(2), it is not necessary for the Court to first specifically address Rule 23(a). [FN2]

> FN2. Nonetheless, it seems clear to the Court based on the Complaint that the Plaintiffs' claims do not satisfy the commonality or typicality requirements of Rule 23(a).

*Rule 23(b)(2)*

Under Rule 23(b)(2), a class action may be maintained if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. Pro. 23(b)(2). The Defendant contends that the Plaintiffs' proposed class cannot be certified under Rule 23(b)(2) because the Plaintiffs' monetary claims predominate over their demands for injunctive relief. The Court agrees.

The Eleventh Circuit, adopting the position set forth in the Advisory Committee Notes on Rule 23, has held that monetary relief can be sought pursuant to Rule 23(b)(2) only if the predominant relief sought is injunctive or declaratory relief. *See Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir.1983) ("Although the cases binding on the court clearly permit back pay as part of a class remedy so long as monetary relief is not the predominant relief sought ... it is important to emphasize that the relief portion of the subsection and its accompanying Advisory Committee Note contemplate conduct by defendants that applies generally to the class as a whole."); Advisory Committee Notes, Fed. R. Civ. Pro. 23. Monetary relief predominates in a case under Rule 23(b)(2) when "the monetary relief being sought is less of a group remedy and instead depends more on the varying circumstances and merits of each potential class member's case." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir.1998)

*2 In this case, the Plaintiffs seek compensatory and punitive damages in the amount of $50 million as well as back pay. Determination of the compensatory and punitive damages is dependent on the individual circumstances surrounding each potential class member's claim. *See Holmes*, 706 F.2d at 1156 (recognizing that money damages are "directly related to the disparate merits of individual claims and are not generally applicable to the claims of the class as a whole."). Accordingly, the Court finds that the monetary relief sought predominates and that therefore the Plaintiffs' proposed class action cannot, as a matter of law, be maintained under Rule 23(b)(2).

*Rule 23(b)(3)*

Rule 23(b)(3) provides that a class action may be maintained only if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. Pro. 23(b)(3). The Defendant argues that class certification is inappropriate as a matter of law pursuant to Rule 23(b)(3) because the claim of company-wide discrimination involved individual decisions which predominated over any alleged policy of discrimination.

The Eleventh Circuit has long held that in order to fulfill the requirements of Rule 23(b)(3), "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999 (11 th Cir.1997), *quoting Kerr v. City of West Palm Beach*, 875 F.2d 1546 (11 th Cir.1989); *see also Holmes*, 706 F.2d at 1156. Moreover, in *Jackson*, the Eleventh Circuit held that when plaintiffs allege a practice and policy of discrimination, as the Plaintiffs have essentially alleged in this case, they do not create a class issue which predominates over the individual issues. *Jackson*, 130 F.3d at

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

1006 ("the resolution of this overreaching common issue breaks down into an unmanageable variety of legal and factual issues").

Viewing the Complaint in the light most favorable to the Plaintiffs, the Court finds that resolution of the Plaintiffs' class action Complaint, if certified, would "require distinctly case-specific inquiries into the facts surrounding each alleged incident of discrimination." *Jackson,* 130 F.3d at 1006. Specifically, as the Defendant points out, many factual issues would arise including 1) the employment histories of the various class members; 2) the employment histories of the other individuals considered for the respective job; 3) the requirements of the collective bargaining agreements; 4) the various job descriptions; and 5) the process used by the Defendant in promoting, terminating, and reprimanding individuals. Because these individualized factual inquiries predominate over any class-wide issues, the Plaintiffs' class allegations fail under Rule 23(b)(3) as a matter of law. In light of the foregoing, it is hereby

*3 ORDERED AND ADJUDGED that the Defendant's Motion to Dismiss Class Action is GRANTED. Accordingly, this action may be maintained only on an individual basis. It is further

ORDERED AND ADJUDGED that no later than November 30, 1998, Plaintiff Saunders and Plaintiff Stephens shall each file a separate Amended Complaint   [FN3] that comports with the Court's rulings contained herein.

> FN3. In light of the fact the Court finds that Plaintiffs Saunders **and Stephens** are improperly joined as Plaintiffs in this action, the Plaintiffs are directed to file separate amended complaints.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works





13 FEP Cases 963
13 Fair Empl.Prac.Cas. (BNA) 963
(Cite as: 1976 WL 13328 (N.D.Ga.))
<KeyCite Citations>

Strozier
v.
General Motors Corporation (Lakewood
Assembly Plant)

No. C75-49A

U.S. District Court, Northern District of
Georgia

November 7, 1975

Order March 24, 1976

Employment discrimination action by individual against employer, wherein employer moved to dismiss class aspects of action. Motion granted.

BNA Labor Relations Reporter Headnote -
FEP Cases
CLASS ACTIONS
Adequacy of representation
C108.7501 C108.7507
N.D.Ga., 1976.
Individual who failed to file motion to maintain his employment discrimination action against employer as class action within 90 days after filing of action as required by local court rule may not maintain action as class action. (1) Action is almost 10 months old, no valid excuse has been offered for failure to file class action motion, and there are serious questions as to propriety of maintenance of action as class action; (2) individual's failure properly and timely to move for class certification also raises serious questions as to whether he would fairly and adequately represent class and protect their interests.
STROZIER v. GENERAL MOTORS CORP.
13 FEP Cases 963
BNA Labor Relations Reporter Headnote -
FEP Cases
CLASS ACTIONS
Motion to strike
C108.7206
N.D.Ga., 1976.
Motion to strike does not appear to be proper remedy in attacking insufficient affidavits.

STROZIER v. GENERAL MOTORS CORP.
13 FEP Cases 963
S. Ralph Martin, Jr., Atlanta, Ga., for plaintiff.

Charles H. Kirbo and John A. Pickens (King & Spalding), Atlanta, Ga., and Frazer Hilder, Detroit, Mich., for defendant.

Full Text of Opinion

WILLIAM O. KELLEY, District Judge: -

*1 This action is before the court on the defendant's motion to dismiss the class aspects of plaintiff's complaint on the grounds that: (1) plaintiff has failed to comply with Local Court Rule 221.13 which requires plaintiff to file a motion for class action determination within 90 days after the filing of the complaint and (2) because plaintiff does not meet the requirements of Fed. R. Civ. P. 23.

While this court has serious doubts as to whether plaintiff meets the requirements of Fed. R. Civ. P. 23 in many respects, it is of the opinion that consideration need not be given such substantive contentions due to plaintiff's failure to comply with Local Court Rule 221.13. That rule provides in pertinent part:
Within ninety days after the filing of a complaint in a class action, unless this period is extended on motion for good cause appearing, the plaintiff shall move for a determination under subdivision (c) (1) of Rule 23 of the Federal Rules of Civil Procedure as to whether the case is to be maintained as a class action.

In the case sub judice the plaintiff did not timely file a motion for class determination; the plaintiff did not move for an extension of time upon good cause within which to move for such determination, and, now, over three months after defendant's motion to dismiss the class because of such failure and over nine months after the complaint was filed, plaintiff still has not moved for class determination. This action is not like Gilinsky v. Columbia University, 62 F.R.D. 178, 7 FEP Cases 641

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

(S.D. N.Y. 1974). In Gilinsky, the delay in filing was less than a month, the entire case had been pending for only four months, and the defendants did not contest that the putative class met the requirements of Fed. R. Civ. P. 23(a) (1) (2) and (3) and 23(b) (2). In the case sub judice the case is almost ten months old, no motion for class determination has yet been filed, no valid excuse has been offered for the failure to file such motion, and there are serious questions as to the propriety of this suit's being maintained as a class action. The continuing failure of plaintiff to properly and timely move for class determination also raises serious questions as to whether he will fairly and adequately represent the class and protect their interests. See Walker v. Columbia University, 62 F.R.D. 63, 7 FEP Cases 100 (S.D.N.Y. 1973).

For the foregoing reasons, defendant's motion to dismiss the class aspects of the complaint is GRANTED.

IT IS SO ORDERED this 7th day of November, 1975.

### Order

This action is before the court on the plaintiff's motion for reconsideration of this court's dismissal of the class aspects of his complaint and on the defendant's motion for summary judgment. The motion for reconsideration of this court's order of November 7, 1975, dismissing the class aspects of his case is DENIED.

One of the primary issues in the defendant's motion for summary judgment is the "two-letter" procedure utilized by the EEOC in notifying a charging party of his right to institute court action with respect to his complaint. This court has held that the first letter begins the running of the statutory 90 day period within which the suit must be filed. Barfield v. A.R.C. Security Inc., 10 FEP Cases 789, Civil No. C74-2448A (N.D. Ga., April 25, 1975); however, in Roberts v. H. W. Ivey Construction Co., 11 FEP Cases 697, 12 FEP Cases 526, Civil No. C74-1996A (N.D. Ga., Nov. 6, 1975, & Dec. 1, 1975), this court held

that if the plaintiff were misled by the action of the EEOC, then the court would consider the second letter to trigger the 90 day period. See also Stansell v. Sherwin-Williams Co., 11 FEP Cases 928, Civil No. C75-379A (N.D. Ga., Nov. 18, 1975). Stansell was recently certified to the Fifth Circuit, and this court has also been informed that the Fifth Circuit presently has before it an appeal of the decision in Turner v. Texas Instruments, Inc., 11 FEP Cases 748 (N.D. Tex. 1975), in which the district court dismissed the plaintiff's claim for failure to file suit within 90 days of the receipt of the notice that conciliation efforts had failed. In light of the pendency of this issue on appeal, this court is of the opinion that a ruling on this issue should be and is DEFERRED pending the outcome on appeal of either the Turner or Stansell cases. Since this is a jurisdictional issue, ruling should not be made on the other contentions of the defendant.

*2 The defendant has also filed a motion to strike the affidavit of Paul Foote and to strike certain paragraphs of the affidavits of Henry deGive and Eddie B. Strozier. Motions to strike are a drastic remedy and are seldom granted. It does not appear that such a motion is a proper remedy in attacking insufficient affidavits. See Wright & Miller, Federal Practice and Procedure, Civil § 1380. If the jurisdictional issue noted above is resolved in favor of the plaintiff and this court is required to rule on the defendant's motion for summary judgment, it will consider the adequacy of the affidavits and will rely only on those that are sufficient within the meaning of Fed. R. Civ. P. 56(e). Cf. G. D. Searle & Co. v. Chas. Pfizer & Co., 231 F.2d 316 (7th Cir. 1956). Accordingly, the motion to strike the affidavits is DENIED.

IT IS SO ORDERED this 24th day of March, 1976.

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works





# Frequently Asked Questions about Auto Insurance

Back to FAQ categories

**1. I was a passenger in someone else's car and received a citation for having an alcoholic beverage in an open container. Can my insurance company raise my rates, or cancel, or nonrenew my policy?**

According to Florida Statute 316.1936, a passenger of a vehicle is guilty of a nonmoving violation. If this is your first citation of a nonmoving, non-criminal violation, the company may not cancel, non-renew or surcharge you. However, if you change to another company, they may consider this violation as a part of the underwriting of your new policy, and you may have to pay a higher premium.

**2. I was involved in an automobile accident, and the other party was at fault. My company does not want to subrogate, including the amounts due on my deductible or loss of use. What can I do?**

There is no requirement that your company pursue subrogation. If the company does subrogate, you may be responsible for a portion of the expenses, regardless of the outcome. If the company does not plan to pursue subrogation, you can usually file in small claims court to recover the amounts owed. Or, you may make a claim against the at fault party's insurance policy for your out of pocket expenses.

**3. I was in an accident caused by a state-owned vehicle. How do I go about resolving my claim?**

You should contact the Division of Risk Management, (850) 922-3120, ext. 1600, which handles the insurance claims for all state agencies.

**4. My agent quoted me one price for my automobile insurance, but when I received the policy, the premiums were higher. What can I do?**

You should first find out why there was a discrepancy in the quote. Sometimes information will be revealed to the company on your Motor Vehicle Record (MVR) that will require the originally quoted premiums to be changed by the company.

According to Florida Statute 627.7282, you have three options:

- You may pay the increase.
- You may request cancellation, but the company is entitled to earned premium based on the corrected premium. The policyholder has a period of within 10 days from receipt of the notice to cancel the policy and demand a refund of any unearned premiums, without penalty.
- Do not pay, and the company will cancel your policy for nonpayment of premium.

The agent should be able to give you a satisfactory explanation for the increase in your premium. If you feel that your premium was intentionally quoted low in order to obtain your business, you

should file a formal complaint with our Department.

**5. I was involved in an automobile accident, and the company has not yet inspected my vehicle or authorized a rental vehicle. Isn't there a time limit on how long an insurance company can take?**

At the present time, there is no Florida Statute or Department Rule, which addresses a time limit. However, seven to ten working days should be ample time for a company to inspect a damaged vehicle and authorize a rental car. Rental may not be covered unless it is approved by the insurance company.

**6. Will a company cover property damage liability for rental vehicles?**

Usually, but it depends upon the terms and conditions of the contract. Contact the company or agent.

**7. Can an insured cancel an automobile insurance policy during the first 60 days after the effective date?**

Florida Statute 627.7295 states that no policy providing coverage for PIP and property damage liability may be cancelled by the insured during the first two months of the policy term immediately following the date of issuance or renewal except: 1) upon total destruction of the motor vehicle, 2) upon transfer of ownership, 3) upon replacement of the policy, or 4) if the insured elects to cancel because of an additional premium charge as allowed in Florida Statute 627.7282.

**8. Can an insurance company cancel an automobile policy within the first 60 days of the effective date?**

An insurance company is prohibited from canceling only for nonpayment of premium within the first 60 days, unless the nonpayment is the result of a dishonored check. Otherwise, the company's rights to cancel are the same as allowed by Florida Statute 627.728.

**9. How much notice does a company have to give for cancellation of an auto policy?**

For nonpayment of premium, 10 days. For any other reason, 45 days.

**10. How much notice does the company have to give to cancel a binder on auto insurance?**

Five days written notice.

**11. Is insurance required on motorcycles?**

There is no statutory requirement to purchase insurance on motorcycles, except when a driver has to prove financial responsibility due to violations or failure to pay for damages they caused in an accident. Lenders may require comprehensive and collision coverage to protect their interest.

**12. What is the minimum amount of insurance required to be carried in order to comply with Florida's automobile insurance laws?**

Any person who has a car in Florida for more than 90 days during the preceding 365 days, reside in Florida, be employed in Florida or have children enrolled in school in Florida, must purchase Personal Injury Protection coverage ($10,000) and Property Damage Liability coverage ($10,000).

In addition, if the insured is involved in an accident, the Financial Responsibility Law, regulated by the Department of Motor Safety and Motor Vehicles, also requires Bodily Injury Liability coverage ($10,000 one person, $20,000 one accident or $30,000 combined).

**13. How long does an insurance company have to settle an auto claim?**

There is no specific time limit during which the company must come to a settlement agreement with an insured or a third party claimant. However, once the person and the company have agreed in writing upon an amount, the company must pay within 20 days or pay interest as provided by Florida Statute 627.4265.

**14. What is the minimum amount of insurance required to be carried in order to comply with Florida's automobile insurance laws?**

Any person who has a car in Florida for more than 90 days during the preceding 365 days, resides in Florida, is employed in Florida or has children in school in Florida must purchase Personal Injury Protection ($10,000) and Property Damage Liability coverage ($10,000).

In addition, if the insured is involved in an accident, the Financial Responsibility Law, regulated by the Department of Highway Safety and Motor Vehicles, also requires Bodily Injury Liability coverage ($10,000 Bodily Injury one person, $20,000 Bodily Injury one accident, or $30,000 combined Bodily Injury).

**15. How long does an insurance company have to settle an auto claim?**

There is no specific time limit during which the company must come to a settlement agreement with an insured or a third party claimant. However, once the person and the company have agreed in writing upon an amount, the company must pay within 20 days or pay interest as provided by Florida Statute 627.4265.

**16. Can any casualty agent place a policy with the Florida Joint Underwriting Association?**

The agent will have to make application to the FJUA to be an authorized agent.

**17. The company selected a body shop to repair my car. However, I'd rather go to one I am familiar with. Will I be penalized for choosing my own body shop?**

Normally, you have the right to choose the auto repair shop you want. Note: Some policies approved by Department of Insurance require the insured to take the vehicle to a designated repair shop in exchange for a reduced premium. The company cannot be required to pay a higher price for the same necessary repairs. When a company directs a vehicle to be repaired by their facility, the insurance company is responsible for the quality of the repair.

**18. I have my car financed through the bank. I could not afford comprehensive and collision coverage. The bank secured coverage on my vehicle without my consent. Can they do this?**

Yes, the bank has the right under their installment can agreement to protect their interest. The loan agreement includes a provision allowing the lending institution to secure coverage and charge you for it, if you fail to obtain the required insurance. These charges are subject to interest and the premiums will be much higher than if you purchase insurance yourself.

**19. Why do I have to carry PIP if I already have health insurance?**

Florida law requires every owner of a motor vehicle required to be registered in Florida carry PIP to protect themselves in the event of injuries sustained in an automobile accident. This coverage is primary over any health insurance.

**20. The person that hit my car does not have any coverage. I don't want to make a claim through my own insurance company. Do you have any suggestions?**

You can take the at-fault party to court. If you obtain a judgment against the owner of the car and they do not pay the judgment, you should contact the bureau of Financial Responsibility in the Department of Highway Safety and Motor Vehicles so they can take the appropriate action against the owner of the car.

**21. The company wants to repair my car with non-factory parts. Can they do this?**

Yes. The parts used do not necessarily have to be original equipment manufacturer (OEM) parts, but should be of like kind and quality as the parts being replaced. Ask your company about what guarantees will be given on these parts. Florida law requires the parts to be of same fit, quality and performance.

**22. My front windshield was broken. I have comprehensive coverage with a deductible. Will I have to pay the deductible before the company pays for the replacement of my windshield?**

No. Florida Statute 627.7288 states that the deductible shall not apply to windshield damages.

**23. Can my automobile insurance premium be increased because I received a speeding ticket for driving 69 mph on an interstate highway?**

No. Florida Statute 626.9701 states a company may not surcharge an insured for non-criminal violations solely for speeding less than 70 mph on a four-lane major highway, outside of business or residential area.

**24. How long should it take to receive a refund of premium after I cancel my auto policy?**

Florida Statute 627.7283 states that the unearned premium must be returned within 30 days of the company's receipt of the written request for cancellation, or the company must pay interest at the rate of 8%. If a premium finance company is involved, the company is responsible to refund to the premium finance company within 30 days.

**25. I was in an automobile accident. The other person was at fault. What should I do?**

You have two options: You may file a claim with the at-fault party's insurance company if they are insured; or, if you have collision insurance on your vehicle, you can have your own insurance company pay for the damages, less your deductible, and they will usually subrogate against the at-fault party to recover their loss.

**26. My car has been totaled. The company has made payment, but the amount paid will not cover what I still owe the financial institution. What next?**

Insurance companies are obligated to pay in accordance with their policy provisions, which is usually the actual cash value of the vehicle at the time of the loss. This amount does not always cover the loan balance because you may owe more than the vehicle is actually worth. You would be responsible to pay the difference to the financial institution.

**27. The company is refusing to pay for a CB radio that was stolen from my automobile. Can they do this?**

Most companies exclude electronic equipment, such as CB radios, cellular telephones, compact disc changers, etc., unless they are factory- installed. You should review your policy and its exclusions to determine if your CB is covered. If CB radios are excluded and it was not specifically endorsed onto your policy, then there would be no coverage.

**28. How long does it take for an insurance company to issue an automobile insurance policy?**

You should receive your policy no later than 60 days after the effective date.

**29. What expenses are covered under Medical Payments coverage?**

Medical Payments coverage pays for medical expenses which are caused by injury in an automobile accident. It covers you and members of your family who live with you regardless of who is at fault. This coverage also applies if you are in someone else's vehicle or if you are a pedestrian, as long as the accident occurs in Florida.

**30. Can a company refuse to renew your policy based on the number of accidents made in the last three years?**

An insurance company may non-renew your policy if you have more than one at-fault accident. If you have three or more accidents, regardless of who is at fault, the company may non-renew your policy.

Please note, a company may non-renew for claims activity, regardless of accidents.

**31. What is Personal Injury Protection?**

Personal Injury Protection (PIP) is sometimes referred to as "no-fault" insurance. It covers you and relatives residing in your household for injuries sustained in an automobile accident

regardless of who is at fault. This coverage pay 80% of reasonable and necessary medical bills, 60% of lost wages, and includes a $5,000 death benefit, up to a limit of $10,000.

### 32. What is comparative negligence?

Comparative negligence is a legal principle providing that the amount of a person's negligence in an accident is determined by his contribution to the accident. In Florida, the percentage of the individual's negligence in the accident is usually subtracted from the amount he would otherwise recover, if the other person were 100% at fault.

### 33. I was involved in an automobile accident, and my car was totaled. My company is not offering me a fair settlement on my claim. What can I do?

Do your homework. Check the "blue book" for the actual cash value (ACV) of your car, check out the classified advertisements in your local newspapers and check with the car dealerships in your area. Look for the prices of cars similar to yours and submit them to your company, if the prices are higher than the company's offer. If they still fail to offer you more money, you may invoke the appraisal clause in your policy, request mediation or consult an attorney to see if legal action may be taken. Remember their estimate must be based on the local market.

### 34. Can my premium finance company request cancellation of my auto policy because I did not pay the late charge assessed, but did pay my regular installment?

No. The premium finance company may only cancel your policy for nonpayment of the premium, which doesn't include late charges.

### 35. I was involved in a car accident and was not at fault. The officer gave a ticket to the other individual. I have contacted the other party's insurance company, and they refuse to honor my claim because their insured has not given them notice of the accident. Doesn't the company have an obligation to pay my claim even if their insured does not report the accident?

The company is obligated to pay what the insured is legally liable for because of an accident. A ticket by itself is not evidence of 100% legal liability, therefore, in many instances the company may not have to pay for damages if their insured does not report the accident and cooperation in the investigation. There are many factors taken into consideration when evaluating liability claims. Each situation is judged on its own merit.

### 36. If my auto repair is delayed while waiting for parts or body shop delays, is my auto rental extended.

If you feel you are entitled to rental, check with your adjuster. The adjuster approves or denies all these expenses.

**Back to Top**

*January 19, 2000*

No. 88853

IN THE
SUPREME COURT OF ILLINOIS

| | |
|---|---|
| MICHAEL E. AVERY, et al., on behalf of themselves and all others similarly situated, | In The Appellate Court of Illinois Fifth District |
| Plaintiffs-Appellees, | On appeal from the Circuit Court for the First Judicial Circuit Williamson County |
| vs. | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | No. 97-L-114 |
| | John Speroni, |
| Defendant-Appellant. | *Judge Presiding* |

AMICUS CURIAE BRIEF
SUPPORTING APPELLANT'S RULE 302(B) MOTION

Eleanor J. Lewis
D.C. Bar No. 443973

Thomas Geoghegan
Illinois Bar No. 70814

Center for Auto Safety
1825 Connecticut Avenue, NW
Suite 330
Washington, DC 20009
(202)328-7700

Despres, Schwartz & Geoghegan
77 West Washington Street
Suite 711
Chicago, IL 60602
(312)372-2511

**Counsel for *Amici Curiae* Center for Auto Safety, Inc. and Public Citizen, Inc.**

## TABLE OF CONTENTS

A.  DESCRIPTION OF *AMICI CURIA*..................................................................1

B.  ARGUMENT AND CITATION OF AUTHORITIES..........................................1

    1.    This Case Is One in Which the Public Interest
            Requires Expeditious Determinations by This
            Court..................................................................................1

    2.    This Decision Gives Vehicle Manufacturers What
            They Have Been Unable to Obtain from Congress,
            Federal Courts, State Legislatures, and International
            Treaties..............................................................................3

            a.  The Federal Trade Commission Found a
                Monopoly Existed for OEM Crash Parts.................................4

            b.  Congress Repeatedly Refuses to Create a Crash Parts
                Monopoly by Enacting Design Protection Legislation.......................5

            c.  State Legislatures Reject Bills Strengthening Crash Parts
                Monopoly.........................................................................6
            d.  Other Countries Reject Trade Protection
                 for OEM Crash Parts.......................................................7

            e.  Crash Parts are Denied State Patent Protection...............................8

    3.    Certified Non-OEM Parts Provide a Pro-Consumer
            Alternative to OEM Crash Parts..............................................8

    4.    Trial Court's Decision is Based on Substantial
            Constitutional Errors that Require Immediate Review
            and Reversal by this Court...................................................11

C.    CONCLUSION.............................................................................15

## TABLE OF AUTHORITIES

### CASES

Bonito Boats, Inc. v. Thunder Craft Boats, Inc.
    489 U.S. 141 (1989)................................................................................................8

In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.
    174 F.R.D. 332 (D.N.J. 1997)..............................................................................14

In re Ford Motor Co. Bronco II Prod. Liab. Litig.
    177 F.R.D. 360 (E.D. La. 1997)...........................................................................14

In re Masonite Corp. Hardboard Siding Prods. Liab. Litig.
    170 F.R.D. 417 (E.D. La. 1997)...........................................................................14

Phillips Petroleum Co. v. Shutts
    472 U.S. 797 (1985)..............................................................................................12

Stacke v. Bates
    562 N.E.2d 192 (1990)............................................................................................2

Weinstein v. Rosenbloom
    322 N.E.2d 20 (1974)..............................................................................................1

### STATUTES

Fed. R. Civ. P. 23 (b)(1)(A) and (b)(2)...............................................................13

Haw. Rev. Stat. Ann. § 431:10C-313.6(a)........................................................6, 12

IL. Rev. Stat. 215 ILCS 5/155.29........................................................................7

Mass. Regs. Code tit. 211, § 133.04(1).............................................................6, 12

W. Va. Code 46A-6B-1 ........................................................................................6

## LEGISLATIVE MATERIALS

Cost of Automobile Crash Parts: Hearing Before the Subcomm. for Consumers of
Senate Comm. on Commerce, 94th Cong., 2d Sess., March 1, 1976 .................................4

Design Innovation and Technology Act of 1991: Hearing Before the Subcomm. on
Intellectual Property and Judicial Administration of House Comm. of the Judiciary,
102d Cong., 2d Sess. 112, 116-17, 122-23, 306 (1992)........... .................................9, 10, 11

Industrial Design Protection: Hearings Before the Subcomm. on Courts,
Intellectual Property, and the Administration of Justice of the House Comm.
on the Judiciary, 101st Cong., 2d Sess. 282-91(1990)......................................................9

## OTHER

Cost Comparison, OEM vs. Non-OEM (Aftermarket) Parts, Alliance of American
Insurers, 1999.................................................................................................................5

European Law Reporter, Issue 6, 1997, p. 2. ..................................................................8

Uruguay Round of Multilateral Trade Negotiations: General Agreement of Tariffs
and Trade, Office of the United States Trade Representative (1994). ..........................7

## A. DESCRIPTION OF *AMICI CURIAE*

The above-named consumer organizations are among the most active consumer organizations in the United States. Their collective membership is over 165,000 consumers. For the reasons explained below, the proceedings and judgment in this case significantly affect the interests of the consumer organizations, their members and the millions of other purchasers of auto insurance across the country who benefit from the positions advocated by the organizations.

## B. ARGUMENT AND CITATION OF AUTHORITIES

### 1. This Case Is One in Which the Public Interest Requires Expeditious Determination by the Court.

This Court's immediate review pursuant to Rule 302(b) is warranted in this case because of the significant public interest involved. The judgment of the trial court below is a serious threat to consumer interests nationwide. As a result of the trial court verdict, State Farm and several other insurers have stopped using non-original equipment manufacturer ("non-OEM") crash parts for the repair of damaged vehicles covered by their policies. The use of certified non-OEM parts, as discussed more fully below, benefits consumers nationwide in the form of lower insurance premiums -- with no sacrifice to vehicle safety or performance. Amici curiae are particularly concerned that the trial court's decision will halt the use of non-OEM crash parts certified by Certified Automotive Parts Association to rigorous standards. The benefit of certified non-OEM may well be eviscerated absent immediate review by this Court of the trial court judgment below.

1

Insurers are the major purchasers of non-OEM crash parts -- exterior sheet metal and plastic parts, such as fenders, hoods and grills. Their decision to stop purchasing such parts will almost certainly lead many manufacturers of non-OEM parts to stop making such parts. Indeed, many manufacturers of non-OEM parts are likely to be driven out of business entirely by the insurers' decisions to cease purchasing such parts. Those that manage to remain in business may be forced to raise prices in order to continue marketing the parts. All of these actions stem from the trial court's judgment and will adversely impact consumers.

The public interest in prompt adjudication here is at least as significant as in other cases in which the court has granted direct appeals under Rule 302(b). See Weinstein v. Rosenbloom, 59 Ill.2d 475, 322 N.E.2d 20 (1974) (accepting on direct appeal claims for disclosure by the Industrial Commission of certain information relevant to workmen's compensation despite appellant's failure to follow proper procedures under Rule 302(b)).

In Stacke v. Bates, 138 Ill.2d 295, 562 N.E.2d 192 (1990), this court upheld a stay of monetary award where "necessary to secure the fruits of the appeal in the event the movant is successful."[1] A protracted appellate proceeding in this case will result in more and more vehicle parts manufacturers withdrawing non-OEM crash parts -- or indeed withdrawing altogether -- from the marketplace. The "fruits of this appeal" are the non-

---

[1] Stacke, 59 Ill.2d at 322, 562 N.E.2d at 196.

OEM crash parts that the public will lose if this case is not heard on direct appeal. If this Court does not consider this matter on an expedited basis pursuant to Rule 302(b), by the time this case is heard in the normal course of events by the appellate court and then this Court, the non-OEM producers will be out of business. If the movant prevails through such a protracted appeal, it will then be a pyrrhic victory for the more than five million insureds directly affected by this decision. They will have won the battle but lost the war. It is just such an irreparable harm that this motion seeks to avoid.

Irrespective of the ultimate outcome of the litigation, the anti-competitive impact of the narrowing of marketplace choices now occurring – which may well be irreversible – is adverse to the public interest. Rule 302(b) is designed precisely to avoid such an adverse result.

### 2. The Decision Below Gives Vehicle Manufacturers What They Have Been Unable to Obtain from Congress, Federal Courts, State Legislatures, and International Treaties.

The trial court's decision will effectively reinstate the automakers' crash parts monopoly at the expense of the consumer, a goal the manufacturers have been seeking for over 30 years. During this time, the auto industry has been unsuccessful in advocating its monopolistic position before (a) the Federal Trade Commission, (b) the United States Congress, © state legislatures, (d) international treaty partners, and (e) courts adjudicating state copyright claims.

### a. The Federal Trade Commission Found a Monopoly Existed for OEM Crash Parts.

The decision below ordered appellant to pay such a large amount ($586,636,180.00 in money damages and $600 million in punitive damages) for using certified non-OEM crash parts to repair the damaged vehicles of its insureds that this decision is a de facto judgment ordering the re-establishment of the long-standing crash parts monopoly controlled by the motor vehicle manufacturers. This monopoly repeatedly received federal government scrutiny and attention because of the artificially high prices it imposed on consumers.

During the 1960s and 1970s, the Federal Trade Commission ("FTC") undertook three separate investigations into the cost of automobile crash parts. During Congressional Oversight Hearings in 1976, Owen M. Johnson, Jr., Director, Bureau of Competition, FTC, testified about that agency's actions and told the Senate Committee:

> In November 1971 the Commission's task force concluded that the underlying competitive problems in the "crash parts" aftermarket derived from the monopoly power possessed by the automobile manufacturers, that each vehicle manufacturer possessed a de facto monopoly in the manufacture, sale, and distribution of such parts, and that there was every indication that these monopolies had been maintained by the affirmative acts and practices of the vehicle manufacturers.[2]

Unfortunately, the FTC was unable to craft a remedy for the problem and the monopoly continued.

---

[2]Cost Of Automobile Crash Parts: Hearing Before the Subcomm. for Consumers of Senate Comm. on Commerce, 94th Cong., 2d Sess., March 1, 1976 at 7.

4

b. Congress Has Repeatedly Refused to Create Crash Part Monopoly
by Enacting Design Protection Legislation.

Since the mid-1950s, manufacturers have urged passage of federal "industrial design" legislation which would confer copyright-like protection for the design and manufacture of both crash and repair parts of automobiles. Extensive hearings were held in the Senate in 1987 on S. 791, and in the House of Representatives in 1988 on H.R. 1179, in 1990 on H.R. 902, 3017, and 3499, and in 1992 on H.R. 1790.[3] The proposed industrial design legislation would have conferred ten years of protection on crash parts and other common consumer products. Such legislation would have created a broad new design right and would have been a marked departure from our country's traditional intellectual property law principles. It would have eliminated all competition in the production of crash parts, resulting in substantial increases in prices. The Alliance of American Insurers studied the price differences between OEM crash parts and non-OEM crash parts for thirteen different 1994 through 1999 models and found OEMs charged an average of 60% more than distributors selling non-OEM crash parts.[4]

---

[3]Hearings on S. 791 Before the Subcomm. on Patents, Copyright and Trademarks of the Senate Judiciary Comm., 100th Cong., 1st Sess., March 26, 1987; Hearings on H.R. 1179, Before the Subcomm. on Courts, Civil Liberties and the Administration of Justice of the House Judiciary Comm., 100th Cong., 2d Sess., June 23, 1988; Hearings on H.R. 902, H.R. 3017, H.R. 3499, Before the Subcomm. on Courts, Intellectual Property and the Administration of Justice of the House Judiciary Comm., 101st Cong., 2d Sess., May 3, June 20 and Sept. 27, 1990; Hearings on H.R. 1790 Before the Subcomm. on Intellectual Property and Judicial Administration of the House Judiciary Comm., 102d Cong., 2d Sess., June 29, 1992.

[4] Cost Comparison, OEM vs. Non-OEM (Aftermarket) Parts, Alliance of American Insurers, 1999.

5

### c. State Legislatures Have Rejected Bills That Would Strengthen The Crash Parts Monopoly.

State legislation provides another avenue through which vehicle manufacturers may strengthen their monopoly and curtail the use of non-OEM parts. Since the early 1980s, the auto industry has targeted anywhere from ten to twenty states during each legislative session. Lobbyists are hired, anticompetitive legislation is proposed, sponsors are enlisted and campaigns are conducted in an effort to obtain a prohibition on the use of non-OEM crash parts. Despite these efforts, two states, Hawaii and Massachusetts, passed legislation *favoring* the use of non-OEM parts. Hawaii's law provides that the insured shall have a choice of parts; if the insured chooses the OEM part, the insured must pay any existing price differential.[5] In Massachusetts, non-OEM parts "shall be used" absent specific conditions.[6] In 1999, the auto industry targeted twenty-three states for a range of restrictive legislation and was unsuccessful in all of them. A major effort was made to pass such legislation in Florida, but it failed.

Even the law most favorable to the OEM crash parts monopoly, West Virginia's, does not go as far as the trial court's decision does. Since 1995, West Virginia's law has required that during a vehicle's first three model years, OEM crash parts must be used unless the owner consents in writing at the time of repair to the use of non-OEM parts.[7] Many West

---

[5] Haw. Rev. Stat. Ann. § 431:10C-313.6(a).

[6] Mass. Regs. Code tit. 211, § 133.04(1).

[7] W. Va. Code, 46A-6B-1.

Virginia members of the class did consent to the use of non-OEM crash parts, yet State Farm was still held liable to those consenting class members.

The Illinois law governing the use of non-OEM crash parts is similar to that of most other states in that it requires the consumer to be informed in writing of the use of non-OEM crash parts and for written estimates to identify each non-OEM crash part to be used in the repair.[8]

### d. Other Countries Have Resisted Trade Protection for OEM Crash Parts.

The auto manufacturers have lobbied extensively and vigorously to obtain monopoly protection for OEM crash parts outside the United States. Efforts by consumer groups, independent component manufacturers, and insurance companies to introduce competition into the crash parts market abroad have been met by well-financed, fierce opposition from auto companies attempting to preclude competition and preserve monopoly profits from the sale of these parts. The negotiations of the General Agreement on Tariffs and Trade Agreement on Trade-Related Aspects of Intellectual Property Rights in the early 1990s,[9] and, in particular, the follow-up implementing efforts in the European Union to harmonize national laws and regulations on industrial design protection in 1995 and 1996 demonstrated the auto manufacturers' herculean efforts to avoid competition in the crash parts market.

---

[8] IL. Rev. Stat. 215 ILCS 5/155.29.

[9] See Section 4: Industrial Designs, Articles 25-26, Agreement on Trade-Related Aspects of Intellectual Property Rights, contained in Uruguay Round of Multilateral Trade Negotiations: General Agreement on Tariffs and Trade, Office of the United States Trade Representative (1994).

According to the European Union Law Reporter, legislation adopted by the European Commission ("EC") occurred only after the EC dropped its "proposals to open up the single market in spare parts for motor vehicles."[10] "As one of the most powerful lobbies in Europe, the car industry is used to getting its way" according to the Financial Times, July 1, 1999. The auto industry has not yet, however, prevailed with a widespread monopoly abroad.

### e. Crash Parts Have Been Denied State Patent Protection.

In May 1983, Florida enacted legislation prohibiting competition in the production and sale of a boat hull made via a specific method developed by Bonito Boats. Although Bonito had been selling boats containing the hull since 1976, it had never applied for a patent for the process. Bonito eventually sued a competitor that was using the process for violating the Florida statute. In Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141 (1989), the U.S. Supreme Court held that because the Florida law intruded on Congress' exclusive power to regulate patents, it was preempted. Thus, unless Congress specifies otherwise, there may be no impediment to the public use of the "unprotected design and utilitarian ideas" embodied in unpatented products.[11] If the Florida law had been upheld, vehicle manufacturers would have claimed patent protection for their crash parts.

### 3. Certified Non-OEM Parts Provide a Pro-Consumer Alternative to OEM Crash Parts.

---

[10] 2 European Union Law Reporter, Issue 6, 1997, P.2.

[11] Bonito, 489 U.S. at 157.

Consumers benefit both directly and indirectly from policies that encourage the use of non-OEM replacement parts, which is why national consumer groups, such as the amici, have long supported such policies. This benefit to consumers occurs not only because non-OEM parts are less expensive than OEM parts, but also because their very existence as an alternative to OEM parts serves to stimulate competition and reduce the cost of OEM-parts. For car owners who pay for their own repairs, the price pressure that non-OEM parts exert on the replacement parts market leads to substantial consumer savings. And of particular relevance here, the use of non-OEM parts benefits insurance policyholders in general, and the plaintiff class members in particular, by reducing the cost of repairs and, thus, insurance premiums.

Because crash parts account for nearly half of the cost of accident claims, savings on those parts lead to significant reductions in the total cost of post-accident repairs. Industrial Design Protection: Hearings Before the Subcommittee on Courts, Intellectual Property, and the Administration of Justice of the Committee on the Judiciary, House of Representatives, 101st Cong., 2d Sess. 282-91 (1990) (statement of Rodger Lawson, Senior Vice-President and economist for the American Alliance of Automobile Insurers). The presence of non-OEM parts as an alternative to OEM parts stimulates competition in the replacement parts market and has forced automobile manufacturers such as General Motors to cut the prices of their OEM parts in an attempt to remain competitive. Design Innovation and Technology Act of 1991: Hearing Before the Subcommittee on Intellectual Property and Judicial

9

Administration of Committee of the Judiciary, House of Representatives, 102d Cong., 2d Sess. 122-23 (1992) (statement of Mark Silbergeld, Director, Washington Office of Consumers Union); see also Claude E. Barfield and Cynthia A. Beltz, Industrial Design Protection and Automobile Repair Parts: Balancing Competition and Monopoly at Home and Abroad 49-69 (Feb. 23, 1990) (available through the American Enterprise Institute, Washington, D.C.).

Federal recall records show that non-OEM parts are, if anything, better than OEM parts. From 1987 to 1997, OEM hoods have been the subject of nineteen recalls covering 2.6 million vehicles.[12]  Non-OEM hoods have not been subject to any safety recalls. The non-OEM crash parts that are the subject of this litigation are held to stringent standards of independent parts-testing agencies that ensure the same, if not better, quality as their OEM counterparts. It is appellant's policy to use non-OEM parts certified by the Certified Automotive Parts Association ("CAPA") to repair the automobiles that it insures. CAPA conducts a "rigorous testing program" for crash parts under the guidance of an independent testing laboratory. Design Innovation and Technology Act of 1991: Hearing Before the Subcommittee on Intellectual Property and Judicial Administration of Committee of the Judiciary, House of Representatives, 102d Cong., 2d Sess. 116-117 (statement of Clarence Ditlow, Executive Director of the Center for Auto Safety). The CAPA program includes the following:

---

[12] See Attachment 1.

10

> [I]nitial on-site inspections of manufacturing plants, review and approval of quality control manuals, periodic re-inspections, demanding [I]nitial on-site inspections of manufacturing plants, review and approval of quality control manuals, periodic re-inspections, demanding tests of each part for which certification is desired . . . . The actual part testing procedures include dimensional checks (form and fit), metallurgical analysis (composition, mechanical properties, thickness), corrosion protection and construction requirements.

Id. at 116-17.

In sum, for automobile insurance companies that insure millions of drivers and vehicles, the cost-savings achieved through the use of non-OEM parts runs into the hundreds of millions of dollars. Id. at 112. These savings are often passed on to policyholders in the form of reduced insurance premiums on collision coverage or lower rates of increase on pre-existing collision coverage premiums. Id. at 306 (statement of David F. Snyder, American Insurance Association). Appellant's insureds receive a double benefit: the cost-savings benefits of non-OEM parts and the quality-related benefits of appellant's use of CAPA certified non-OEM parts. However, the decision below has summarily eliminated these benefits for appellant's insureds and for millions of other insureds across the country.

### 4. The Trial Court's Decision Is Based on Substantial Constitutional Errors Requiring Immediate Review and Reversal by This Court.

The trial court's application of Illinois law to the claims of the out-of-state class members in this case permits Illinois to undermine the decisions of sister states to promote the use of non-OEM parts. This Court should grant immediate review to resolve two related questions critical to multi-state class actions: First, does the due process clause permit the

11

certification of a multi-state class through application solely of forum law in the face of conflicting state laws from other jurisdictions? Second, is the fact that appellant's headquarters is located in Illinois enough to create sufficient "minimum contacts" between Illinois and out-of-state class members to permit the extraterritorial application of forum law? See generally Phillips Petroleum Co. v. Shutts, 472 U.S. at 815-23.

Both Massachusetts and Hawaii actively promote the use of non-OEM parts by auto insurance companies. See Mass. Regs. Code tit. 211, § 133.04(1) (non-OEM parts "shall be used" absent specific conditions); Haw. Rev. Stat. Ann. § 431:10C-313.6(a) (insureds who insist on receiving OEM parts must pay the price differential between the OEM-part and a non-OEM part). The lower court's judgment is binding on class members who reside in Massachusetts and Hawaii. Through that judgment, contrary to fundamental constitutional principles, this single Illinois state trial court has effectively nullified the law of those other states. The trial court simply ignored the fact that, because of the stark conflicts in law among the states involved in this case, due process prevents the application of Illinois law to every member of this nationwide class. See Shutts, 472 U.S. at 821-22. If this Court fails to correct the trial court's erroneous judgment, it will allow a single judge or jury sitting in one county of one state to override the considered, deliberate policy decisions of legislatures in other states to promote the use of non-OEM parts to limit the cost of auto insurance.

Furthermore, the application of forum law to the claims of out-of-state plaintiffs is limited, in part, by "the expectation of the parties." See Shutts, 472 U.S. at 822. Since the

12

law of Massachusetts affirmatively requires the use of non-OEM parts by auto insurers, it was reasonable for appellant not to expect lawsuits of this kind with Massachusetts residents as plaintiffs. Under the lower court's decision, however, appellant has been ordered to pay damages to policyholders who reside in a state where the law generally mandates the use of non-OEM parts, thus raising significant due process concerns by creating liability that could be avoided only by violating Massachusetts law. Cf. Fed. R. Civ. P. 23 (b)(1)(A) and (b)(2). Moreover, policyholders in states that permit or encourage the use of non-OEM parts had a right to rely on those laws, and the lower premiums that they bring, and thus they would have no reason to expect that another state's laws would be employed to nullify their own state's pro-consumer policies.

The trial court ruled that across-the-board application of Illinois law to both in-state and out-of-state policyholders is permissible because Illinois has a significant interest in regulating corporations that operate within its borders. Although the regulation of in-state corporations does provide Illinois some interest in the claims raised by the plaintiff class, that interest is outweighed, in amici's view, by the greater interest that other states have in regulating the corporations that conduct business with their residents. After all, it is the states in which the plaintiffs reside, and not where the corporation is headquartered, that generally must contend with the consequences of corporate misconduct and the costs of regulating that misconduct.

Most of the relevant "contacts" for a non-Illinois policyholder are in his or her home

13

state. Take, for example, a typical Arizona insured. Generally speaking, the policyholder would have bought the policy in Arizona on terms approved by Arizona insurance regulators, through an agent based in Arizona, on a vehicle licensed and driven in Arizona. If the vehicle is involved in an accident, it is likely to take place in Arizona. If replacement parts are needed, the repairs will likely be performed in Arizona (and almost certainly will *not* be performed in Illinois). And, ultimately, if the policyholder seeks to vindicate "rights" such as those asserted in the present lawsuit, one must then determine whether the replacement parts placed on the vehicle in Arizona restored the vehicle to its "pre-loss condition" or are of "like kind and quality" as the vehicle's original parts. In circumstances such as these, it is difficult to see why Illinois law would apply simply because the appellant is headquartered there. Many courts share this view. See In re Ford Motor Co. Ignition Switch Prods. Liab. Litig. 174 F.R.D. 332, 348 (D.N.J. 1997) (as a matter of both choice-of-law principles and due process, the fact that the defendant is headquartered in Michigan does not justify applying only Michigan law in a fifty state class action); In re Ford Motor Co. Bronco II Prod. Liab. Litig., 177 F.R.D. 360, 371 (E.D. La. 1997) (under Shutts, Michigan law may not be applied in nationwide class action even though the defendant is headquartered in Michigan); In re Masonite Corp. Hardboard Siding Prods. Liab. Litig., 170 F.R.D. 417, 423 (E.D.La. 1997) (under applicable choice-of-law principles, the fact that defendant's primary place of business is in Illinois does not justify applying Illinois law to the claims of all members of a fifty state class). The conflict between the trial court's

judgment and these federal decisions further demonstrate the need for immediate review of the lower court's choice-of-law ruling.

## C. CONCLUSION

To ensure that the critical questions raised by the judgment of the trial court below are resolved without creating further unwarranted harm to consumers, this Court should grant appellant's Rule 302 (b) motion and review the trial court's judgment as expeditiously as possible.

Respectfully submitted,

Center for Auto Safety, Inc.

Eleanor J. Lewis
D.C. Bar No. 443973

1825 Connecticut Avenue, NW
Suite 330
Washington, DC 20009
(202)328-7700

Despres, Schwartz & Geoghegan

Thomas Geoghegan
Illinois Bar No. 70814

77 West Washington Street
Suite 711
Chicago, IL 60602
(312)372-2511

judgment and these federal decisions further demonstrate the need for immediate review of the lower court's choice-of-law ruling.

## C. CONCLUSION

To ensure that the critical questions raised by the judgment of the trial court below are resolved without creating further unwarranted harm to consumers, this Court should grant appellant's Rule 302 (b) motion and review the trial court's judgment as expeditiously as possible.

Respectfully submitted,

Center for Auto Safety, Inc.

Eleanor J. Lewis
D.C. Bar No. 443973

1825 Connecticut Avenue, NW
Suite 330
Washington, DC 20009
(202)328-7700

Despres, Schwartz & Geoghegan

Thomas Geoghegan
Illinois Bar No. 70814

77 West Washington Street
Suite 711
Chicago, IL 60602
(312)372-2511

ATTACHMENT I

# Report on OEM Hood Failures

Based on Data from the
## National Highway Traffic Safety Administration
U.S. Department of Transportation
1987-1997

Compiled by
## The Certified Automotive Parts Association
1518 K St., Ste. 306
Washington, DC 20005

CAPA Report: DEFECTIVE OEM HOODS                              page 2

### OEM Hood Problems 1987-1997
### Manufacturer Ranking
### Based on U.S. Department of Transportation Recall Actions

| Car Company | No. of Recalls | No. of Recalled Hood Problems | 10 Year Rank |
|---|---|---|---|
| General Motors | 8 | 1,183,617 | 1 |
| Ford | 5 | 1,182,637 | 2 |
| Chrysler | 2 | 192,000 | 3 |
| Mercedes | 1 | 44,114 | 4 |
| Suzuki | 1 | 38,229 | 5 |
| Lexus | 1 | 16,036 | 6 |
| Porsche | 1 | 2,451 | 7 |

### OEM Hood Problems 1987-1997
### 10 Year Detailed History
### Based on U.S. Department of Transportation Recall Actions

| Car Company | Model | Model Year | Recall Year | Number Recalled | Problem with Recalled Hood |
|---|---|---|---|---|---|
| Cadillac | DeVille | 96 | 95 | 12,783 | Does not meet requirements of FMVSS No. 113 "Hood latch systems." |
| Ford | Crown Victoria | 96 | 97 | 125,000 | Hood or latch striker can wear or become detached from the hood. |
| Ford | Windstar, Mustang | 96 | 97 | 769,000 | Tearing of bond between inner and outer door panels can cause outer panel to fly up during minor collisions. |
| Mercedes | Mercedes Benz | 96 | 96 | 44,114 | Does not meet requirements of FMVSS No. 113 "Hood latch systems." |
| Dodge | RAM | 94 | 95 | 175,000 | Secondary hood latch rod can bind on the guide bracket and prevent engagement of secondary latch--can cause the hood to fly up |
| Chevrolet | Cavalier | 92 | 91 | 3,212 | Secondary hood latch not installed properly or missing. |
| Chrysler | LeBaron | 92 | 92 | 17,000 | Hood latch assembly may not have been properly installed. |
| Lexus | ES300 | 92 | 94 | 16,036 | Dust or other foreign matter can accumulate, causing hood not to engage properly |
| Buick | Roadmaster | 91 | 91 | 224,588 | Secondary hood latch can corrode, causing hood not to latch properly when closed |

## CAPA Report: DEFECTIVE OEM HOODS                              page 3

| Car Company | Model | Model Year | Recall Year | Number Recalled | Problem with Recalled Hood |
|---|---|---|---|---|---|
| Lincoln | Town Car | 91 | 95 | 142,800 | Corrosion of Hood Latch Striker Plate causes detachment of the plate from the hood assembly resulting in an unexpected opening of the hood while vehicle is being driven. |
| Lincoln | Town Car | 91 | 95 | 73,837 | Secondary hood latch may not engage when the hood is closed.  If primary hood latch releases or is not properly latched, the hood could fly up. |
| Lincoln | Town Car | 91 | 91 | 72,000 | Secondary hood latch may not engage when hood is closed. |
| Porsche | Coupe | 90 | 91 | 2,451 | Safety latch may be prevented from locking properly |
| GEO | Metro | 89 | 93 | 356,097 | Mislocated attaching spot welds of the hood striker assembly cause cracks to start on the hood inner panel. |
| Suzuki | Swift | 89 | 93 | 38,229 | Mislocated attaching spot welds of the hood striker assembly cause cracks to start on the hood inner panel |
| Buick | Regal | 88 | 88 | 12,457 | Secondary hood latch may not properly engage. |
| Chevrolet | Beretta | 87 | 91 | 290,408 | Secondary hood latch assembly may not be properly adjusted and could become bent. |
| Chevrolet | Beretta | 87 | 88 | 282,052 | Secondary hood latch assembly may not have been properly adjusted resulting in latch becoming bent. |
| Chevrolet | Beretta | 87 | 87 | 2,020 | Loss of skid plate could lead to disengagement of secondary and primary latches. |

2a

APPENDIX B

## IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL CIRCUIT WILLIAMSON COUNTY, ILLINOIS

No. 97-L-114

TAMMY SNIDER AND MICHAEL AVERY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

vs.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

Defendant.

ORDER AND FINDINGS THAT ACTION MAY BE MAINTAINED AS A CLASS ACTION FOR BREACH OF CONTRACT, CONSUMER FRAUD AND EQUITABLE RELIEF CLAIMS

## I.  SUMMARY OF THE CASE

The representative plaintiffs ("Plaintiffs") in this class action allege that defendant State Farm Mutual Automobile Insurance Company ("State Farm") has breached its contract with its auto insurance policyholders, and violated the provisions of Illinois' Consumer Fraud and Deceptive Business Practices Act (the "CFA"), 815 ILCS 505/1 et seq. Plaintiffs seek certification of a class (the "Class") composed of:

All persons in the United States, except those residing in Arizona and Tennessee, who (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had imitation that is, non-fac-...-authorized and/or non-OEM parts installed on their ...cles or else received

3a

monetary compensation determined in relation to the cost of imitation parts. Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.

In addition, the following persons are excluded from the class: (1) persons who resided in Illinois and whose policies were issued/executed prior to April 16, 1994, and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996.

Plaintiffs' claims concern contractual language in standard form State Farm automobile insurance policies issued nationwide. This language either obligates State Farm to restore a policyholder's vehicle to "its pre-loss condition" after an accident, or for State Farm to "pay to repair or replace the property or part with like kind and quality." While State Farm has designed form policies specific to each state, the contractual obligations at issue in this case are stated in substantially identical form in State Farm policies issued nationwide.

Notwithstanding this language, State Farm's uniform policy specifics the use of certain non-original equipment manufacture (non-OEM) replacement parts (referred to as "quality replacement parts" by State Farm and "imitation parts" by Plaintiffs) when these parts are priced lower than original equipment manufacturer's (OEM) parts. Whether this policy violates the above-referenced provisions of State Farm's insurance contracts with its policyholders is the central issue of this litigation.[1]

In their Second Amended Class Action Complaint (A) (the "Complaint"), their submissions, and their arguments before the Court, Plaintiffs contend that non-OEM parts are neither of "like kind and quality," nor are they sufficient to restore a policyholder's vehicle to its "pre-loss condition." For this reason, Plaintiffs

---

[1] Throughout the hearing there was much discussion as to what parts may or may not be "crash parts." Throughout this order the Court has used the term "non-OEM parts" without specifying "crash parts" so as to ... the Class definition.

contend that State Farm has breached its contract with its policyholders. Plaintiffs seek damages for breach of contract and for State Farm's alleged violation of CFA. Plaintiffs also seek equitable relief against State Farm as set forth in Plaintiffs' Complaint.

State Farm contends that non-OEM parts (particularly those certified by the Certified Auto Parts Association ("CAPA")) are of "like kind and quality" to OEM parts, and that they fully restore a policyholder's vehicle to its "pre-loss condition." State Farm also contends that its policyholders are informed whenever non-OEM parts are used, and that its use of the term "quality replacement parts" is not misleading.

## II. GOVERNING LEGAL STANDARD

Certification of a class action in the State of Illinois is governed by 735 ILCS 5/2-801, which provides as follows:

An action may be maintained as a class action in any court of this State and a party may sue or be sued as a representative party of the class only if the court finds:

(1) The class is so numerous that joinder of all members is impracticable.

(2) There are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members.

(3) The representative parties will fairly and adequately protect the interests of the class.

(4) The class action is an appropriate method for the fair and efficient adjudication of the controversy.

Plaintiffs request class certification under 5/2-801. The Court has carefully considered the testimony adduced over the course of the evidentiary hearing on class certification completed in November, 1997, the affidavits filed by Plaintiffs and State Farm, the pleadings and briefs submitted to the Court, the voluminous exhibits introduced at the certification hearing, and the arguments by counsel. See Gordon v. Boden, 224 *** App. 3d 195, 199, 586

N.E.2d 461, 464 (1991). In considering class certification the Court has assigned to Plaintiffs the burden of satisfying the four requirements of 5/2-801. Wheatley v. Board of Bd. of District 205, 99 Ill. 2d 481, 486, 459 N.E.2d 1364, 1367 (1984). The Court has not considered the possibility of success on the underlying merits, but only whether the statutory requisite for class certification are satisfied at this time. See Purcell & Wardrope Chartered v. Hertz Corp., 175 Ill. App. 3d 1069, 1075, 530 N.E.2d 994, 998 (1988) ("hypothetical problems that may arise in the future***[are] not a sufficient basis to refuse to certify an otherwise properly pleaded class action.") Applying this standard, the Court makes the following findings of fact, and the following conclusions, with respect to each of the four statutory requirements for certification of a class action in Illinois.

## III. CERTIFICATION ISSUES

### A. Numerosity and Impracticality of Joinder

735 ILCS 5/2-801(1) requires not only that the number of plaintiffs be numerous, but also that joinder of plaintiffs in one individual action be impractical. "In general the question of numerosity depends on the particular facts of each case and no arbitrary rules regarding the size of class have been established by the courts." In re Application of Edward J. Rosewell, 236 Ill. App. 3d 165, 174, 603 N.E.2d 681, 686 (1992). Where there are a number of potential claimants, and the individual amount of each claim is small, making redress on an individual level difficult, if not impossible, Illinois courts have been particularly receptive to proceeding on a class action basis. Miner v. Gillette Co., 87 Ill. 2d 7, 428 N.E. 2d 478 (1981), cert. dismissed, 459 U.S. 86 (1982).

Testimony at the certification hearing indicates that State Farm's practice of using non-OEM parts affects a large number of policyholders. State Farm is the largest auto insurer in the United States, with over 34 million auto policies in effect nationwide. Affidavit of Kathleen M. Pechan, Defendant's Exhibit 8, p. 3. State Farm paid approximately 5.1 million separate collision and comprehensive claims in 1996. Affidavit of David W. Gibson Jr., Defendant's Exhibit 5, p. 3. In 1993, 49.4% of State Farm's re... estimates nationwide included CAPA certified non-OEM

7a

"the hypothetical existence of individual issues is not a sufficient reason to deny the right to bring a class action. Where it appears that the common issues is dominant and pervasive, something more than the assertion of hypothetical variations of a minor character should be required to bar the action."

*Harrison Sheet Steel Co. v. Lyons*, 15 Ill. 2d 532, 538, 155 N.E. 2d 595, 598 (1959). Common questions arising from the interpretation of standard contract provisions or other uniform documents may be found to predominate; accordingly, the inability of some members of the class to obtain relief due to particular factors unique to them, is to be resolved at trial and does not impair certification of the class. *Steinberg*, 69 Ill. 2d at 338, 371 N.E. 2d at 643; *Rosen v. Village of Downer's Grove*, 19 Ill. 2d 448, 456, 167 N.E. 2d 230, 235 (1960).

Testimony at the class certification hearing highlighted the common factual pattern in this case. James Ford, employed by State Farm as a divisional claims superintendent, testified that State Farm's claims policies are communicated through a series of "general claims memos" issued from State Farm's headquarters in Bloomington, Illinois, which govern claims policy nationwide. Certification Hearing at 0120-0124. General Claims Memo #430, introduced at the hearing as Defendant's Exhibit 23, governs the use on non-OEM parts.

In resolving customer claims, an estimate is prepared at a local State Farm claims office. When a particular part is needed to complete a repair, the part number is input into a computer program. This program contains a database maintained by, respectively, Mitchell, C.C.C. or A.D.P.. *Id.* at 0142, which contains information on the availability of, and price for, various parts from suppliers State Farm has approved. *Id.* at 0144. The computer's software then automatically searches what was referred to as "the matrix," and locates the cheapest available part. *Id.* at 0143-44. This part, whether it is an OEM or non-OEM part, is then automatically specified on the repair estimate. *Id.* at 0143-44. The State Farm adjuster has no authority to override the computer's choice of the cheapest part. *Id.* at 0153-54. It appears that this

6a

parts. Plaintiffs' Exhibit 177. It is clear from the exhibits introduced by both Plaintiffs and State Farm that millions of people are affected by State Farm's current claims settlement practices. The Court therefore finds the potential class members are sufficiently numerous.

In reaching its determination that joinder is impracticable the Court is guided by the number of potential class members. The Court finds that, first, the potential class members are widely distributed. Second, the class is large and its members cannot be easily identified, located and informed of the pendency of this action for purposes of formal joinder. Third, the potential class members are average consumers, not "sophisticated" entities. Fourth, the individual damages alleged in this action are, for the most part, small. They involve accelerated vehicle deterioration after repair, inferior fit and finish of repaired areas, and loss of value at resale. The dollar value of individual claims, although not nominal, is not large. *See, e.g.,* Plaintiffs' Exhibit 94 ($1,670 diminution in value upon resale when non-OEM parts used). Finally, it should be noted that this is the type of consumer class action on behalf of smaller claimants to which Illinois courts have been particularly receptive. *Gordon*, 224 Ill. App. 3d at 204, 586 N.E.2d at 467.

The Court finds that more localized litigation, either on an individual or localized class basis, would be a waste of scarce judicial resources both in this and other states. Addressing the common issues in one litigation would aid judicial administration. Therefore, the Court finds that requirements for certification of a class action under 5/2-801(1) are satisfied.

B.  Common Questions of Fact or Law

735 ILCS 5/2-801(2) requires that there be "questions of fact or law common to the class." However, "[c]ertification require[s] only that there be either a predominating common issue of law or fact, not both." *Martin v. Heinold Commodities, Inc.*, 117 Ill. 2d 67, 81, 510 N.E. 2d, 840, 846 (1987). While Plaintiffs must demonstrate that the common questions predominate over individual issues,

9a

Given State Farm's common and ongoing course of conduct in repairing its insureds' vehicles with cheaper non-OEM parts whenever those parts were available, potential class members have a common interest in determining State Farm's obligations under its contractual provisions. "A class action can properly be prosecuted where a defendant is alleged to have acted wrongfully in the same basic manner as to an entire class. In such circumstance, the common class questions still dominate the case." *Brooks v. Midas-International Corp.*, 47 Ill. App. 3d 266, 273, 361 N.E. 2d 815, 820 (1977). Here the class members have a common interest in determining if State Farm's policy violates its contractual obligations, and this issue of contractual interpretation predominates over other issues. *See, e.g., Carrao v. Healthcare Service Corp.*, 118 Ill. App. 3d 417, 428, 454 N.E. 2d 781, 790 (1983). Similarly, the question of whether State Farm's practice of using non-OEM parts constitutes a violation of the CFA is a common issue appropriate for resolution. *See, e.g., Brooks*, 47 Ill. App. 3d at 272, 361 N.E. 2d at 820.

In determining if this common question predominates, the Court has carefully considered State Farm's contention that it has no standard form auto insurance policy, as each individual state's policy is tailored to comply with the requirements of that state. *See* Affidavit of Everett J. Trutmann, Defendant's Exhibit 9. Therefore, State Farm contends there is no common question to be interpreted. The Court finds, however, that the policies specific form is immaterial, provided that the operative contractual language contained in each policy is susceptible to uniform interpretation. Whether particular language in its policies authorizes State Farm's use of non-OEM parts or is in conflict with the "like kind and quality" or "pre-loss condition" language of the policies is not a question to be resolved during class certification. It is a question for resolution on the merits.

State Farm has placed particular emphasis on its practice of using CAPA-certified non-OEM parts. Under this practice, State Farm will specify only a CAPA-certified part in place of an OEM part when that type of part was subject to CAPA certification. Affidavit of David A. Gibson, Jr., Defendant's Exhibit 5, p. 8. Al..th considerable testimony was received as to the difference

8a

practice is uniform throughout the United States wherever non-OEM parts are used. *Id.* at 0155. Defendant's Exhibit 23. The policyholder is neither informed, nor consulted when a non-OEM part is specified. Certification Hearing at 0132. If the policy holder does not want non-OEM parts placed on their car, they must convince a body shop to absorb the price difference, or pay for the difference in price themselves. *Id.* at 0151.

As to the consumer fraud allegations, the facts presented at the certification hearing on State Farm's methods of disclosing to policyholders its use of non-OEM parts also demonstrates a course of conduct common to all class members. When such parts are used on an estimate, the policyholder is given a State Farm brochure discussing the use of non-OEM parts. Defendant's Exhibit 24; Certification Hearing at 0124-25. The estimate is then stamped indicating the use of non-OEM parts. Defendant's Exhibit 27. State Farm has also promoted the use of the term "quality replacement part" nationwide in an effort to promote its substitution of non-OEM for OEM parts. Plaintiffs' Exhibits 115, 116.

The Court finds that the evidence introduced at the certification hearing demonstrate "a series of essentially identical transactions." *Miner*, 87 Ill. 2d at 19, 428 N.E. 2d at 484, between State Farm and its insureds, which transactions routinely result in the use of non-OEM parts.

In reaching its conclusion that the class claims are essentially factually identical, the Court acknowledges the significant evidence presented at the hearing regarding the varying availability and use of non-OEM parts in each of State Farm's regional offices. Affidavit of David A. Gibson, Jr., Defendant's Exhibit 5; Certification Hearing at 0121, 0124. The Court notes that varying availability of non-OEM parts affects how many policyholders did or did not receive non-OEM parts, but it does not affect the common pattern with respect to class members, who always received such parts if they were available. Any person whose car was repaired only with OEM parts is not part of the class for which certification is sought. Therefore, any variations in OEM part use is irrelevant to certification.

10a

between CAPA-certified non-OEM parts, non-CAPA-certified non-OEM parts, and OEM parts, this testimony all addresses the merits of whether non-OEM parts satisfy State Farm's contractual obligations. This ultimate issue is irrelevant to class certification, where the common treatment of the class members in having received non-OEM parts is the central question.

The Court heard substantial testimony as to the number of different non-OEM parts. Since the Court finds that a common question concerning the use of non-OEM parts has been established, the number of different parts and their relative quality is a question that goes to the merits of whether non-OEM parts are equal to OEM parts. Plaintiffs submission that non-OEM parts are categorically inferior in performance and safety, because of inferior design, manufacture and quality control, and evidence that they are commonly perceived by the marketplace as inferior, with a resulting negative effect on policyholders' cars' ultimate resale value are factors in the Court's determination that the requirements of 2-801(2) have been established.

In *Phillips Petroleum Co. v. Shutts*, the United States Supreme Court discussed the constitutional limitations on the application of a particular state's substantive law to the claims of out-of-state plaintiffs, finding that a state may apply its substantive law beyond its borders where it has "'significant contact or significant aggregation of contracts' to the claims asserted by each member of the plaintiff class, contacts 'creating, state interests'*** insuring' that the choice of [law] is not arbitrary or unfair." 472 U.S. 797, 821-22, 105 S. Ct. 2965, 2979 (1985) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-12, 101 S. Ct. 633, 640 (1981). Illinois courts have approved the application of the CFA, § 815 ILCA 505/1 *et seq.*, to the claims of out-of-state plaintiffs. *See, e.g., Gordon*, 224 Ill. App. 3d at 202-03, 586 N.E. 2d at 466; *Martin* 117 Ill. 2d 67, 510 N.E.2d 840. In *Martin*, a class composed of in state and out-of state plaintiffs sued an Illinois corporation for fraud and for violations of the Illinois CFA. Relying upon *Phillips*, the Illinois Supreme Court noted that *defendant's* principal place of business was Illinois and stated:

11a

"Applying the Phillips Petroleum standard to the instant case, it is apparent that Illinois substantive law can be applied to resolve the underlying common factual dispute. Here each member of the plaintiff class asserts the same breach of defendant's fiduciary duty with regard to the same nondisclosure of the same fact. This common allegation implicates the legitimate interests of the State of Illinois in insuring that persons and entities within its jurisdiction, insofar as they undertake to act as agents, do so in accordance with its law." 117 Ill. 2d at 82, 510 N.E.2d at 847.

The Illinois Supreme Court concluded that "there can be no doubt that the claim of each member of the plaintiff class implicates the legitimate interests of Illinois in applying its law to adjudicate a dispute involving a business principally situated in its jurisdiction and which, by its own efforts, insistently has sought to avail itself of both the courts and the laws of the forum State." 117 Ill. 2d at 83, 510 N.E.2d at 847. Under *Phillips* and *Martin*, given the fact that State Farm is situated and headquartered in Illinois and affirmatively uses Illinois courts and law, this Court could apply Illinois substantive laws, including the CFA to the entire class.

While it is not necessary for the Court at this time to decide upon choice of law as to the breach of contract claim, it does note that the eventual decision as to choice of law will not prevent the certification of the Class in this case. *Gordon*, 224 Ill. App. 3d at 202, 586 N.E.2d at 466. The Court retains the right to divide the litigation into a manageable number of sub-classes under 2-802(b) should differences in law present themselves. The Court finds that the requirements of Section 2-801(2) are met as "common issues of fact or law predominate."

C. **The Representative Plaintiffs Fairly and Adequately Protect the Interest of the Class**

735 ILCS 5/2-801(3) conditions class certification upon a finding that "[t]he representative parties will fairly and adequately protect the interest of the class." "The purpose ... of the adequate representation requirement is merely to ensure that all class members will receive proper, efficient, and appropriate protection [o]f interests in the presentation of the claim." *Gordon*, 224 Ill.

13a

In determining the adequacy of representation, the Court may also consider the quality and experience of the attorneys for the Class. The Court finds, after a rigorous analysis and review of the pleadings and records submitted by Plaintiffs' counsel and having observed their conduct in open Court, that they are able advocates for the Class. Counsel for Plaintiffs have regularly engaged in major complex consumer litigation of size, scope and complexity similar to this case. Counsel have successfully prosecuted many and varied class actions or other complex litigation. They have the experience and sophistication that the Plaintiffs and Class members lack. The Court finds that counsel for Plaintiffs are well suited for this case and that Plaintiffs will fairly and adequately protect the interest of the Class in compliance with the mandate of 735 ILCS 5/2-801(3).

D. The Class Action is an Appropriate Method to Resolve the Class Issues

735 ILCS 5/2-801(4) conditions class certification on a finding that "[t]he class action is an appropriate method for the fair and efficient adjudication of the controversy." In applying the fourth prerequisite, the Court has considered whether a class action can best secure economies of time, effort, and expense and promote uniformity of decision or accomplish other ends of equity and justice. Gordon, 224 Ill. App. 3d at 203, 586 N.E.2d at 467. While Federal Rule Of Civil Procedure 23(b)(3) requires that a class action be superior to the available methods of adjudication, the Illinois statute requires that the trial court find that the class action is an appropriate method of litigating the controversy. Section 5/2-801(4). This standard allows the trial court a more flexible measure of discretion in determining whether to permit the class action to proceed. A significant factor in the case at bar is that a class action is the only practical means for State Farm policyholders to present their claims and for State Farm to achieve finality as to their claims.

Illinois courts have historically recognized that class actions are an appropriate method of fairly and efficiently adjudicating controversies involving numerous small claims. In Wood River Area Development Corporation v. Germania Federal Savings and

12a

App. at 203, 586 N.E. 2d at 466. Judicial evaluation of the quality of the representation, as well as class certification in general, rests within the sound discretion of the trial court. McCabe v. Burgess, 75 Ill. 2d at 457, 464, 389 N.E. 2d 565, 568 (1979).

Adequate representation assures compliance with due process requirements. "The test applied to determine the adequacy of representation is whether the interests of those who are not parties are the same as those who are not joined and whether the litigating parties fairly represent those not joined." Milner, 87 Ill. 2d at 14, 428 N.E.2d at 482. Essentially, the determination focuses on whether the absentee members are so represented by the persons before the court "that their interests will receive actual and efficient protection." Brooks, 47 Ill. App. 3d at 274, 361 N.E. 2d at 820, quoting State Life Insurance Co. v. Board of Education, 394 Ill. 301, 308, 68 N.E.2d 525, 529 (1946). Finally, unlike Federal Rule Of Civil Procedure 23, there is no "typicality" requirement in 5/2-801(3). The Illinois rule is more liberal than the federal rule in this regard and "...a class representative may not be disqualified merely because his claim is not exactly the same as the claims of other potential class members." Carrao, 118 Ill. App. 3d at 428, 454 N.E.2d at 790. The Court finds that the requirement of adequate representation under 735 ILCS 5/2-801(3) has been satisfied.

After a rigorous analysis of Plaintiffs' Complaint, Plaintiffs' affidavits and Plaintiffs' counsels' affidavits or resumes, the Court concludes that Plaintiffs have zealously pursued their claims since learning of State Farm's alleged wrongful conduct and that Plaintiffs have sufficient financial resources to absorb the expenses involved in being the named representatives. The Court further finds that no conflicting interests exist between Plaintiffs and the Plaintiff Class as it is clear from the Court's review of the material submitted in support of class certification that the representatives herein and Class members share common objective and legal and factual positions. Other than the dates and specific amounts concerning Plaintiffs' repairs and Class members' repairs, the proof, objective, legal and factual positions will be essentially identical from plaintiff to plaintiff and class member to class member.

## 15a

Defendant State Farm provides automobile insurance coverage to one out of every five insured drivers in the United States, making it the nation's number one auto insurer. Plaintiffs' Exhibit 102. The evidence submitted by Plaintiffs indicate that State Farm achieved a savings of $32 million in 1994 from the use of non-OEM parts. Plaintiffs' Exhibit 92. Accordingly, this action qualifies for class resolution both in terms of the dollar amount in controversy and the number of claims involved.

State Farm has previously settled two lawsuits challenging its non-OEM parts practices — the Illinois case entitled *Krulaiski v. State Farm*, No. 87 CH 10253, in the Circuit Court of Cook County ("*Krulaiski*"), and the California case entitled *Krivak v. State Farm Mutual Automobile Insurance Company*, No. 626412, in San Diego County Superior Court ("*Krivak*"). Defendant's Exhibit 1. State Farm has settled both the *Krulaiski* and *Krivak* actions but has confirmed its practice of utilizing non-OEM parts in its repairs of policyholders' vehicles. In addition to other relief, Plaintiffs at bar seek an injunction prohibiting State Farm from continuing its practice of settling policyholders' repair claims based upon the use and cost of non-OEM parts.

Proof of Plaintiffs' claims against Defendant State Farm may be made on a class-wide basis. After a rigorous review of the pleadings, exhibits and affidavits submitted by Plaintiffs, the only proof that might differ from Plaintiff to Plaintiff and class member to class member would appear to be the amount of damages suffered by each class member. It is well settled, in Illinois and elsewhere, that difference in the amounts of damages suffered by individual class members will not defeat class certification. *Gordon*, 224 Ill. App. 3d at 2246, 586 N.E.2d at 465-66. Individual lawsuits for small amounts would be too expensive, and absent a class action, individual lawsuits run a substantial likelihood of inconsistent adjudication. Upon consideration for the pleadings, exhibits and affidavits submitted by Plaintiffs, the Court concludes that the proposed Class is manageable. The Court concludes, pursuant to 735 ILCS 5/2-801(4), that a class action is an appropriate method for the fair and efficient adjudication of this controversy.

## 14a

*Loan*, 198 Ill. App. 3d 445, 452; 555 N.E.2d 1150, 1154 (1990), the Court stated "[t]he class action is particularly appropriate where those who have allegedly been injured "are in poor position to seek legal redress, either because they do not know enough or because such redress in disproportionately expensive." ...Its "historic mission" has been to take care of the smaller guy." The *Wood River* court concluded,

"No matter how refined, how revised, or how evolved" [the class action becomes], "...the goal of the class action remains the same — justice for the lowly, the lemons, the parishioners, the multitude." 198 Ill. App. 3d at 448, 555 N.E.2d at 1152.

The United States Supreme Court recently acknowledged not only the appropriateness, but the necessity, of class treatment of small consumer claims in *AmChem Prods. Inc. v. Windsor*, ___ U.S. ___, 117 S. Ct. 2231, 2250 (1997), stating,

"Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."

With respect to "small claims" class actions in general, the Court stated:

"The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." 117 S.Ct. at 2246, quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997).

The evidence presented to the Court supports the conclusion that, not only is a class action an appropriate method for the fair adjudication of the disputes between Defendant State Farm and its millions of automobile insurance policyholders, but also that it may be the only means by which these disputes may be efficiently resolved.

17a

monetary compensation determined in relation to the cost of imitation parts. Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.

In addition, the following persons are excluded from the class: (1) persons who resided in Illinois and whose policies were issued/executed prior to April 16, 1994, and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996.

ENTERED: December 5, 1997

John Speroni
Associate Circuit Judge

16a

## IV. CONCLUSION

Pursuant to 735 ILCS 5/2-801, this Court concludes that Plaintiffs have adequately satisfied the four requirements for class certification of this action under Illinois law. Plaintiffs will now have the opportunity to try and prove the merits of their claims, which is an entirely different matter from establishing the requirements for class certification. The Court notes that class certification will allow all State Farm policyholders to seek redress for their claims and will also provide State Farm with finality as to the claims. State Farm has, for years, had class actions filed against it concerning the matters involved in this litigation and has been forced to defend itself in numerous jurisdictions. Since this case has ben filed, the parties have made the Court aware of several cases which have recently been filed, including the *Dorrier* action in Champaign County, Illinois (No. 97-L-188), which has not been terminated by Judge Green's November 10, 1997 order in "*Krusinski*". The Court has learned that the attorneys prosecuting the *Dorrier* case in Illinois had also filed an identical class action case in Alabama. Such a multiplicity of suits is an inefficient use of judicial resources and places State Farm in the unenviable position of trying to defend itself on multiple fronts.

The Court believes that Illinois is the one State where a national class can be maintained and where all issues between State Farm and State Farm's policyholders concerning the use of non-OEM parts can finally be resolved. The Court is unaware of any other class action cases pending in Illinois concerning the issues involved in this litigation and is unaware of any other class action case in any other State which has certified a national class after a full evidentiary hearing on class certification.

The following described Plaintiff Class is hereby ordered certified for purposes of litigation and trial:

All persons in the United States, except those residing in Arkansas and Tennessee, who (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had imitation that is, non-factory-authorized and/or non-OEM parts installed on their vehicle—or else received



Florida Bar Journal
March. 1998

Column
Trial Lawyers Forum

**\*78 CONSIDERATIONS IN CLASS CERTIFICATION**

Ervin A. Gonzalez [FNa1]
Raymond W. Valori [FNa2]

Copyright © 1998 by the Florida Bar; Ervin A. Gonzalez, Raymond W. Valori

Rule 1.220 of the Florida Rules of Civil Procedure is perhaps the most conceptually complex rule of civil procedure. In essence, the rule allows a person or entity who has a claim or defense in common with others to represent the group. The class action is not a new mechanism. English common law provided for a similar equitable remedy known as a "bill of peace." Recently, interest in the class action has heightened. This is largely due to the increasingly overcrowded judicial system searching for more efficient ways to administer justice. Thus, the purpose of the class action focuses on judicial economy and access to justice. Long ago the Florida Supreme Court stated in Tenney v. City of Miami Beach, 11 So. 2d 188 (Fla. 1942): "[t]he purpose of a 'class suit' is to save the multiplicity of suits, to reduce the expense of litigation, to make legal procedure more effective and expeditious, and to make available a remedy that would not otherwise exist."

Consequently, even though only one lone voice stands to protect and raise the rights of others, this is not reason to deny class certification and may be the reason to grant it. [FN1]

The foregoing benefits must be tempered against concerns of due process. Rule 1.220 provides for this protection. [FN2] This article addresses the principal issues associated with class certification. [FN3]

**Class Certification--Factual Inquiry**

Two principal questions arise with regard to the class certification process. First, whether an evidentiary hearing is required or advisable; and, second, what factual matters should be considered.

Rule 1.220 does not expressly require an evidentiary hearing. Nevertheless, an evidentiary hearing is generally required unless it is clear from the pleadings that class certification is appropriate. Barton-Malow Co. v. Bauer, 627 So. 2d 1233, 1235 (Fla. 2d DCA 1993). Failure to conduct an evidentiary hearing may constitute reversible error. Id.

Federal interpretations of Rule 23 follow this approach. See generally Bradford v. Sears, Roebuck & Co., 673 F.2d 792 (5th Cir. 1982); Woodworkers v. Chesapeake Bay Plywood, 659 F.2d 1259 (4th Cir. 1981). The Manual for Complex Litigation states that "[a]lthough the rule does not specifically require a hearing, one will generally be desirable; some courts have held that a hearing is required before denial of certification, and one may also be necessary where the factual basis for a class action is challenged." [FN4]

It is also important to understand what matters should, and should not, be considered at the class certification stage. At the class certification stage, the court should only determine whether the requirements of Rule 1.220 are met, and not consider the substantive merits of the claims or defenses. See generally Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 177- 178 (1974). Thus, for purposes of class certification the court generally should accept the plaintiffs' substantive allegations as true. See In Re: Carbon Dioxide Antitrust Litigation, 149 F.R.D. 229 (M.D. Fla. 1993).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Nevertheless, the court may look behind the pleadings and consider all facts and legal issues involved. CV Riet, Inc. v. Levy, 144 F.R.D. 690 (S.D. Fla. 1993); Brooks v. Southern Bell Tel. & Tel. Co., 133 F.R.D. 54 (S.D. Fla. 1990). In other words, the merit of the claims made or defenses is not an area for inquiry but the nature of the claims as they relate to the class certification requirements does require examination.

### Class Certification Requirements

In order to certify a class, the court must determine whether a proposed class meets the requirements of Rule 1.220. Rule 1.220(a) sets forth the following four prerequisites that every class action must meet: *79 numerosity; commonality; typicality; and adequacy of representation. In addition, the court must find that the proposed class falls into one of the following three requirements under Rule 1.220(b): limited fund/inconsistent standards, injunctive relief, or common predominance. The following discussion addresses prerequisites to class certification and the specific Rule 1.220(b) requirements.

### Prerequisites to Class Certification

The proponent of the class certification must demonstrate numerosity, common issues, typicality of claims, and adequate representation. In Re: Amerifirst Securities Litigation, 139 F.R.D. 423 (S.D. Fla. 1991). Thus, the proponent of class certification bears the burden of making an affirmative showing that the prerequisites are met. See R.J. Reynolds Tobacco Co. v. Engle, 672 So. 2d 39 (Fla. 3d DCA 1996); Southern Bell Tel. & Tel. Co. v. Wilson, 305 So. 2d 302 (Fla. 3d DCA 1974).

. Numerosity. In order to satisfy the numerosity requirement, the class must be "so numerous that separate joinder of each member is impracticable." Rule 1.220(a)(1). As a threshold matter, the class must be sufficiently defined as to make it administratively feasible for the court to determine whether a particular person is a member. See Rodriguez v. U.S. Department of the Treasury, 131 F.R.D. 1, 7 (D.D.C. 1990). Note, however, that the proponent need not identify each member of the class at the outset. Holly v. City of Naples, 371 So. 2d 501 (Fla. 2d DCA 1979).

Generally, courts view the numerosity requirement liberally; "impracticable" does not mean "impossible." [FN5] Rather, the proponent of class certification must demonstrate that joinder of all class members would be extremely difficult or inconvenient. [FN6]

There is no magic number. Nevertheless, both Florida and federal courts have held that fewer than 100 plaintiffs may satisfy the numerosity requirement. Estate of Robinger v. Deltona Corp., 563 So. 2d 739, 743 (Fla. 2d DCA 1990) (classes as small as 25 have fulfilled numerosity requirement of the rule); In Re: Kirschner Medical Corp. Securities Litigation, 139 F.R.D. 74 (D. Md. 1991) (class of as few as 25 to 30 members raises the presumption that joinder would be impractical); Fifth Moorings Condominium Inc. v. Shere, 81 F.R.D. 712 (S.D. Fla. 1979) (suggests that if the class exceeds 40 people there is sufficient numerosity under the rule); Fidelis Corp. v. Litton Industries, 293 F.Supp. 164 (S.D.N.Y. 1968) (35 members certified). But see Hum v. Derkicks, 162 F.R.D. 628, 634 (D. Hawaii 1995) (class with 200 potential members not sufficiently numerous).

. Commonality. The claims of the representative plaintiffs must raise questions of law or fact common to the questions of law or fact raised by the claim of each member of the potential class. [FN7] The "threshold of 'commonality' is not high ... the Rule requires only that resolution of the common questions affect all or a substantial number of class members." Jenkins v. Raymark Industries, 782 F.2d 468 (5th Cir. 1986), quoted with approval in Broin v. Phillip Morris Co., Inc., 641 So. 2d 888 (Fla. 3d DCA 1994).

Commonality can be met where a single common issue runs throughout the claims. Ikonen v. Hartz Mountain Corp., 122 F.R.D. 258 (S.D. Cal. 1988). Class certification should not be denied merely because the claim of one or more class representatives arises in a factual context that varies somewhat from that of the other plaintiffs. Love v. General Development Corp., 555 So. 2d 397 (Fla. 3d DCA 1989); Morgan v. Laborer's Pension Trust Fund for Northern Cal., 81 F.R.D. 669 (N.D. Cal. 1979) (courts shall not deny class certification merely because claim of one or more class representatives arises in a factual context that varies somewhat from that of other plaintiffs.); Broin v.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Phillip Morris Co., Inc., 641 So. 2d 888 (Fla. 3d DCA 1994) (variations in amount of damages and statute of limitations not fatal to class representation).

. Typicality. The representative plaintiff's claim must be typical of the claims of the class. A named plaintiff's claim will be found to be typical if it arises from the same event or conduct giving rise to the claims of absent class members.

Courts require that the claims of the representative plaintiffs rest on the same legal and remedial theories as the unnamed members of the class. Jenkins v. Raymark, 782 F.2d 468 (5th Cir. 1986). Consequently, typicality is not defeated by different amounts of damages among class members and their representatives. Cohen v. Camino Sheridan, Inc., 466 So. 2d 1212 (Fla. 4th DCA 1985). Nevertheless, the factual circumstances *80 surrounding the representative plaintiff's claim must be sufficiently similar to the class as to avoid conflict. This requirement often is viewed as overlapping with the adequacy requirement. [FN8]

. Adequacy of Representation. The representative parties must "fairly and adequately protect and represent the interests of each member of the class." Rule 1.220(a)(4). Adequacy of representation is a two-party inquiry which requires that: 1) "class counsel must be qualified, experienced and generally able to conduct the litigation"; and 2) "class members [and representative plaintiffs] must not have interests that are antagonistic to one another." In Re: Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir. 1992); see also Jenkins v. Raymark, 782 F.2d 468 (5th Cir. 1986); Griffin v. Carlin, 755 F.2d 1516 (11th Cir. 1985); Hessen v. Metropolitan Dade Co., 513 So. 2d 1330 (Fla. 3d DCA 1987); Port Royal Inc. v. Conboy, 154 So. 2d 734 (Fla. 2d DCA 1963) (interests of representative plaintiffs must be co-extensive with those of the class).

The court should consider whether putative class counsel is qualified and experienced. If counsel cannot conceptualize how the class litigation will be conducted, the endeavor will undoubtedly fail. In addition to experience, putative class counsel must have the financial wherewithal to advance potentially tremendous costs. Class counsel also must possess adequate staff and computer database systems to communicate with and service the class members.

It is also necessary that the representative plaintiff's interests are aligned with those of the class. This inquiry turns on the particular facts of the case. Port Royal Inc. v. Conboy, 154 So. 2d 734 (Fla. 2d DCA 1963). Conceptually, the court must examine whether the representative plaintiff will be motivated to act in a way which is contrary to some members of the class. For example, a class which settles the claims of present and future claimants for asbestos exposure is inherently flawed because of inherent conflict. Present claimants seek the maximum present recovery but future claimants seek to preserve capitol. See Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996).

**Specific Requirements of Rule 1.220(b)**

Three types of classes may be certified under Rule 1.220(b):   classes where the rights of absent members' rights would be determined; classes which seek injunctive relief; and generic classes in which common issues predominate. The requirements for each class type is addressed below.

. Rule 1.220(b)(1)--Inconsistent Standards/Impairment of Interests.   Rule 1.220(b)(1) provides for certification where:

(1) The prosecution of separate claims or defenses by or against individual members of the class would create a risk of either:

(A) inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications concerning individual members of the class which would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or substantially impair or impede the ability of other members of the class who are not parties to the adjudications to protect their interests.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

This type of class action generally focuses on the party from whom relief is sought. Rule 1.220(b)(1)(B) typically arises in the limited fund context where damage recovery by some claimants would reduce or exhaust the defendant's available funds for remaining claimants. Similarly, Rule 1.220(b)(1)(A) often focuses on the defendant. For example, when a number of taxpayers seek to have a municipal bond issue declared invalid and others seek to have the terms changed, the municipality might be forced to follow incompatible standards of conduct. In this situation, a class under Rule 1.220(b)(1)(A) is appropriate. See Advisory Committee Notes to Federal Rule 23(b)(1), Clause A. For obvious reasons a Rule 1.220(b)(1) class is a non-opt-out class.

. Rule 1.220(b)(2)--Injunctive Relief Classes. Rule 1.220(b)(2) provides for certification of injunctive relief classes where two requirements are met. First, "the party opposing the class has acted or refused to act on grounds generally applicable to all the members of the class." Second, the representative plaintiff is seeking "final injunctive or declaratory relief."

It usually is plain whether the plaintiff is seeking injunctive relief. For example, this provision has traditionally been used in discrimination and civil rights cases to enjoin the defendant from further improper conduct. The rule has also been applied in other contexts. See, e.g., City of Miami Beach v. Tenney, 7 So. 2d 136 (Fla. 1942) (a petition to contest the validity of a tax may be certified).

Medical monitoring is one area in which issues have been raised as to the injunctive nature of the relief sought. Some courts have held that injunctive relief ordering medical monitoring is appropriate. See In Re: NLO, Inc., 5 F.3d 154 (6th Cir. 1993) (in radiation exposure case medical monitoring claims are injunctive in nature and cognizable under Rule 23(b)(2)). But see Ball v. Joy Technologies, 958 F.2d 36 (4th Cir. 1991) (medical monitoring merely an element of damages). It appears to be important that the medical monitoring program is court-supervised rather than simply an element of damages in order to meet the "injunctive" requirement of the rule. See Cook v. Rockwell Int'l Corp., 151 F.R.D. 387 (D. Colo. 1993) (certifying a court-supervised medical monitoring program in radiation exposure case).

Any petition for injunctive relief or declaratory judgment may be certified if generally applicable to a class. The "generally applicable" requirement is usually not difficult to satisfy.

. Rule 1.220(b)(3)-Predominance/Superiority. When a proposed class does not fall within Rule 1.220(b)(1) or (b)(2), the court may certify a class under Rule 1.220(b)(3). Rule 1.220(b)(3) requires that: 1) questions of law or fact common to the class predominate over any questions affecting individual members of the class; and 2) a class action would be superior to other available methods for the fair and efficient adjudication of the controversy. The rule provides that *81 when making the foregoing inquiry, the court shall consider all relevant facts and circumstances, including:

(1) the respective interests of each member of the class in individually controlling the prosecution of separate claims or defenses, (2) the nature and extent of any pending litigation to which any member of the class is a party and in which any question of law or fact controverted in the subject action is to be adjudicated, (3) the desirability or undesirability of concentrating the litigation in the forum where the subject action is instituted, and (4) the difficulties likely to be encountered in the management of the claim or defense on behalf of a class.

Rule 1.220(b)(3)(A)-(D).

In other words, the court should consider whether class certification is desirable and beneficial.

The inquiry regarding the predominance requirement is pragmatic (i.e., whether there are enough common questions to make class treatment worthwhile). See In Re: "Agent Orange" Product Liability Litigation, 100 F.R.D. 718 (E.D.N.Y. 1983), cert. denied, 465 U.S. 1067 (1984). [FN9] Where the action presents a common interest and all members of the class have a similar interest in obtaining the relief sought, class certification is appropriate. See Port Royal v. Conboy, 154 So. 2d 734 (Fla. 2d DCA 1963); Love v. General Development Corp., 555 So. 2d 397 (Fla. 3d DCA 1989).

Contemporary Florida cases do not strictly construe this requirement. A general course of conduct applicable to the class is sufficient. Broin v. Phillip Morris Co., Inc., 641 So. 2d 888, 890 (Fla. 3d DCA 1994) ("plaintiffs must

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

merely establish a common claim arising from the same practice or course of conduct that gave rise to the remaining claims and ... based on the same theory.") (citation omitted); see also Colonial Penn Ins. Co. v. Magnetic Imaging Systems, I, Ltd., 22 Fla. L. Weekly D1370 (Fla. 3d DCA, June 4, 1997) ("claims which arise out of the same course of conduct by a defendant but arise in differing factual contexts may be plead as a class action if they present a common question of interest.")

The superiority requirement concerns judicial function. Thus, courts focus on whether the class will alleviate a significant multiplicity of litigation *82 or make adjudication more accessible. For example, where a defendant constructs homes which contain common construction defects, the class mechanism will avoid the needless repetition. In this circumstance, it has been observed that:

[I]t is evident that handling the numerous claims involved on an individual basis would be burdensome and inefficient and would require a costly, time consuming and repetitive presentation of the same evidence on common issues in the numerous claims involved. "The very purpose of a class suit is to save a multiplicity of suits, to reduce the expense of litigation, to make legal processes more effective and expeditious, and to make available a remedy that would not otherwise exist." Frankel v. City of Miami Beach, 340 So. 2d 463, 466 (Fla. 1976), quoting Tenney v. City of Miami Beach, 152 Fla. 126, 11 So. 2d 188, 189 (1942).

Rivera v. Arvida/JMB Partners, Case No. 92-21130 (Dade Co. 1993).

Consequently, superiority may be found where many plaintiffs can access the court who would not otherwise be able to do so or where significant economies are achieved. The court should consider the alternatives to class certification, i.e., individual suits or consolidation.


## Rule 1.220(d)(4)--Individual Issues/Subclasses

Rule 1.220(d)(4) provides that the court may certify particular issues for class treatment and may also certify subclasses. This provision affords the court and the litigants significant flexibility in crafting a class action which will meet the requirements of Rule 1.220.

The bifurcation of certain issues has long been applied to separate damages claims from issues of liability. The rule may also be applied more creatively to avoid needless duplicative trials on the same issues.

For example, contemporary pressures on the judicial system have caused modern courts and commentators to reexamine the applicability of the class action device to mass tort situations by bifurcating liability from specific causation and damages. [FN10] Courts now recognize that application of the class action procedural device to the mass tort situation can avoid needless repetitive presentation of the same evidence and litigation of the same legal issues. [FN11] The court, however, should proceed with caution. Judge Posner, writing for the U.S. Seventh Circuit Court of Appeals, reasoned that such bifurcation violates the Seventh Amendment, because the jury would necessarily consider the defendant's liability for a second time in the causation and damages phase. In Re: Rohne-Poulenc Roher, Inc., 51 F.3d 1293 (7th Cir. 1995). This reasoning is generally not followed. See In Re: Copley Pharmaceutical, Inc., 161 F.R.D. 456 (D. Wyo. 1995). Similar bifurcation can be applied in other contexts which are not so fraught with difficulty.

The creation of subclasses is another creative method by which the litigation can be made more manageable. Plaintiffs are grouped in a manner which more readily satisfies the requirements of Rule 1.220. Subclasses may be created at the class certification stage or fashioned later as the issues develop. The specific facts of each action determine the necessity and prudence of subclasses.


## Conclusion

In sum, under appropriate circumstances, the class action device can serve two extremely important functions. First, it can help to alleviate overcrowded court dockets by addressing otherwise repetitive issues on one occasion. Second, it can provide justice to persons with relatively small damages that would not otherwise be able to litigate

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

their claims.

[FNa1]. Ervin A. Gonzalez, Miami, is board certified in civil trial law by The Florida Bar and the National Board of Trial Advocacy. He is a former director of the Dade County Trial Lawyers Association and secretary of the Dade County Bar Association. Mr. Gonzalez is an adjunct professor at the University of Miami Law School, teaching pretrial litigation skills.

[FNa2]. Raymond W. Valori is a trial attorney with the law firm of Robles & Gonzalez, P.A., Miami. He concentrates his practice in the areas of complex litigation and products liability. Mr. Valori received his bachelor's degree in architectural engineering from Pennsylvania State University in 1988, and his J.D., magna cum laude, from the University of Miami School of Law in 1994.

This article was initially presented in outline form at the 1996 Judicial Conference, entitled, "To Certify or Not to Certify; Application of the Rule 1.220 Class Action Requirements."

This article is submitted on behalf of the Trial Lawyers Section, David W. Bianchi, chair, and D. Keith Wickendon, editor.

[FN1]. This view has long been held in federal courts. In Week v. Bareco Oil Co., 125 F.2d 84, 90 (7th Cir. 1941), the court stated: "[t]o permit the defendant to contest liability with each claimant in a single separate suit would, in many cases, give defendants an advantage which would almost be equivalent to closing the door of justice to small claimants. This is what we think the class suit practice was to prevent."

[FN2]. Note that Fla. R. Civ. P. 1.220 is based upon Fed. R. Civ. P. 23. Florida courts apply federal construction and application of Rule 23 where appropriate. Powell v. River Ranch Property Owners Assn., Inc., 522 So. 2d 69 (Fla. 2d D.C.A. 1988). Consequently, this article incorporates federal interpretations of Fed. R. Civ. P. 23.

[FN3]. It is important to note that at the pleading stage the court should be careful not to pass on the propriety of class certification. The proponent of class certification must plead with specificity the facts and circumstances supporting class certification and cannot simply repeat Fla. R. Civ. P. 1.220. See Dade Co. Police Benevolent Ass'n, Inc. v. Metropolitan Dade County, 452 So. 2d 6 (Fla. 3d D.C.A. 1984), rev. denied, 461 So. 2d 6 (1984). More importantly, however, the court should reserve ruling on a motion to dismiss until the proponent of class certification has had a sufficient opportunity to take discovery to "ascertain necessary information that must be pled." Cordell v. World Ins. Co., 355 So. 2d 479 (Fla. 1st D.C.A. 1978).

[FN4]. MANUAL FOR COMPLEX LITIGATION (3d ed. 1995) (citations omitted).

[FN5]. WRIGHT, MILLER & KANE, Civil 2d § 1762.

[FN6]. Id.

[FN7]. Note that in a Fla. R. Civ. P. 1.220(b)(3) class, common questions not only must exist but must predominate individual issues. Thus, the commonality inquiry is generally subsumed by the predominance inquiry with regard to a Fla. R. Civ. P. 1.220(b)(3) class.

[FN8]. See WRIGHT, MILLER & KANE, Civil 2d § 1764.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[FN9]. See also WRIGHT, MILLER & KANE, Civil 2d § 1778.

[FN10]. See, e.g., David Rosenberg, <u>Class Action for Mass Torts: Doing Individual Justice by Collective Means, 62 IND. L.J. 561 (1986-87)</u>; Comment, Federal Mass Tort Class Actions: A Step Toward Equity and Efficiency, 47 ALB. L. REV. 1180 (1983).

[FN11]. See, e.g., <u>Sterling v. Velsicol Chemical Corp., 855 F.2d 1188 (6th Cir. 1988)</u>; see also NEWBERG ON CLASS ACTIONS § 17.1 (3d ed. 1992);

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Florida Bar Journal
March, 1998

**Column**
**Trial Lawyers Forum**

*78 CONSIDERATIONS IN CLASS CERTIFICATION

Ervin A. Gonzalez [FNa1]
Raymond W. Valori [FNa2]

Copyright © 1998 by the Florida Bar; Ervin A. Gonzalez, Raymond W. Valori

Rule 1.220 of the Florida Rules of Civil Procedure is perhaps the most conceptually complex rule of civil procedure. In essence, the rule allows a person or entity who has a claim or defense in common with others to represent the group. The class action is not a new mechanism. English common law provided for a similar equitable remedy known as a "bill of peace." Recently, interest in the class action has heightened. This is largely due to the increasingly overcrowded judicial system searching for more efficient ways to administer justice. Thus, the purpose of the class action focuses on judicial economy and access to justice. Long ago the Florida Supreme Court stated in Tenney v. City of Miami Beach, 11 So. 2d 188 (Fla. 1942): "[t]he purpose of a 'class suit' is to save the multiplicity of suits, to reduce the expense of litigation, to make legal procedure more effective and expeditious, and to make available a remedy that would not otherwise exist."

Consequently, even though only one lone voice stands to protect and raise the rights of others, this is not reason to deny class certification and may be the reason to grant it. [FN1]

The foregoing benefits must be tempered against concerns of due process. Rule 1.220 provides for this protection. [FN2] This article addresses the principal issues associated with class certification. [FN3]

**Class Certification--Factual Inquiry**

Two principal questions arise with regard to the class certification process. First, whether an evidentiary hearing is required or advisable; and, second, what factual matters should be considered.

Rule 1.220 does not expressly require an evidentiary hearing. Nevertheless, an evidentiary hearing is generally required unless it is clear from the pleadings that class certification is appropriate. Barton-Malow Co. v. Bauer, 627 So. 2d 1233, 1235 (Fla. 2d DCA 1993). Failure to conduct an evidentiary hearing may constitute error. Id.

Federal interpretations of Rule 23 follow this approach. See generally Bradford v. Sears, Roebuck & Co., 673 F.2d 792 (5th Cir. 1982); Woodworkers v. Chesapeake Bay Plywood, 659 F.2d 1259 (4th Cir. 1981). The Manual for Complex Litigation states that "[a]lthough the rule does not specifically require a hearing, one will generally be desirable; some courts have held that a hearing is required before denial of certification, and one may also be necessary where the factual basis for a class action is challenged." [FN4]

It is also important to understand what matters should, and should not, be considered at the class certification stage. At the class certification stage, the court should only determine whether the requirements of Rule 1.220 are met, and not consider the substantive merits of the claims or defenses. See generally Eisen v. Carlisle & Jacqueline, 417 U.S. 156, 177- 178 (1974). Thus, for purposes of class certification the court generally should accept the plaintiffs' substantive allegations as true. See In Re: Carbon Dioxide Antitrust Litigation, 149 F.R.D. 229 (M.D. Fla. 1993).

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Nevertheless, the court may look behind the pleadings and consider all facts and legal issues involved. CV Riet, Inc. v. Levy, 144 F.R.D. 690 (S.D. Fla. 1993); Brooks v. Southern Bell Tel. & Tel. Co., 133 F.R.D. 54 (S.D. Fla. 1990). In other words, the merit of the claims made or defenses is not an area for inquiry but the nature of the claims as they relate to the class certification requirements does require examination.

## Class Certification Requirements

In order to certify a class, the court must determine whether a proposed class meets the requirements of Rule 1.220. Rule 1.220(a) sets forth the following four prerequisites that every class action must meet: *79 numerosity; commonality; typicality; and adequacy of representation. In addition, the court must find that the proposed class falls into one of the following three requirements under Rule 1.220(b): limited fund/inconsistent standards, injunctive relief, or common predominance. The following discussion addresses prerequisites to class certification and the specific Rule 1.220(b) requirements.

## Prerequisites to Class Certification

The proponent of the class certification must demonstrate numerosity, common issues, typicality of claims, and adequate representation. In Re: Amerifirst Securities Litigation, 139 F.R.D. 423 (S.D. Fla. 1991). Thus, the proponent of class certification bears the burden of making an affirmative showing that the prerequisites are met. See R.J. Reynolds Tobacco Co. v. Engle, 672 So. 2d 39 (Fla. 3d DCA 1996); Southern Bell Tel. & Tel. Co. v. Wilson, 305 So. 2d 302 (Fla. 3d DCA 1974).

. Numerosity. In order to satisfy the numerosity requirement, the class must be "so numerous that separate joinder of each member is impracticable." Rule 1.220(a)(1). As a threshold matter, the class must be sufficiently defined as to make it administratively feasible for the court to determine whether a particular person is a member. See Rodriguez v. U.S. Department of the Treasury, 131 F.R.D. 1, 7 (D.D.C. 1990). Note, however, that the proponent need not identify each member of the class at the outset. Holly v. City of Naples, 371 So. 2d 501 (Fla. 2d DCA 1979).

Generally, courts view the numerosity requirement liberally; "impracticable" does not mean "impossible." [FN5] Rather, the proponent of class certification must demonstrate that joinder of all class members would be extremely difficult or inconvenient. [FN6]

There is no magic number. Nevertheless, both Florida and federal courts have held that fewer than 100 plaintiffs may satisfy the numerosity requirement. Estate of Robinger v. Deltona Corp., 563 So. 2d 739, 743 (Fla. 2d DCA 1990) (classes as small as 25 have fulfilled numerosity requirement of the rule); In Re: Kirschner Medical Corp. Securities Litigation, 139 F.R.D. 74 (D. Md. 1991) (class of as few as 25 to 30 members raises the presumption that joinder would be impractical); Fifth Moorings Condominium Inc. v. Shere, 81 F.R.D. 712 (S.D. Fla. 1979) (suggests that if the class exceeds 40 people there is sufficient numerosity under the rule); Fidelis Corp. v. Litton Industries, 293 F.Supp. 164 (S.D.N.Y. 1968) (35 members certified). But see Hum v. Derkicks, 162 F.R.D. 628, 634 (D. Hawaii 1995) (class with 200 potential members not sufficiently numerous).

. Commonality. The claims of the representative plaintiffs must raise questions of law or fact common to the questions of law or fact raised by the claim of each member of the potential class. [FN7] The "threshold of 'commonality' is not high ... the Rule requires only that resolution of the common questions affect all or a substantial number of class members." Jenkins v. Raymark Industries, 782 F.2d 468 (5th Cir. 1986), quoted with approval in Broin v. Phillip Morris Co., Inc., 641 So. 2d 888 (Fla. 3d DCA 1994).

Commonality can be met where a single common issue runs throughout the claims. Ikonen v. Hartz Mountain Corp., 122 F.R.D. 258 (S.D. Cal. 1988). Class certification should not be denied merely because the claim of one or more class representatives arises in a factual context that varies somewhat from that of the other plaintiffs. Love v. General Development Corp., 555 So. 2d 397 (Fla. 3d DCA 1989); Morgan v. Laborer's Pension Trust Fund for Northern Cal., 81 F.R.D. 669 (N.D. Cal. 1979) (courts shall not deny class certification merely because claim of one or more class representatives arises in a factual context that varies somewhat from that of other plaintiffs.); Broin v.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

Phillip Morris Co., Inc., 641 So. 2d 888 (Fla. 3d DCA 1994) (variations in amount of damages and statute of limitations not fatal to class representation).

. Typicality. The representative plaintiff's claim must be typical of the claims of the class. A named plaintiff's claim will be found to be typical if it arises from the same event or conduct giving rise to the claims of absent class members.

Courts require that the claims of the representative plaintiffs rest on the same legal and remedial theories as the unnamed members of the class. Jenkins v. Raymark, 782 F.2d 468 (5th Cir. 1986). Consequently, typicality is not defeated by different amounts of damages among class members and their representatives. Cohen v. Camino Sheridan, Inc., 466 So. 2d 1212 (Fla. 4th DCA 1985). Nevertheless, the factual circumstances *80 surrounding the representative plaintiff's claim must be sufficiently similar to the class as to avoid conflict. This requirement often is viewed as overlapping with the adequacy requirement. [FN8]

. Adequacy of Representation. The representative parties must "fairly and adequately protect and represent the interests of each member of the class." Rule 1.220(a)(4). Adequacy of representation is a two-party inquiry which requires that: 1) "class counsel must be qualified, experienced and generally able to conduct the litigation"; and 2) "class members [and representative plaintiffs] must not have interests that are antagonistic to one another." In Re: Drexel Burnham Lambert Group, Inc., 960 F.2d 285 (2d Cir. 1992); see also Jenkins v. Raymark, 782 F.2d 468 (5th Cir. 1986); Griffin v. Carlin, 755 F.2d 1516 (11th Cir. 1985); Hessen v. Metropolitan Dade Co., 513 So. 2d 1330 (Fla. 3d DCA 1987); Port Royal Inc. v. Conboy, 154 So. 2d 734 (Fla. 2d DCA 1963) (interests of representative plaintiffs must be co-extensive with those of the class).

The court should consider whether putative class counsel is qualified and experienced. If counsel cannot conceptualize how the class litigation will be conducted, the endeavor will undoubtedly fail. In addition to experience, putative class counsel must have the financial wherewithal to advance potentially tremendous costs. Class counsel also must possess adequate staff and computer database systems to communicate with and service the class members.

It is also necessary that the representative plaintiff's interests are aligned with those of the class. This inquiry turns on the particular facts of the case. Port Royal Inc. v. Conboy, 154 So. 2d 734 (Fla. 2d DCA 1963). Conceptually, the court must examine whether the representative plaintiff will be motivated to act in a way which is contrary to some members of the class. For example, a class which settles the claims of present and future claimants for asbestos exposure is inherently flawed because of inherent conflict. Present claimants seek the maximum present recovery but future claimants seek to preserve capitol. See Georgine v. Amchem Products, Inc., 83 F.3d 610 (3d Cir. 1996).

## Specific Requirements of Rule 1.220(b)

Three types of classes may be certified under Rule 1.220(b): classes where the rights of absent members' rights would be determined; classes which seek injunctive relief; and generic classes in which common issues predominate. The requirements for each class type is addressed below.

. Rule 1.220(b)(1)--Inconsistent Standards/Impairment of Interests. Rule 1.220(b)(1) provides for certification where:

(1) The prosecution of separate claims or defenses by or against individual members of the class would create a risk of either:

(A) inconsistent or varying adjudications concerning individual members of the class which would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications concerning individual members of the class which would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or substantially impair or impede the ability of other members of the class who are not parties to the adjudications to protect their interests.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

This type of class action generally focuses on the party from whom relief is sought. <u>Rule 1.220(b)(1)(B)</u> typically arises in the limited fund context where damage recovery by some claimants would reduce or exhaust the defendant's available funds for remaining claimants. Similarly, <u>Rule 1.220(b)(1)(A)</u> often focuses on the defendant. For example, when a number of taxpayers seek to have a municipal bond issue declared invalid and others seek to have the terms changed, the municipality might be forced to follow incompatible standards of conduct. In this situation, a class under <u>Rule 1.220(b)(1)(A)</u> is appropriate. See Advisory Committee Notes to Federal Rule 23(b)(1), Clause A. For obvious reasons a <u>Rule 1.220(b)(1)</u> class is a non-opt-out class.

. <u>Rule 1.220(b)(2)</u>--Injunctive Relief Classes. <u>Rule 1.220(b)(2)</u> provides for certification of injunctive relief classes where two requirements are met. First, "the party opposing the class has acted or refused to act on grounds generally applicable to all the members of the class." Second, the representative plaintiff is seeking "final injunctive or declaratory relief."

It usually is plain whether the plaintiff is seeking injunctive relief. For example, this provision has traditionally been used in discrimination and civil rights cases to enjoin the defendant from further improper conduct. The rule has also been applied in other contexts. See, e.g., <u>City of Miami Beach v. Tenney, 7 So. 2d 136 (Fla. 1942)</u> (a petition to contest the validity of a tax may be certified).

Medical monitoring is one area in which issues have been raised as to the injunctive nature of the relief sought. Some courts have held that injunctive relief ordering medical monitoring is appropriate. See In Re: <u>NLO, Inc., 5 F.3d 154 (6th Cir. 1993)</u> (in radiation exposure case medical monitoring claims are injunctive in nature and cognizable under Rule 23(b)(2)). But see <u>Ball v. Joy Technologies, 958 F.2d 36 (4th Cir. 1991)</u> (medical monitoring merely an element of damages). It appears to be important that the medical monitoring program is court-supervised rather than simply an element of damages in order to meet the "injunctive" requirement of the rule. See Cook v. Rockwell Int'l Corp., 151 F.R.D. 387 (D. Colo. 1993) (certifying a court-supervised medical monitoring program in radiation exposure case).

Any petition for injunctive relief or declaratory judgment may be certified if generally applicable to a class. The "generally applicable" requirement is usually not difficult to satisfy.

. <u>Rule 1.220(b)(3)</u>-Predominance/Superiority. When a proposed class does not fall within <u>Rule 1.220(b)(1) or (b)(2)</u>, the court may certify a class under <u>Rule 1.220(b)(3)</u>. <u>Rule 1.220(b)(3)</u> requires that: 1) questions of law or fact common to the class predominate over any questions affecting individual members of the class; and 2) a class action would be superior to other available methods for the fair and efficient adjudication of the controversy. The rule provides that *81 when making the foregoing inquiry, the court shall consider all relevant facts and circumstances, including:

(1) the respective interests of each member of the class in individually controlling the prosecution of separate claims or defenses, (2) the nature and extent of any pending litigation to which any member of the class is a party and in which any question of law or fact controverted in the subject action is to be adjudicated, (3) the desirability or undesirability of concentrating the litigation in the forum where the subject action is instituted, and (4) the difficulties likely to be encountered in the management of the claim or defense on behalf of a class.

<u>Rule 1.220(b)(3)(A)-(D)</u>.

In other words, the court should consider whether class certification is desirable and beneficial.

The inquiry regarding the predominance requirement is pragmatic (i.e., whether there are enough common questions to make class treatment worthwhile). See In Re: <u>"Agent Orange" Product Liability Litigation, 100 F.R.D. 718 (E.D.N.Y. 1983)</u>, cert. denied, <u>465 U.S. 1067 (1984)</u>. [FN9] Where the action presents a common interest and all members of the class have a similar interest in obtaining the relief sought, class certification is appropriate. See <u>Port Royal v. Conboy, 154 So. 2d 734 (Fla. 2d DCA 1963)</u>; <u>Love v. General Development Corp., 555 So. 2d 397 (Fla. 3d DCA 1989)</u>.

Contemporary Florida cases do not strictly construe this requirement. A general course of conduct applicable to the class is sufficient. <u>Broin v. Phillip Morris Co., Inc., 641 So. 2d 888, 890 (Fla. 3d DCA 1994)</u> ("plaintiffs must

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

merely establish a common claim arising from the same practice or course of conduct that gave rise to the remaining claims and ... based on the same theory.") (citation omitted); see also Colonial Penn Ins. Co. v. Magnetic Imaging Systems, I, Ltd., 22 Fla. L. Weekly D1370 (Fla. 3d DCA, June 4, 1997) ("claims which arise out of the same course of conduct by a defendant but arise in differing factual contexts may be plead as a class action if they present a common question of interest.")

The superiority requirement concerns judicial function. Thus, courts focus on whether the class will alleviate a significant multiplicity of litigation *82 or make adjudication more accessible. For example, where a defendant constructs homes which contain common construction defects, the class mechanism will avoid the needless repetition. In this circumstance, it has been observed that:

[I]t is evident that handling the numerous claims involved on an individual basis would be burdensome and inefficient and would require a costly, time consuming and repetitive presentation of the same evidence on common issues in the numerous claims involved. "The very purpose of a class suit is to save a multiplicity of suits, to reduce the expense of litigation, to make legal processes more effective and expeditious, and to make available a remedy that would not otherwise exist." Frankel v. City of Miami Beach, 340 So. 2d 463, 466 (Fla. 1976), quoting Tenney v. City of Miami Beach, 152 Fla. 126, 11 So. 2d 188, 189 (1942).

Rivera v. Arvida/JMB Partners, Case No. 92-21130 (Dade Co. 1993).

Consequently, superiority may be found where many plaintiffs can access the court who would not otherwise be able to do so or where significant economies are achieved. The court should consider the alternatives to class certification, i.e., individual suits or consolidation.

Rule 1.220(d)(4)—Individual Issues/Subclasses

Rule 1.220(d)(4) provides that the court may certify particular issues for class treatment and may also certify subclasses. This provision affords the court and the litigants significant flexibility in crafting a class action which will meet the requirements of Rule 1.220.

The bifurcation of certain issues has long been applied to separate damages claims from issues of liability. The rule may also be applied more creatively to avoid needless duplicative trials on the same issues.

For example, contemporary pressures on the judicial system have caused modern courts and commentators to reexamine the applicability of the class action device to mass tort situations by bifurcating liability from specific causation and damages. [FN10] Courts now recognize that application of the class action procedural device to the mass tort situation can avoid needless repetitive presentation of the same evidence and litigation of the same legal issues. [FN11] The court, however, should proceed with caution. Judge Posner, writing for the U.S. Seventh Circuit Court of Appeals, reasoned that such bifurcation violates the Seventh Amendment, because the jury would necessarily consider the defendant's liability for a second time in the causation and damages phase. In Re: Rohne-Poulenc Roher, Inc., 51 F.3d 1293 (7th Cir. 1995). This reasoning is generally not followed. See In Re: Copley Pharmaceutical, Inc., 161 F.R.D. 456 (D. Wyo. 1995). Similar bifurcation can be applied in other contexts which are not so fraught with difficulty.

The creation of subclasses is another creative method by which the litigation can be made more manageable. Plaintiffs are grouped in a manner which more readily satisfies the requirements of Rule 1.220. Subclasses may be created at the class certification stage or fashioned later as the issues develop. The specific facts of each action determine the necessity and prudence of subclasses.

Conclusion

In sum, under appropriate circumstances, the class action device can serve two extremely important functions. First, it can help to alleviate overcrowded court dockets by addressing otherwise repetitive issues on one occasion. Second, it can provide justice to persons with relatively small damages that would not otherwise be able to litigate

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

their claims.

[FNa1]. **Ervin A. Gonzalez**, Miami, is board certified in civil trial law by The Florida Bar and the National Board of Trial Advocacy. He is a former director of the Dade County Trial Lawyers Association and secretary of the Dade County Bar Association. Mr. Gonzalez is an adjunct professor at the University of Miami Law School, teaching pretrial litigation skills.

[FNa2]. **Raymond W. Valori** is a trial attorney with the law firm of Robles & Gonzalez, P.A., Miami. He concentrates his practice in the areas of complex litigation and products liability. Mr. Valori received his bachelor's degree in architectural engineering from Pennsylvania State University in 1988, and his J.D., magna cum laude, from the University of Miami School of Law in 1994.

This article was initially presented in outline form at the 1996 Judicial Conference, entitled, "To Certify or Not to Certify; Application of the Rule 1.220 Class Action Requirements."

This article is submitted on behalf of the Trial Lawyers Section, David W. Bianchi, chair, and D. Keith Wickendon, editor.

[FN1]. This view has long been held in federal courts. In Week v. Bareco Oil Co., 125 F.2d 84, 90 (7th Cir. 1941), the court stated: "[t]o permit the defendant to contest liability with each claimant in a single separate suit would, in many cases, give defendants an advantage which would almost be equivalent to closing the door of justice to small claimants. This is what we think the class suit practice was to prevent."

[FN2]. Note that Fla. R. Civ. P. 1.220 is based upon Fed. R. Civ. P. 23. Florida courts apply federal construction and application of Rule 23 where appropriate. Powell v. River Ranch Property Owners Assn., Inc., 522 So. 2d 69 (Fla. 2d D.C.A. 1988). Consequently, this article incorporates federal interpretations of Fed. R. Civ. P. 23.

[FN3]. It is important to note that at the pleading stage the court should be careful not to pass on the propriety of class certification. The proponent of class certification must plead with specificity the facts and circumstances supporting class certification and cannot simply repeat Fla. R. Civ. P. 1.220. See Dade Co. Police Benevolent Ass'n, Inc. v. Metropolitan Dade County, 452 So. 2d 6 (Fla. 3d D.C.A. 1984), rev. denied, 461 So. 2d 6 (1984). More importantly, however, the court should reserve ruling on a motion to dismiss until the proponent of class certification has had a sufficient opportunity to take discovery to "ascertain necessary information that must be pled." Cordell v. World Ins. Co., 355 So. 2d 479 (Fla. 1st D.C.A. 1978).

[FN4]. MANUAL FOR COMPLEX LITIGATION (3d ed. 1995) (citations omitted).

[FN5]. WRIGHT, MILLER & KANE, Civil 2d § 1762.

[FN6]. Id.

[FN7]. Note that in a Fla. R. Civ. P. 1.220(b)(3) class, common questions not only must exist but must predominate individual issues. Thus, the commonality inquiry is generally subsumed by the predominance inquiry with regard to a Fla. R. Civ. P. 1.220(b)(3) class.

[FN8]. See WRIGHT, MILLER & KANE, Civil 2d § 1764.

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works

[FN9]. See also WRIGHT, MILLER & KANE, Civil 2d § 1778.

[FN10]. See, e.g., David Rosenberg, Class Action for Mass Torts: Doing Individual Justice by Collective Means, 62 IND. L.J. 561 (1986-87); Comment, Federal Mass Tort Class Actions: A Step Toward Equity and Efficiency, 47 ALB. L. REV. 1180 (1983).

[FN11]. See, e.g., Sterling v. Velsicol Chemical Corp., 855 F.2d 1188 (6th Cir. 1988); see also NEWBERG ON CLASS ACTIONS § 17.1 (3d ed. 1992);

END OF DOCUMENT

Copr. © West 2001 No Claim to Orig. U.S. Govt. Works



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 00-6035-CIV-MOORE
Magistrate Judge O'Sullivan

KIMBERLY JONES HUBBARD, on behalf
of herself and all other similarly
situated,

       Plaintiff,

v.

GOVERNMENT EMPLOYEES INSURANCE
COMPANY,

       Defendant.

_____

**PLAINTIFF, KIMBERLY JONES HUBBARD'S, NOTICE OF PROVIDING VERIFIED ANSWERS TO DEFENDANT, GOVERNMENT EMPLOYEES INSURANCE COMPANY'S, FIRST SET OF INTERROGATORIES TO PLAINTIFF**

The Plaintiff, Kimberly Jones Hubbard, On Behalf Of Herself And All Others Similarly Situated, by and through her undersigned attorneys, hereby gives notice of serving her Verified Answers to Interrogatories Propounded by Defendant, Government Employees Insurance Company, dated July 14, 2000.

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by U.S. Mail to all counsel on the attached list this 31st day of January, 2001.

_____
Sean C. Domnick, Esq.
Florida Bar No.: 843679
Jack Scarola, Esq.
Florida Bar No.: 169440
Searcy Denney Scarola Barnhart
& Shipley, P.A.
2139 Palm Beach Lakes Blvd.
Post Office Drawer 3626
West Palm Beach, FL 33402-3626
(561) 686-6300
(561) 478-0754 (Fax)
**Attorneys for Plaintiff**

**Interrogatory No. 1**

Identify each automobile part that you contend is an "after-market part" as that term ("after-market")

is used in the proposed class definition and throughout the Amended Complaint to refer to the parts

at issue in this putative class action.

**Answer No. 1**

After-market crash parts are replacement parts made by manufacturers other than by the Original
Equipment Manufacturer or manufacturer authorized by the OEM to its specifications. As of this
time, the after-market crash parts include, but are not limited to the following: Fenders, hoods, front
covers, door shell, quarter panels, bumper covers, bumpers and components, grills, headlights, tail
lights, turn lights, fog lights, doors, trunk lids, fascias, rear covers, head panel, wheel house, radiator
support, tie bars, front air dam, valance, nose panel, deflector, tailgate, rebars, bumper
reinforcements, lamps and assemblies, roofs, front section, and rear section. Parts such as batteries,
filters, spark plugs and shock absorbers are not included in the definition. Discovery continues on
the issue as GEICO has within its possession and control the repair estimates of prospective class
members which further reflect the extent to which GEICO was using aftermarket crash parts. It is
anticipated that this information may be determined in whole or in part from GEICO repair
estimates. See answer to Interrogatory #2.

**Interrogatory No. 2**

For every claimant, including each putative class member should the proposed class be certified,

identify each and every aftermarket part that you contend is "inferior," not of "like, kind and

quality," or otherwise an inadequate substitute for its original equipment manufacturer counterpart.

For each such "after-market part," identify:

     (a)     the type of part (*e.g.*, fender, hood, headlamp, etc.);

     (b)     the manufacturer(s) of the part;*

     (c)     the make(s), model(s) and year(s) of the vehicle for which the part is sold;

     (d)     the basis for your contention that the part is inferior;

     (e)     the manufacturer of the comparable original equipment part;

     (f)     where the comparable original equipment part was manufactured;

(g)     the material(s) from which the comparable original equipment part was made, including, for example, the specific gauge of steel and/or the type of plastic; and

(h)     the quality control procedures of the manufacturer of the comparable original equipment part.

**Answer No. 2**

As of this date, this question, as posed, cannot be answered. The repair estimates which would allow, in whole or in part, the answer to this question are in the possession of GEICO and have not yet been produced to the Plaintiff. Furthermore, a jury has already determined that all aftermarket crash parts are inferior to their OEM counterparts. To the extent that GEICO uses only CAPA Certified Parts, GEICO has in its possession and control the parts, part description, OEM number, and after-market number for the relevant time period. Discovery continues on these issues.

KIMBERLY JONES-HUBBARD

STATE OF                    )
COUNTY OF                   )

The foregoing instrument was acknowledged before me this _11th_ day of October, 2000, by ____Kimberly Jones Hubbard____, who is personally known to me or who has produced_____ as identification and who did not take an oath.

(SEAL)

(Notary signature)

LEAH SCHRIB
Notary Public - State of Florida
My Commission Expires Sep 7, 2003
Commission # CC869478

(Notary name - print)

NOTARY PUBLIC, State of Florida

_____
(Serial number, if any)